# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION



United States District Court
Southern District of Texas
FILED

**DEC 1 5 2003**

Michael N. Milby
Clerk of Court

MANUEL TORRES and DOMINGA TORRES,
Individually and as Next Friends of DEREK
TORRES, et al.,

        Plaintiffs,

    v.

AMERICAN HOME PRODUCTS, et al.,

        Defendants.

Civil Action No: 03-CV-222

## ELI LILLY AND COMPANY'S MOTION TO DISMISS
## AND MEMORANDUM IN SUPPORT THEREOF

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

NATURE OF PROCEEDINGS BEFORE THE COURT ............................................. 1

ISSUES PRESENTED FOR REVIEW ..................................................................... 2

SUMMARY OF THE ARGUMENT ......................................................................... 2

ARGUMENT ...................................................................................................... 3

I.   ALL VACCINE-RELATED CLAIMS MUST BE DISMISSED PURSUANT TO
     THE VACCINE ACT ..................................................................................... 3

     A.   The Vaccine Act Bars This Civil Action ................................................. 3

     B.   The Chief Special Master of the Vaccine Court Has Recognized That
          Claims for Injuries Resulting From Thimerosal in Vaccines are Covered
          by the Vaccine Act ............................................................................... 4

     C.   Multiple Courts Across the Country, Including Texas Federal Courts,
          Have Dismissed Similar Claims Against Lilly Pursuant to the Vaccine Act ......... 6

     D.   Multiple Provisions of the Vaccine Act Require Dismissal .................... 8

     E.   The Act Requires Dismissal Of The Parents' Claims Brought On Behalf
          Of The Minor Plaintiffs For Medical Expenses, Loss Of Earning Capacity
          And Pain And Suffering ....................................................................... 8

II.  SHOULD THE COURT DETERMINE THAT IT HAS JURISDICTION OVER
     ANY OF PLAINTIFFS' CLAIMS, THE COURT SHOULD DISMISS
     PLAINTIFFS' PETITION, AND EACH CAUSE OF ACTION THEREIN, FOR
     FAILURE TO STATE A CLAIM UNDER TEXAS LAW ................................. 9

     A.   Plaintiffs Fail To Allege That Any Product Sold or Manufactured By Lilly
          Caused The Minor Plaintiffs' Alleged Injuries ..................................... 10

     B.   Plaintiffs' Claims For Strict Liability Fail As A Matter Of Law .......... 11

     C.   Plaintiffs' Claims For Negligence Fail As A Matter Of Law ............... 12

     D.   Plaintiffs' Claims For Breach Of Warranty Fails As A Matter Of Law ....... 13

     E.   Plaintiffs' Claims For Civil Conspiracy Fail As A Matter Of Law ....... 13

     F.   Texas Law Requires Dismissal Of The Parents' Claims for Loss of
          Consortium, Services and Companionship ........................................... 13

1353216v1

CONCLUSION ....................................................................................................................14

CERTIFICATE OF SERVICE ........................................................................................16

1353216v1

# TABLE OF AUTHORITIES

## CASES

Autism General Order # 1, *In re: Claims for Vaccine Injuries Resulting in Autism Spectrum Disorder or a Similar Neurodevelopmental Disorder*, 2002 WL 31696785 (Fed. Cl. July 3, 2002) ...................................................................7

Autism Update and Order – November 7, 2003, *In re: Claims for Vaccine Injuries Resulting in Autism Spectrum Disorder or a Similar Neurodevelopmental Disorder* (Fed. Cl. Nov. 7, 2003).............................................................................5

*Blackmon v. American Home Products Corp.*, Civil Action No. G-02-179 (S.D. Tex. May 8, 2002) ....................................................................................................7

*Block v. Wyeth, Inc.*, No. 3:02-CV-1077, 2003 WL 20307, *2 (N.D. Tex. Jan. 28, 2003)....................................................................................................................11, 12

*Botter v. Aventis Pasteur, Inc.*, Civil Action No. 9:02 CV 181 (E.D. Tex. Jan. 15, 2003)............................................................................................................................7

*Brown v. Secretary of HHS*, 874 F. Supp. 238 (S.D. Ind. 1994) .....................................4

*Carabine v. Aventis Pasteur, Inc.,* Civil Action No. A-02-501-SS (W.D. Tex. Oct. 8, 2002) ...................................................................................................................6

*Carr v. Aventis Pasteur, Inc.*, CV 02-J-3096-NE at 4 (N.D. Al. Feb. 27, 2003)............................9

*Castellanos v. Bridgestone Corp.*, 215 F. Supp. 2d 862 (S.D. Tex. 2002)....................11

*Cheskiewicz v. Aventis Pasteur, Inc. et al.,* May Term 2002, No. 0952, at 4 (Ct. Common Pleas of Phila Cty, Pa. Dec. 16, 2002).........................................................9

*Chiles v. American Home Prods. Corp.,* 2003 WL 22287527 (N.D. Tex. Oct. 2, 2003)..............................................................................................................................6

*Cimino v. Raymark Industries, Inc.*, 151 F.3d 297 (5th Cir. 1998) ..............................11

*Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608 (Tex. 1996)...........11, 12, 13

*Gilbert v. Secretary of HHS*, 31 Fed. Cl. 379 (Fed. Cl. 1994)....................................2, 4

*In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990)..................................................11

*In re Surinam Airways Holding Co.*, 974 F.2d 1255 (11th Cir. 1992) .............................4

*Leroy v. Secretary of HHS,* No. 02-392V, 2002 WL 31730680 (Fed. Cl. Oct. 11, 2002).......................................................................................................................4, 5, 7

*Liu v. Aventis Pasteur, Inc.,* 219 F. Supp. 2d 762 (W.D. Tex. 2002)............................................6

*Minnesota Mining and Manufacturing Co. v. Atterbury,* 978 S.W.2d 183 (Tex. App. 1998)........................................................................................................13

*Nolan v. Boeing Co.,* 919 F.2d 1058 (5th Cir.1990).........................................................................4

*O'Connell v. American Home Products Corp.,* Civil Action No. G-02-184 (S. D. Tex. May 7, 2002) ........................................................................7

*Owens v. American Home Products Corp.,* 203 F. Supp. 2d 748 (S.D. Tex. 2002) .......................7

*Roberts v. Williamson,* 111 S.W.3d 113 (Tex. July 3, 2003) ...........................................14

*Russak v. Aventis Pasteur, Inc.,* Civil Action No. A-02-CA-480-SS (W.D. Tex. Sept. 9, 2002)........................................................................................................6

*Sanchez v. Schindler,* 651 S.W.2d 249 (Tex. 1983) ........................................................14

*Stewart v. Secretary of HHS,* 2002 WL 31965743 (Fed. Cl. Dec. 30, 2002) ..................................7

*Swafford v. Aventis Pasteur, Inc.,* Civil Action No. A-03-CA-055-SS (W.D. Tex. Mar. 7, 2003)...............................................................................................6

*Torrington Co. v. Stutzman,* 46 S.W.3d 829 (Tex. 2000)...........................................12

*Vulcan Materials Co. v. City of Tehuacana,* 238 F.3d 382 (5th Cir. 2001) ..............................2, 10

*White v. Aventis Pasteur, Inc.,* Case No. 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CIV, at 6 (Miss. Cir. Ct. Nov. 17, 2003)..................................................................................................5

*Young v. Aventis Pasteur, Inc.,* Civil Action No. A-02-CA-734-SS (W.D. Tex. Jan. 6, 2003)..................................................................................................6

## STATUTES

42 U.S.C. § 300aa-11(a)(2)(B) ..............................................................................................2, 4

42 U.S.C. § 300aa-11(a)(5)(B) ..................................................................................................8

42 U.S.C. § 300aa-15(3)(A) ......................................................................................................9

42 U.S.C. § 300aa-15(4) ............................................................................................................9

42 U.S.C. § 300aa-15(a)(1)(A) ..................................................................................................9

42 U.S.C. §§ 300aa-1, *et seq.* ................................................................................................2, 4

1353216v1

## OTHER AUTHORITIES

Restatement (Second) of Torts § 402A (1965)..............................................................................11

## RULES

Fed. R. Civ. P. 12(b)(1) ......................................................................................................3

Fed. R. Civ. P. 12(b)(6) ...................................................................................................3, 9

1353216v1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| MANUEL TORRES and DOMINGA TORRES, Individually and as Next Friends of DEREK TORRES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN HOME PRODUCTS, et al., <br><br> Defendants. | Civil Action No: 03-CV-222 |

ELI LILLY AND COMPANY'S MOTION TO DISMISS
AND MEMORANDUM IN SUPPORT THEREOF

<u>NATURE OF PROCEEDINGS BEFORE THE COURT</u>

Plaintiffs have brought suit on behalf of themselves and their minor children for injuries allegedly received by their children from vaccines. Plaintiffs' Original Petition (hereinafter "Petition"), p. 2. Plaintiffs allege that their injuries were caused by the use of the vaccine component thimerosal as a preservative in their vaccines. *Id.* at 5. Eli Lilly and Company (hereinafter "Lilly") and the other Defendants in this case are alleged to have "designed, manufactured, marketed and distributed the vaccines" which contained thimerosal as a component. *Id.* at 6-8. Plaintiffs seek damages for "medical case; loss of earning capacity; physical impairment; disfigurement; physical pain; mental anguish; loss of consortium; loss of services; [and] loss of companionship." *Id.* at 10.

The Defendants removed the case to this Court on the ground that the only non-diverse Defendant, Oribi, Inc., was fraudulently joined. Consequently, this Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441(b).

## ISSUES PRESENTED FOR REVIEW

**A.      Whether Plaintiffs' Original Petition Should Be Dismissed Because Of The U.S. Court Of Federal Claims' Exclusive Initial Jurisdiction Over Vaccine-Related Claims**

The National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-1, *et seq.*, requires the dismissal of all claims brought against manufacturers of vaccines or vaccine components prior to exhausting administrative remedies in the U.S. Court of Federal Claims. 42 U.S.C. § 300aa-11(a)(2)(B). The Vaccine Act "is jurisdictional in nature because it defines the jurisdiction of state and federal courts with respect to civil actions against a vaccine administrator or manufacturer for vaccine-related injuries," and therefore presents a threshold issue for the Court. *Gilbert v. Secretary of HHS*, 31 Fed. Cl. 379, 381 (Fed. Cl. 1994). Should the Court determine that it has jurisdiction over any of Plaintiffs' claims, the allegations in Plaintiffs' petition fail to state a claim for which relief can be granted under Texas law.

When deciding a motion to dismiss under Rule 12(b), a petition should be dismissed if it appears "beyond a doubt" that a plaintiff, based on the allegations in the petition, has no "set of facts in support of his claim which would entitle him to relief." *Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001).

## SUMMARY OF THE ARGUMENT

Plaintiffs have sued Defendant Eli Lilly and Company ("Lilly") for injuries allegedly received from the administration of childhood vaccines which contained thimerosal as a component part. However, vaccine-related claims must first be brought pursuant to the National Childhood Vaccine Injury Act (42 U.S.C. §§ 300aa-1, *et seq.*). Plaintiffs have not yet exhausted the administrative remedies set forth by that statute. Because the U.S. Court of Federal Claims has exclusive initial jurisdiction over Plaintiffs' vaccine-related claims, this

- 2 -

Court should dismiss Plaintiffs' Original Petition ("Petition") for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). In further support of its Motion to Dismiss, Lilly adopts, incorporates, and hereby joins in the Vaccine Defendants' Motion to Dismiss.

Should the Court determine to reach the merits of Plaintiffs' claims, the Court should dismiss those claims on substantive grounds. Plaintiffs have failed to allege any set of facts under which Lilly can be held liable for the Plaintiffs' alleged injuries. Specifically, Plaintiffs have not alleged that Lilly is the manufacturer of any particular vaccine (or the thimerosal component thereof) which allegedly injured the minor Plaintiffs. It is clear, therefore, that Plaintiffs' claims fail as a matter of law because no product made or sold by Lilly is alleged to have caused any injury to the minor Plaintiffs. Furthermore, Plaintiffs' allegations regarding strict liability, negligence, breach of warranty, fraud/misrepresentation, and civil conspiracy fail to state a claim as a matter of Texas law. Moreover, Plaintiffs are not entitled to damages for loss of consortium under Texas law. For these reasons, should the Court determine it has jurisdiction over Plaintiffs' claims, the Court should dismiss Plaintiffs' Petition for failure to state a claim under Texas law pursuant Fed. R. Civ. P. 12(b)(6).

## ARGUMENT

### I.   ALL VACCINE-RELATED CLAIMS MUST BE DISMISSED PURSUANT TO THE VACCINE ACT

#### A.   The Vaccine Act Bars This Civil Action

Plaintiffs' Petition alleges that Lilly was responsible for manufacturing or marketing vaccines which allegedly injured the minor Plaintiffs due to the inclusion of thimerosal as a preservative. *See* Petition, p. 2 (alleging injuries from "vaccines manufactured and distributed by Defendants"), p. 5 (alleging "the vaccines and component parts of the vaccines were designed, manufactured, marketed and distributed by Defendants"), p. 6

- 3 -

("Defendants designed, manufactured, marketed and distributed the vaccines . . ."). The National Childhood Vaccine Injury Act (the "Vaccine Act" or "the Act") prohibits the filing of this type of civil lawsuit for "vaccine-related" claims prior to filing a petition in a specially-designated court of the U.S. Court of Federal Claims ("Vaccine Court"). 42 U.S.C. §§ 300aa-1, *et seq.* Where a plaintiff files a civil action in state or federal court against a manufacturer in violation of this prohibition, "the court **shall dismiss the action**." 42 U.S.C. § 300aa-11(a)(2)(B) (emphasis added).[1] *See Nolan v. Boeing Co.*, 919 F.2d 1058, 1066 (5th Cir.1990) (defining the term "civil action" to include "the entirety of a civil proceeding"); *In re Surinam Airways Holding Co.*, 974 F.2d 1255, 1260 (11th Cir. 1992) (holding that "the use of the words 'civil action' are synonymous with the concept of an entire case when those words are not otherwise limited"). Plaintiffs have failed to exhaust their administrative remedies prior to bringing this suit. Thus, the Court must dismiss the action.

### B.  The Chief Special Master of the Vaccine Court Has Recognized That Claims for Injuries Resulting From Thimerosal in Vaccines are Covered by the Vaccine Act

The Chief Special Master of the Vaccine Court has concluded that claims for alleged injuries from thimerosal are vaccine-related and are covered by the Vaccine Act. *See Leroy v. Secretary of HHS*, No. 02-392V, 2002 WL 31730680 (Fed. Cl. Oct. 11, 2002) (**Exhibit A**). In *Leroy*, petitioners alleged that thimerosal-containing vaccines caused developmental problems within the diagnosis of autism spectrum disorder. Their claims were similar to over

---

[1] The Vaccine Act "is jurisdictional in nature because it defines the jurisdiction of state and federal courts with respect to civil actions against a vaccine administrator or manufacturer for vaccine-related injuries." *Gilbert v. Secretary of HHS*, 31 Fed. Cl. 379, 381 (Fed. Cl. 1994). *See also Brown v. Secretary of HHS*, 874 F. Supp. 238, 241 (S.D. Ind. 1994) ("[t]his Court's jurisdiction over a claim for compensation for a vaccine-related injury or death is determined by the [Vaccine Act]."). This Court need only recognize that the Vaccine Act applies to this case to determine that dismissal of plaintiffs' vaccine-related claims is appropriate.

1353216v1

numerous other cases filed under the Vaccine Act. *Leroy,* 2002 WL 31730680 at *1.[2]  At issue was whether the Vaccine Court had jurisdiction over those claims. *Id.*  The Chief Special Master conclusively held that "petitioners alleging injury from the thimerosal preservative in vaccines are statutorily obligated to file their claim . . . in the Court of Federal Claims, *in the first instance.*" *Id.* at *17. (emphasis in original).  The Chief Special Master held that "an injury or death arising from the thimerosal component is encompassed within the statutory definition of 'vaccine-related injury or death,' thereby granting jurisdiction over such claims" to the Vaccine Court. *Id.* at *17.  As noted above, Plaintiffs have alleged injuries from "vaccines manufactured and distributed by Defendants."[3]  Petition, p. 2.  Thus, the claims stated in Plaintiffs' Petition against Lilly are vaccine-related as defined by the Act, and therefore must be first brought in Vaccine Court.

---

[2]  The Vaccine Court is currently exercising jurisdiction over more than 3350 cases involving similar allegations that vaccines or the vaccine component thimerosal allegedly caused autism. *See* Autism Update and Order - November 7, 2003, *In re: Claims for Vaccine Injuries Resulting in Autism Spectrum Disorder or a Similar Neurodevelopmental Disorder* (Fed. Cl. Nov. 7, 2003) (**Exhibit B**).

[3]  To the extent Plaintiffs are bringing suit against Defendants for allegedly manufacturing "component parts of the vaccines" which allegedly injured Plaintiffs (*see, e.g.* Petition, p. 5), this same reasoning applies. The Chief Special Master observed that "the plain meaning of the term 'vaccine' allows for the composition of different ingredients in the vaccine product, including a preservative such as thimerosal; therefore, a vaccine preservative is a constituent part of the vaccine." *Id.* at *5.  "It is reasonable to construe the plain meaning of 'vaccine' to encompass the thimerosal *component.* . . ." *Id.* at *7. (emphasis in the original).  Therefore, it is reasonable to construe the plain meaning of "vaccine manufacturer" to encompass "the thimerosal component manufacturer."  Based on the Vaccine Court's interpretation that the definition of "vaccine" includes the thimerosal component, it logically follows that a component part of a vaccine, and its manufacturer and supplier, are entitled to the Act's protections for "vaccine-related" claims.  Thus, any claims made by Plaintiffs against  the manufacturer of any component of a vaccine should also be dismissed in favor of the exclusive initial jurisdiction of the Vaccine Court.  The Act would apply to "all damages arising from a vaccine related injury associated with the administration of a vaccine," including damages sought for alleged fraud or misrepresentations. *See White v. Aventis Pasteur, Inc.*, Case No. 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CIV, at 6 (Miss. Cir. Ct. Nov. 17, 2003) (**Exhibit C**).

**C.    Multiple Courts Across the Country, Including Texas Federal Courts, Have Dismissed Similar Claims Against Lilly Pursuant to the Vaccine Act**

A wealth of decisions across the country have demonstrated that the Plaintiffs' claims for injuries allegedly caused by the thimerosal component of vaccines are precisely the type of "vaccine-related" claims that must first be adjudicated by the Vaccine Court. The question of whether claims regarding the use of thimerosal as a preservative in vaccines are "vaccine-related" for the purposes of the Vaccine Act is well-settled. Additionally, the vast majority of courts have extended the protections of the Vaccine Act to identical claims against Lilly, providing a national consensus that claims such as those pled by Plaintiffs must first be brought in the Vaccine Court.

Texas federal courts have repeatedly dismissed claims such as the Plaintiffs' pursuant to the Vaccine Act. In fact, very recently the Fort Worth Division of this Court dismissed all claims against all Defendants, including Lilly, in a case very similar to the present in *Chiles v. American Home Prods. Corp.*, 2003 WL 22287527 (N.D. Tex. Oct. 2, 2003) **(Exhibit D)**. The court held that vaccine-related claims brought against the alleged manufacturers of vaccines or vaccine components must be first pursued in the Vaccine Act.. *Id.* In five separate cases, the Western District of Texas similarly dismissed claims against brought against vaccine or vaccine component manufacturers in that forum, insisting instead that they "be presented in the Court of Federal Claims." *See Liu v. Aventis Pasteur, Inc.*, 219 F. Supp. 2d 762, 768-769 (W.D. Tex. 2002); *Russak v. Aventis Pasteur, Inc.*, Civil Action No. A-02-CA-480-SS (W.D. Tex. Sept. 9, 2002) **(Exhibit E)**; *Carabine v. Aventis Pasteur, Inc.*, Civil Action No. A-02-501-SS (W.D. Tex. Oct. 8, 2002) **(Exhibit F)**; *Young v. Aventis Pasteur, Inc.*, Civil Action No. A-02-CA-734-SS (W.D. Tex. Jan. 6, 2003) **(Exhibit G)**; *Swafford v. Aventis Pasteur, Inc.*, Civil Action No. A-03-CA-055-SS (W.D. Tex. Mar. 7, 2003) **(Exhibit H)**. The same result was

- 6 -

reached by the U.S. District Court for the Eastern District of Texas in *Botter v. Aventis Pasteur, Inc.*, Civil Action No. 9:02 CV 181 (E.D. Tex. Jan. 15, 2003) (**Exhibit I**).[4]

The vast majority of cases nationwide have similarly dismissed all vaccine-related claims against Lilly pursuant to the Vaccine Act. To date, a total of ten federal and nine state courts have dismissed a total of 99 cases against Lilly pursuant to the Act. This overwhelming number of courts, the multiple rulings by Texas Federal Courts, as well as the instructive opinions issued by the Vaccine Court,[5] dispel any doubt that claims such as those in the present case for alleged injuries from the administration of vaccines are indeed "vaccine-related" claims and must first be pursued in Vaccine Court. As Plaintiffs are suing Lilly and the other defendants for vaccine-related injuries, their claims must be dismissed pursuant to the Vaccine Act. The plain language of the Vaccine Act precludes this Court from exercising jurisdiction over claims for vaccine-related injuries until Plaintiffs have exhausted their administrative remedies in Vaccine Court.

---

[4]     The Galveston Division of the Southern District of Texas has also dismissed vaccine-related claims to proceed in Vaccine Court, stating that alleged injuries "cannot be 'thimerosal-related' without being 'vaccine-related' as well," though the court has not yet ruled specifically on a motion to dismiss filed by Lilly. *See Blackmon v. American Home Products Corp.*, 267 F. Supp 2d 667, 675 (S.D. Tex. 2002), *Owens v. American Home Products Corp.*, 203 F. Supp. 2d 748, 756 (S.D. Tex. 2002), and *O'Connell v. American Home Products Corp.*, Civil Action No. G-02-184, 2002 U.S. Dist. LEXIS 22046, *17 (S. D. Tex. May 7, 2002) (**Exhibit J**). While these cases predate the Vaccine Court's decision in *Leroy*, which eliminated the distinction drawn in these cases between the manufacturers of vaccines and vaccine components, they are still good law for the proposition that vaccine-related claims against manufacturers must first be brought in Vaccine Court. The distinction drawn by the Court between these two groups of manufacturers is no longer good law in light of the Vaccine Court's ruling which defined the term "vaccine" to include the vaccine's components. *See* discussion, *supra*, at n. 3.

[5]     *See* Autism General Order # 1, *In re: Claims for Vaccine Injuries Resulting in Autism Spectrum Disorder or a Similar Neurodevelopmental Disorder*, 2002 WL 31696785 (Fed. Cl. July 3, 2002) (**Exhibit K**); *Leroy*, 2002 WL 31730680 (**Exhibit A**); *Stewart v. Secretary of HHS*, 2002 WL 31965743 (Fed. Cl. Dec. 30, 2002) (**Exhibit L**).

- 7 -

### D.    Multiple Provisions of the Vaccine Act Require Dismissal

Dismissal of Plaintiffs' vaccine-related claims against Lilly is further mandated by the provisions of the Vaccine Act that bar a claimant from seeking compensation in the Vaccine Court if a civil claim for the same "vaccine-related injury or death" remains pending against any entity. Specifically, § 300aa-11(a)(5)(B) provides that "[i]f a Plaintiff has pending a **civil action** for damages for a vaccine-related injury or death, such person may not file a petition under subsection (b) of this section for such injury or death." (emphasis added). Section 300aa-11(a)(5)(B) mandates that Plaintiffs cannot maintain a civil suit for vaccine-related damages in state or federal court and at the same time pursue vaccine-related claims in Vaccine Court. Section 300aa-11(a)(5)(B)  furthers Congress's intent that claims be pursued first in Vaccine Court.

According to § 300aa-11(a)(5)(B) , Plaintiffs are not entitled to have two actions pending for vaccine-related injuries, regardless of the types of claims alleged. Nor may Plaintiffs elect to bypass Vaccine Court to proceed first in state or federal court. Instead, the Vaccine Act requires that plaintiffs first bring their claims in Vaccine Court, free of co-pending litigation in another forum. This case must be dismissed so Plaintiffs can file a petition in Vaccine Court and exhaust their administrative remedies.

### E.    The Act Requires Dismissal Of The Parents' Claims Brought On Behalf Of The Minor Plaintiffs For Medical Expenses, Loss Of Earning Capacity And Pain And Suffering

As noted above, the minor Plaintiffs cannot pursue his civil claims because he has failed to exhaust his administrative remedies under the Vaccine Act. To the extent the parents' alleged damages can also be recovered under the Vaccine Act, they too must exhaust administrative remedies before pursuing their civil claims.

- 8 -

The parents seek damages for "medical care," "loss of earning capacity," "physical pain" and "mental anguish." Petition, pp. 10-11. To the extent these alleged damages are brought on behalf of the minor Plaintiffs, they are undeniably recoverable under the Act. 42 U.S.C. § 300aa-15(a)(1)(A) provides that a petitioner under § 300aa-11 for a vaccine-related injury is entitled to compensation for expenses that "have been or will be incurred by or on behalf of the person who suffered such injury." Furthermore, § 300aa-15(a)(3)(A) provides for compensation for impaired earning capacity, and § 300aa-15(a)(4) provides for "actual and projected pain and suffering." As these damages for vaccine-related injuries are specifically recoverable under the Act, Plaintiffs must first proceed with these claims in Vaccine Court. Indeed, as the United States District Court of the Northern District of Alabama noted in a similar case, Plaintiffs' effort "to recover medical expenses through this action is nothing more than an attempt to circumvent the bar put in place by the Vaccine Act requiring a child to first seek recovery from the Vaccine Court for injuries related to a vaccine." *Carr v. Aventis Pasteur, Inc.*, CV 02-J-3096-NE at 4 (N.D. Al. Feb. 27, 2003) (**Exhibit M**). *See also Cheskiewicz v. Aventis Pasteur, Inc. et al.*, May Term 2002, No. 0952, at 4 (Ct. Common Pleas of Phila Cty, Pa. Dec. 16, 2002) (**Exhibit N**) (the "Act permits reimbursement for medical bills incurred by or on behalf of a minor."). Plaintiffs' claims for medical expenses, loss of earning capacity and pain and suffering brought by or on behalf of the minor Plaintiffs must be dismissed and pursued in Vaccine Court.

## II. SHOULD THE COURT DETERMINE THAT IT HAS JURISDICTION OVER ANY OF PLAINTIFFS' CLAIMS, THE COURT SHOULD DISMISS PLAINTIFFS' PETITION, AND EACH CAUSE OF ACTION THEREIN, FOR FAILURE TO STATE A CLAIM UNDER TEXAS LAW

Plaintiffs have failed to state a claim against Lilly as a matter of law. When deciding a motion to dismiss under Rule 12(b)(6), a petition should be dismissed if it appears

- 9 -

"beyond a doubt" that a plaintiff, based on the allegations in the petition, can demonstrate no "set

of facts in support of his claim which would entitle him to relief." *Vulcan Materials Co. v. City

of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001). In the present case, Plaintiffs have not alleged

that any specific product manufactured or sold by Lilly caused any injury to the minor Plaintiffs.

Therefore, as Plaintiffs have failed to state a claim against Lilly as a matter of Texas law, all

claims against Lilly should be dismissed.

### A.     Plaintiffs Fail To Allege That Any Product Sold or Manufactured By Lilly Caused The Minor Plaintiffs' Alleged Injuries

Plaintiffs appear to have had difficulty determining which manufacturers were

responsible for the minor Plaintiffs' alleged injuries. Their solution was to adopt a scattergun

approach to pleading, dispensing with individualized claims in favor of general allegations

against an ambiguous group of "Defendants." For example, while Plaintiffs assert in each cause

of action that the "Defendants designed, manufactured, marketed, and distributed the vaccines"

which allegedly caused them injury, they do not allege which vaccines the minors actually

received, which of those vaccines actually contained thimerosal, and which Defendants were

allegedly responsible. Petition, pp. 7-8. The best Plaintiffs can do is allege that "[v]accines

designed, manufactured, marketed and distributed by Defendants are routinely administered to

**children**," (Petition, p. 5) (emphasis added), but they never allege **which vaccines** were

administered to **this child**. Most importantly, Plaintiffs never allege they received any Lilly

product, let alone that they were injured by the same. Without a specific claim against Lilly, but

only a claim against "Defendants" generally for their involvement in allegedly manufacturing

vaccines, Plaintiffs' claims against Lilly fail as a matter of Texas law. While Texas law only

requires "notice pleading," it has not extended the concept as far as allowing pleadings against

"Defendants" generally without noting some facts or circumstances that demonstrate a particular

1353216v1

Defendant's involvement.  *Castellanos v. Bridgestone Corp.*, 215 F. Supp. 2d 862, 864 (S.D. Tex. 2002).

Plaintiffs have failed to allege which of the Defendants' products the minors were allegedly exposed to, apparently making no inquiry into whether each of the Defendants they seek to hold liable even manufactured the product of which they complain.  However, under Texas law, it is a "fundamental principle of traditional products liability law . . . that the plaintiffs must prove that the defendant supplied the product which caused the injury."  *In re Fibreboard Corp.*, 893 F.2d 706, 711 (5th Cir. 1990) (quoting *Gaulding v. Celotex Corp.*, 772 S.W.2d 66 (Tex. 1989)).  This proof must  "focus on individuals, not groups."  *Id.*  Texas requires an individualized showing of causation and damages as to each defendant.  *Cimino v. Raymark Industries, Inc.*, 151 F.3d 297, 313-314 (5th Cir. 1998) (applying Texas law).  Under Texas law, a manufacturer has no duty to injured consumers if it did not design, manufacture or sell the particular product "in question."  *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 615 (Tex. 1996).  Therefore, Plaintiffs' allegations against a general group of "Defendants" are insufficient as a matter of law.  As Plaintiffs have failed to alleged they received a Lilly product, they have failed to state a claim under Texas law.  *See Block v. Wyeth, Inc.*, No. 3:02-CV-1077, 2003 WL 20307, *2 (N.D. Tex. Jan. 28, 2003) (**Exhibit O**) (noting that if a defendant did not manufacture the product which allegedly caused the injury, the *Barajas* case indicates Texas would find no duty under any "common law tort theory").

## B.   Plaintiffs' Claims For Strict Liability Fail As A Matter Of Law

To succeed on a claim of strict liability, a plaintiff "must prove the defendant supplied the product that caused the injury."  *Firestone Steel*, 927 S.W.2d at 614.  Furthermore, section § 402A of the Restatement (Second) of Torts, which has been adopted in Texas, only subjects a party to liability if the party "is *engaged in the business of selling such a product*,

- 11 -

and . . . [the product] is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." *Id.* at 613 (quoting R.2d Torts § 402A (1965)) (emphasis added). While Plaintiffs' Petition alleges that the "vaccines" of which they complain were "defective products," nowhere is it alleged that Lilly actually manufactured or sold said vaccines to the minor Plaintiffs. Petition, p. 7. Rather Lilly is lumped together with all other Defendants which **collectively** are allegedly responsible for the minors' alleged injuries. The claims against Lilly as to strict liability fail as a matter of law, as there are no allegations that Lilly manufactured or distributed the product which allegedly was defective.

### C.    Plaintiffs' Claims For Negligence Fail As A Matter Of Law

Under Texas law, to succeed on a claim of negligence, a plaintiff must show "(1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach." *Firestone Steel*, 927 S.W.2d at 613. There is no duty to take action to prevent harm to others absent certain special relationships or circumstances. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000) (noting that a broad-form negligence instruction is insufficient in cases where a plaintiff seeks to "impose a duty on another to take protective action based special circumstances or the relationship between the parties"). While Plaintiffs allege the legal conclusion that all "Defendants," including Lilly, "owed a duty" to Plaintiffs, they fail to allege the basis for the imposition of such a duty on Lilly or any other particular Defendant. Petition, p. 7. Once again, Plaintiffs fail to plead that the minor Plaintiffs received any product manufactured by Lilly. Regardless of how negligent Plaintiffs claim the Defendants are, Plaintiffs do not have a claim if the Defendants did not manufacture the product which allegedly caused the harm, the product "in question." *Firestone Steel*, 927 S.W.2d at 615; *Block*, 2003 WL 203067 at *2 (**Exhibit O**). Therefore, Plaintiffs'

- 12 -

negligence claims against Lilly fail as a matter of law, as Plaintiffs have failed to plead any duty as to Lilly with regard to the minor Plaintiffs' alleged injuries.

> ### D.    Plaintiffs' Claims For Breach Of Warranty Fail As A Matter Of Law

A claim for breach of warranty requires a showing of proximate cause. *Minnesota Mining and Manufacturing Co. v. Atterbury*, 978 S.W.2d 183, 197 (Tex. App. 1998). Even when a claim is reviewed under the lesser standard of "producing cause," the "plaintiffs must establish by a reasonable medical probability that each of them has suffered or will suffer injuries or illnesses as a result of the [product] manufactured by [Defendant]." *Id.* Plaintiffs do not allege that the product they were allegedly injured by was manufactured by any particular Defendants. In fact, they do not even allege that any particular Defendant ever had possession of a product which allegedly caused them injury. Therefore, without some connection with the alleged injury-producing product, there is no showing of proximate or even producing cause, and Lilly cannot be held liable for breach of warranty.

> ### E.    Plaintiffs' Claims For Civil Conspiracy Fail As A Matter Of Law

As noted above, as there are no allegations that Lilly manufactured the products which allegedly injured the minor Plaintiffs, Lilly owes no duty to Plaintiffs. *Firestone Steel*, 927 S.W.2d at 615. Similarly, without proof of duty, civil conspiracy claims fail as a matter of law. *Id.* at 617. Since conspiracy is an intentional tort, Plaintiffs must demonstrate an intent to conspire to commit a wrongful act. *Id.* Since all allegations of wrongful acts against Lilly fail, Plaintiffs' conspiracy claim fails as well.

> ### F.    Texas Law Requires Dismissal Of The Parents' Claims for Loss of Consortium, Services and Companionship

The parents seek damages for "loss of consortium, loss of services, [and] loss of companionship." Petition, pp. 10-11. Recently, the Texas Supreme Court "decline[d] to extend

a claim for loss of consortium to parents of children who have been seriously injured" in *Roberts v. Williamson*, 111 S.W.3d 113, 119 (Tex. July 3, 2003). The court determined that "no compelling social policy impels us to recognize a parent's right to damages for the loss of filial consortium," and held that "the common law is best served" by denying such claims. *Id.* at 120. Furthermore, Plaintiffs' "loss of services" claim also fails because the Texas Supreme Court has explicitly rejected "the antiquated concept of the child as an economic asset." *Sanchez v. Schindler*, 651 S.W.2d 249, 251 (Tex. 1983) (abolishing pecuniary loss rule). Therefore, the parents' claims for loss of consortium and loss of services due to the alleged injuries to the minor Plaintiffs must be denied for failing to state a claim as a matter of Texas law.

## CONCLUSION

For the foregoing reasons, and for the reasons expressed in the Vaccine Defendants' Motion to Dismiss, Lilly respectfully requests that the Court dismiss Plaintiffs' vaccine-related claims to proceed first in Court of Federal Claims as provided by the Vaccine Act. Should the Court determine that any of Plaintiffs' claims survive such a dismissal, Lilly requests the same be dismissed for failure to state a claim under Texas law.

Respectfully submitted,

By: _____

M. SCOTT MICHELMAN
Attorney-in-Charge
State Bar No. 00797075
So. Dist. of TX ID No. 20802
SHOOK, HARDY & BACON L.L.P.
600 Travis, Suite 1600
Houston, TX 77002-2911
Telephone:     713/227-8008
Telefax:       713/2279508

ATTORNEYS FOR DEFENDANT,
ELI LILLY AND COMPANY

- 14 -

1353216v1

OF COUNSEL:

DEBORAH A. MOELLER
JEFFERY A. KRUSE
SHOOK, HARDY & BACON L.L.P.
One Kansas City Place
1200 Main Street
Kansas City, MO  64105-2118
Telephone:     816/474-6550
Telefax:       816/421-5547

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing has been forwarded to all counsel of record in accordance with the Federal Rules of Civil Procedure on this the 12th day of December, 2003. Due to the voluminous nature of the exhibits, a copy of the exhibits is being provided only to the Court and to Plaintiffs' counsel. Should other counsel require a copy of the exhibits, Lilly will provide them upon request.

| Attorney(s) | Counsel For: | Method of Service |
|---|---|---|
| Steve T. Hastings<br>Hastings & Alfaro<br>101 N. Shoreline Boulevard, Suite 430<br>Corpus Christi, TX 78401 | Manuel Torres and Dominga Torres, Individually and as Next Friends of Derek Torres, et al. | Certified Mail, Return Receipt Requested |
| Michael A. Simpson/Derrick S. Boyd<br>Simpson & Boyd, P.L.L.C.<br>Post Office Box 957<br>Decatur, TX 76234 | | U.S. 1st Class Mail |
| Greg McCarthy<br>Miller & McCarthy<br>3811 Turtle Creek Boulevard, Suite 1950<br>Dallas, TX 75219 | | U.S. 1st Class Mail |
| Michael R. Klatt/Susan E. Burnett<br>Jeffrey R. Lilly<br>Clark, Thomas & Winters<br>Post Office Box 1148<br>Austin, TX 78767 | Defendant, Wyeth, f/k/a American Home Products Corporation | U.S. 1st Class Mail |
| Bradley S. Wolff/M. Diane Owens<br>Swift Currie McGhee & Heiers, LLP<br>1355 Peachtree Street, N.E., Suite 300<br>Atlanta, GA 30309-3238 | Defendant, Aventis Pasteur, Inc., Individually and as Successor in Interest to Connaught Laboratories, Inc., f/d/b/a Pasteur Merieux Connaught | U.S. 1st Class Mail |
| Wade L. McClure<br>Gibson McClure Wallace & Daniels<br>8080 N. Central Expressway, Suite 1300<br>LB50<br>Dallas, TX 75206-1808 | | U.S. 1st Class Mail |
| David M. Macdonald<br>McCauley Macdonald & Devin, P.C.<br>1201 Elm Street, Suite 3800<br>Dallas, TX 75270-2014 | Defendant, Sigma-Aldrich, Inc. | U.S. 1st Class Mail |

- 16 -

1353216v1

| Attorney(s) | Counsel For: | Method of Service |
|---|---|---|
| Matthew H. Hand<br>Brown & Fortunato, P.C.<br>905 S. Fillmore, Suite 500<br>Post Office Box 9418<br>Amarillo, TX 79105-9418 | Defendant, Oribi, Inc., Individually and d/b/a Meridian Chemical & Equipment, Inc. and d/b/a Global Fine Chemicals and National Association of Compounding Pharmacists | U.S. 1st Class Mail |
| Jeffrey S. Wolff/Charles Jason Rother<br>Fulbright & Jaworski L.L.P.<br>1301 McKinney, Suite 5100<br>Houston, TX 77010-3095<br><br>Stephanie A. Smith<br>Fulbright & Jaworski L.L.P.<br>600 Congress Avenue, Suite 2400<br>Austin, TX 78701 | Defendant, SmithKline Beecham Corp. | U.S. 1st Class Mail |
| Richard L. Josephson/Douglas Roberson<br>Baker & Botts LLP<br>910 Louisiana<br>Houston, TX 77002 | Defendant, Merck & Company, Inc. | U.S. 1st Class Mail |
| Lee Davis Thames<br>Butler, Snow, O'Mara, Steves & Cannada, P.L.L.C.<br>Post Office Box 22567<br>Jackson, MS 39225-2567 | Defendant, Baxter International, Inc. | U.S. 1st Class Mail |
| John Gilbert<br>Gilbert & Gilbert<br>222 North Velasco<br>Post Office Box 1819<br>Angleton, TX 77516 | Defendant, Dow Chemical Company | U.S. 1st Class Mail |

M. SCOTT MICHELMAN

- 17 -

# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS

No  02-392V

Filed: October 11, 2002

```
FILED

OCT 1 1 2002

U.S. COURT OF
FEDERAL CLAIMS
```

* * * * * * * * * * * * * * * * * * * * * * * * *

DIANE and NICHOLAS LEROY,
Individually and as Next Friends of
NICHOLAS ARTHUR LEROY, a minor,

      Petitioners,

      v.

SECRETARY OF THE DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

      Respondent.

To Be Published

* * * * * * * * * * * * * * * * * * * * * * * * *

Michael T. Gallagher, Houston, Texas, for petitioners.
Vincent J. Matanoski, Washington, D.C., for respondent.

#### RULING ON JURISDICTION

**GOLKIEWICZ, Chief Special Master.**

    Petitioners filed for compensation under the National Vaccine Injury Compensation Program ("the Program") on April 24, 2002.[1] Petitioners claim that "a series of mercury-containing vaccines" caused Nicholas, their otherwise healthy child, to suffer developmental problems. Petitioners contest

---

    [1]    The National Vaccine Injury Compensation Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended, 42 U.S.C. §§300aa-10 et seq. (2000). Hereinafter, individual section (§) references will be to 42 U.S.C. §300aa of the National Childhood Vaccine Injury Act of 1986 ("the Act" or "the Vaccine Act").



t ie court's jurisdiction over their claim  Petitioners do not challenge that Nicholas received vaccines covered by the Program or that their damages claim exceeds $1,000.[2]  See Complaint at 3-5, filed April 24, 2002; 42 C F.R. §100.3(a) (1997); §11(a)(2)(A).  However, petitioners argue adamantly t iat their claim is beyond the scope of the Vaccine Act because their son suffers from "mercury poisoning [from the thimerosal preservative contained in the vaccines he received] and not from any c ondition associated with any therapeutic component in any of the vaccines" administered.  Complaint a : 5   Given the Leroys' stated position, the undersigned ordered the parties to brief whether jurisdiction over the subject matter of this claim is properly in this court  After considering the parties' arguments, the court finds that jurisdiction lies properly with the U S. Court of Federal Claims.[3]  The court's reasons follow.

## PROCEDURAL HISTORY

Petitioners filed a petition for compensation on April 24, 2002, but argue that their claim is n ot covered by the Vaccine Act.  Petitioners' injury claim is similar to over 875 other cases filed u ider the Program; the claims allege that a vaccine or series of vaccines caused the vaccinee to d evelop developmental problems which may fall within the diagnosis of autism spectrum disorder.[4]  Like this case, the other claims state that thimerosal, a vaccine preservative, is responsible for the v.iccinee's injury and is the basis for his or her claim for Program compensation.  Working with a

---

[2]    Vaccines covered by the Program are outlined in the Vaccine Injury Table.  §14(a), as amended, 42 C.F.R. §100.3(a) (1997).  Petitioners must file their vaccine-related claim within the Act's statute of limitations period.  §16(a).  Filing an untimely petition is fatal to a claim; equitable te lling is not available to Program petitioners.  See Brice v. Secretary of HHS, 240 F.3d 1367 (Fed. C r. 2001), cert. denied sub nom., Brice v. Thompson, 122 S.Ct. 614 (2001).  Petitions for Program compensation must be filed in this court within 36 months of the first symptom or manifestation of o iset of the alleged vaccine-related injury.  §16(a)(2).  If the vaccinee died, claims on the decedent's behalf must be filed within 24 months of the death, and no later than 48 months after the first symptom or manifestation of onset of the injury from which the death resulted.  §16(a)(3).

[3]    The court's ruling is limited to a finding of subject matter jurisdiction over this claim.  The undersigned makes no determination as to whether petitioners' claim falls outside the court's jurisdiction due to some other legal defect, such as it was filed beyond the Act's statute of limitations period.  Petitioners provide no evidence, but only assertions, as to the timeliness of their petition, see Complaint at 3, and any such issue will be resolved at a later time.

[4]    See Autism General Order #1 at 1, n. 2, Office of Special Masters, Chief Special Master Gary J. Golkiewicz (Fed. Cl. Spec. Mstr.  July 3, 2002) (describing the symptoms of autism spectrum disorder to include "avoidance of eye contact, seeming 'deafness,' abrupt loss of language, unawareness of environment, physical abusiveness, inaccessibility, fixation, bizarre behavior, 'flapping,' repetitive and/or obsessive behavior, insensitivity to pain, social withdrawal, and extreme sensitivity to sounds, textures, tastes, smells, and light") (citing National Institute of Mental Health, Publication 97-4023)

committee of petitioners' and respondent's lawyers, the court has implemented an efficient litigation procedure for resolving the autism cases, see Autism General Order #1  Counsel and the court are diligently preparing the cases pursuant to that agreed upon procedure  Thus, resolving this jurisdictional issue is obviously critical.[5]  Consequently, the undersigned ordered petitioners to brief the court on the jurisdictional issue raised by their petition and to state with particularity whether jurisdiction lies with the Court of Federal Claims.  Petitioners filed their brief on June 18, 2002.  See Petitioners' Brief in Support of the Jurisdictional Issues Raised in Their Petition ("Pet. Brief").  The government filed its response on July 19, 2002  See Response to Petitioners' Brief in Support of the Jurisdictional Issues Raised in Their Petition ("Resp. Brief")  Petitioners filed their reply on August 9, 2002.  See Petitioners' Reply to Respondent's Response Concerning the Jurisdictional Issues Raised in the Petitioners' Brief ("Pet. Reply")

In sum, petitioners allege that the vaccine preservative, thimerosal, caused Nicholas's neurologic injury; that thimerosal is not a "constituent material" of the vaccines that he received, "nor does it have any therapeutic effect which would make it a necessary or essential part of any vaccine"; that the Act explicitly excludes thimerosal from coverage because it is an "adulterant" or "contaminant" of the vaccine; that, further, the Vaccine Act never contemplated thimerosal or autism claims; and finally, that thimerosal, because of its toxicity, is not a "constituent material" as defined by the Code of Federal Regulations setting forth regulations for preservatives used in licensed vaccines. Pet. Brief at 3-15  For the above reasons, petitioners argue that any claims alleging injuries arising from thimerosal are beyond this court's jurisdiction

Respondent contends that petitioners' arguments are "without merit" for the following reasons: compensation has been granted to vaccinees for injuries sustained from a vaccine preservative, citing Grant v. Secretary of HHS, 956 F.2d 1144 (Fed. Cir. 1992); "thimerosal is neither an adulterant or contaminant within the plain meaning of the Act"; thimerosal is not an adulterant or contaminant when used "within [the] prescribed limits of a valid biologics license"; and, the legislative history supports the proposition that "injuries allegedly related to thimerosal [must] be brought under

---

[5]      The issue of whether this court has jurisdiction over claims alleging injuries arising from the thimerosal component of a vaccine (or vaccines) has been the subject of litigation in other courts. See, e.g., Bertrand v. Aventis Pasteur Laboratories, Inc., 2002 WL 31194226 (D. Ariz. Sept. 23, 2002); Liu v. Aventis Pasteur, Inc., 2002 WL 31007709 (W.D. Tex  Aug. 23, 2002); Collins v. American Home Products Corporation, No. 01-979, slip op. (S.D. Miss. Aug. 1, 2002); Stewart v. American Home Products Corporation, No. 02-427, slip op. (S.D. Miss  Aug. 1, 2002); King v. Aventis Pasteur, Inc., 210 F. Supp. 2d 1201 (D. Or. June 7, 2002); Blackmon v. American Home Products Corporation, No. G-02-179, slip op. (S.D. Tex. May 8, 2002); Owens v. American Home Products Corporation, 203 F. Supp. 2d 748 (S.D. Tex. May 7, 2002); O'Connell v. American Home Products Corporation, No. G-02-184, slip op. (S.D  Tex. May 7, 2002).  In most cases filed with the Court of Federal Claims, petitioners have accepted this court's jurisdiction over claims alleging a causal relationship between vaccination and autism disorders  To this court's knowledge, petitioners' counsel is the only practitioner at this time contesting jurisdiction.  Mr. Gallagher currently has nearly 300 autism-related cases pending before this court.

3

t ie Program." Resp. Brief at 2, 4-12  Respondent argues further that thimerosal is a constituent of vaccines and the statute makes no distinction between the vaccine antigens and the vaccine's constituent parts. Id. at 12-14. Finally, respondent contends that petitioners' legal position would lead to a "multiplicity of litigation," which is at odds with the Program's legislative purpose Id. at 14-15.

In their reply, petitioners allege that their claim is not covered under the Program because thimerosal is not a vaccine, but a preservative that "poses a neurotoxic threat to its recipients"; thus, injuries attributable to the ethyl-mercury in thimerosal are not covered. Pet. Reply at 1, 9. Petitioners a so restate that thimerosal is an adulterant and has no therapeutic effect. In this regard, they rely heavily on Special Master Edwards's Order in Geppert v. Secretary of HHS, No. 00-286V (Fed. Cl. Spec. Mstr. Mar. 21, 2001) (unpublished Order raising the issue whether thimerosal is an adulterant or contaminant and directing respondent to file a brief on the jurisdictional issue), for the proposition that injuries from mercury do not fall under the Vaccine Act. Id. at 2. They also rely on Magistrate Judge Ashmanskas's recommendation to the federal district court judge in King v. Aventis Pasteur, Inc., that a state court could find thimerosal-related injuries are not covered by the Program. Id. at 2-3. See also King v. Aventis Pasteur, Inc., No. 01-1305-AS, Findings and Recommendation, slip op. at 7-8 (D. Or. June 7, 2002). Petitioners further contest respondent's reliance on Grant v. Secretary of HHS, 956 F.2d 1144 (Fed. Cir. 1992). They aver that the Federal Circuit in that case d d not find that the preservative caused the injury, and that Grant is distinguishable because the Leroys' son's injuries were caused by the toxin thimerosal and not by an antigen of the vaccines received, as was the case in Grant  Pet. Reply at 3-5  Finally, petitioners contend that irrespective of the Food and Drug Administration's ("FDA") licensing of thimerosal-containing vaccines, thimerosal could not be considered a "constituent material," or component part of a vaccine because it is toxic to the recipient, as evidenced by various agencies' actions. Id. at 5-8.

After considering the parties' arguments, the undersigned finds that subject matter jurisdiction lies properly with this court.

## DISCUSSION

To maintain an action against the government for Program compensation, petitioners must show that their claim meets the filing prerequisites of the Vaccine Act. Section 11(a) is the gate-keeping provision of the statute which sets forth the general rules describing when a vaccinee may petition for compensation. See Amendola v. Secretary of HHS, 989 F.2d 1180, 1182-83 (Fed. Cir. 1993); see also Klahn v. Secretary of HHS, 31 Fed. Cl. 382, 385 (1994) ("The court's jurisdiction involves compliance with [these] gate-keeping provisions . . . ."). Among its various requirements, §11(a)(1) provides for "[a] proceeding for compensation under the Program for a vaccine-related injury or death." Section 33(5) of the Act defines "vaccine-related injury or death" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table." §33(5). However, injuries associated with "an adulterant or contaminant intentionally added" to a Table vaccine are specifically excluded by the Act's definition of a "vaccine-related injury or death." Id. The jurisdictional issue raised in this case is whether an injury allegedly caused by the thimerosal preservative within a Table vaccine is a "vaccine-related injury" under §11(a)(1), as

4

defined by §33(5) of the Vaccine Act  Petitioners' counsel advances a plethora of unsuccessful arguments to contest this court's jurisdiction over the Leroys' case. In short, petitioners ignore time-honored legal principles, common definitions of relevant statutory language, congressionally-stated Program goals, relevant scientific evidence, and case law.  The undersigned finds petitioners' numerous arguments, contending that Nicholas's injuries are not "vaccine-related," legally flawed and unsupported by the record.

I.      **The Scope of the Vaccine Act and the Doctrine of Sovereign Immunity**

The Vaccine Act established a no-fault compensation Program, designed to curb the time and expense of traditional tort litigation [6]  Congress envisioned a system where awards to an injured vaccinee or a person suing on the vaccinee's behalf were to be made "'quickly, easily, and with certainty and generosity.'"  Knudsen v. Secretary of HHS, 35 F.3d 543, 549 (Fed. Cir. 1994)

---

[6]      The Program's structure fosters expedited review of a vaccine claim alleging that a Table vaccine caused the vaccinee's injury. §14; 42 C.F.R. §100.3.  Congress created the Vaccine Injury Table, 42 U.S.C. §300aa-14(a), as amended, 42 C.F.R. §100.3(a), which affords petitioners a statutory presumption that the Table vaccine in question caused an injury, provided that a particular injury listed on the Vaccine Injury Table occurs within the specified time frame following the vaccine.  Alternatively, the vaccinee may prove an off-Table claim, in other words, that the vaccine did in-fact cause the injury even though the injury itself or the onset period falls outside the Table's parameters. §§11(c)(1)(C)(ii)(I) and (II).  Both theories assume that the evidence fails to show by a preponderance that a factor unrelated to the vaccine caused the injury. §13(a)(1)(B).

In off-Table claims, petitioners must establish causation utilizing traditional tort litigation standards.  See, e.g., Grant v. Secretary of HHS, 956 F.2d 1144, 1147-48 (Fed. Cir. 1992); Shyface v. Secretary of HHS, 165 F.3d 1344, 1351 (Fed. Cir. 1999), Terran v. Secretary of HHS, No. 95-431V, 1998 WL 55290, at *6 (Fed. Cl. Spec. Mstr. Jan 23, 1998), aff'd, 41 Fed. Cl. 330 (1998), aff'd, 195 F.3d 1302 (Fed. Cir. 1999)  In other words, petitioners must demonstrate by a preponderance of the evidence that the vaccine caused the alleged injury. §§11(c)(1)(C)(ii)(I) and (II); §13(a)(1)(A).  For a detailed discussion of the appropriate analytical framework for resolving off-Table cases, see Stevens v. Secretary of HHS, No 99-594V, 2001 WL 387418 (Fed. Cl. Spec. Mstr. Mar. 30, 2001).  Any sequela of the vaccine-related injury is compensable. §14(a), as amended, 42 C.F.R. §100.3(a).

Once filed, the Program petition is assigned to a special master who has 240 days to render a decision on the merits or otherwise resolve the case, excluding any periods of suspension allowed by the Act.  §12(d)(3)(A).  Although the Program's scheme is adversarial, there is no right to discovery and often little need for formal discovery; petitions are either filed complete with all the evidence attached as exhibits or the parties work cooperatively to gather information to complete the record.  See the special masters' Guidelines for Practice Under the National Vaccine Injury Compensation Program for a complete description of the Program and the implementing procedures.

(quoting H.R. Rep. No. 99-908, at 3, reprinted in 1986 U.S.C.C.A.N. 6344, 6344) See also Shalala v. Whitecotton, 514 U.S. 268, 270 (1995) (stating that "the [Act's] streamlining does not stop with the mechanics of litigation, but goes even to substantive standards of proof") The Act directs an individual who is injured by a vaccine to file a Program petition with this court against the United States government, namely the Secretary for the Department of Health and Human Services, rather than vaccine manufacturers who provide the vaccines to doctors and hospitals or the doctors who administer the vaccines.[7] As the Federal Circuit recognized, the Vaccine Program "stems from Congress's recognition that '[w]hile most of the Nation's children enjoy great benefit from immunization programs, a small but significant number have been gravely injured'" Knudsen, 35 F.3d at 549 (quoting H.R. Rep. No 99-908, at 4, reprinted in 1986 U.S.C.C.A.N. at 6345) All persons alleging a vaccine-related injury are entitled to take advantage of the Program's "streamlined" process. Significantly, if the vaccinee misinterprets or ignores the Court of Federal Claims's jurisdiction over claims brought pursuant to the Vaccine Act, and instead, for whatever reason, files a civil action in state or federal court, the state or federal court must dismiss the claim until the vaccinee exhausts her remedies under the Program. §11(a)(2)(B) See also §11(a)(3).

The Vaccine Act constitutes the federal government's waiver of sovereign immunity which must be strictly construed "'in favor of the sovereign.'" United States v. Nordic Village, Inc., 503 U.S. 30, 34 (1992) (quoting McMahon v. United States, 342 U.S. 25, 27 (1951)). See also Holihan v. Secretary of HHS, 45 Fed. Cl. 201, 207 (1999); Childers v. Secretary of HHS, No. 96-194V, 1999 WL 218893, at *2 (Fed. Cl. Spec. Mstr. Mar. 26, 1999), Hoffman v. Secretary of HHS, No. 90-3451V, 1995 WL 103334, at *2 (Fed. Cl. Spec. Mstr. Feb. 21, 1995). "As a limited waiver of sovereign immunity, [the Vaccine Act] must be given a strict and narrow construction."[8] Holihan, 45 Fed. Cl. at 207. The Federal Circuit recently cautioned that "courts should be 'careful not to interpret [a waiver of sovereign immunity] in a manner that would extend the waiver beyond that

---

[7]    The Program allows vaccine manufacturers to produce vaccines necessary to maintain the public health, without fear of constant litigation when injuries occur, and at the same time ensures those individuals who are injured by vaccines receive compensation. H.R. Rep. No. 99-908, at 3-5 (1986), reprinted in 1986 U.S.C.C.A.N. at 6345-46 The Act prevents the vaccinee from filing a civil action without first obtaining a judgment from this court and electing to file a civil action, or alternatively, withdrawing her petition pursuant to the Act's provisions §11(a)(2)(A). See also Shalala v. Whitecotton, 514 U.S. 268, 270 (1995) (examining and explaining §11(a) provisions).

[8]    In a thoughtful analysis of sovereign immunity as it applies to the Vaccine Act, Special Master Hastings recognized that the Supreme Court has said, "in construing a statute that waives sovereign immunity, a court must be careful not to 'assume the authority to narrow the waiver that Congress intended,'" and "a federal court should not 'as a self-constituted guardian of the Treasury, import immunity back into a statute designed to limit it.'" Childers v. Secretary of HHS, No. 96-194V, 1999 WL 218893, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1999) (quoting, respectively, United States v. Kubrick, 444 U.S. 111, 118 (1979) and Indian Towing Co. v. United States, 350 U.S. 61, 69 (1955)) But, Special Master Hastings also concluded that Supreme Court precedent reinforces the notion that statutes waiving sovereign immunity must be construed strictly. Id. at *4.

6

which Congress intended.'" Brice v. Secretary of HHS, 240 F.3d 1367, 1370 (Fed. Cir. 2001) (citing Block v. North Dakota, 461 U.S. 273, 287 (1983), as quoted in Stone Container Corp. v. United States, 229 F.3d 1345, 1352 (Fed. Cir. 2000)). Questions of jurisdiction and statutory interpretation must be analyzed and answered in light of these underlying principles.

### II.    Accepted Canons of Statutory Interpretation Support Subject Matter Jurisdiction

It is well settled that when interpreting statutory language, "[a] statute's words must be given their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." Williams v. Taylor, 529 U.S. 420, 421 (2000). See also Smith v. United States, 508 U.S. 223, 228 (1993) (stating "[w]hen a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning"); Old Colony Railroad Co. v. Commissioner of Internal Revenue, 284 U.S. 552, 560 (1932) (stating "'[t]he legislature must be presumed to use words in their known and ordinary signification'" (quoting Levy's Lessee v. M'Cartee, 31 U.S. 102, 6 Pet. 102, 110 (1832)); City of Lincoln, Nebraska v. Ricketts, 297 U.S. 373, 376 (1936) (stating "[w]e give to the words their natural significance unless that leads to an unreasonable result plainly at variance with the evident purpose of the legislation"); Asgrow Seed Company v. Winterboer, 513 U.S. 179, 187 (1995) (stating "[w]hen terms used in a statute are undefined, we give them their ordinary meaning"); Terran v. Secretary of HHS, 195 F.3d 1302, 1310 (Fed. Cir. 1999) (stating "[t]he first and most important step when interpreting a statute is, of course, analyzing its text"). Thus, "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980) (emphasis added). Moreover, "'where Congress has clearly stated its intent in the language of a statute, a court should not inquire further.'" Hellebrand v. Secretary of HHS, 999 F.2d 1565, 1569 (Fed. Cir. 1993) (quoting Brookside Veneers, Ltd. v. United States, 847 F.2d 786, 788 (Fed. Cir. 1988), cert. denied, 488 U.S. 943 (1988) (citations omitted)).

Relevant to the jurisdictional issue before this court, the Vaccine Act defines "vaccine-related injury or death" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such a vaccine." §33(5) (emphasis added). Neither the statute nor the legislative history expressly defines "adulterant," "contaminant," or "vaccine." Petitioners allege that the thimerosal preservative is an adulterant or contaminant within the meaning of the Act, and thus, any injury allegedly caused by the thimerosal is excluded specifically by the Act's definition of "vaccine-related injury." See Pet. Brief at 4-5, 9-12. Petitioners contend further that because definitions of "vaccine" do not mention thimerosal specifically or preservatives generally, thimerosal cannot be a component of the vaccine itself. Id. at 8-9. To determine whether Congress intended to exclude from the Act's statutory scheme those injuries allegedly associated with thimerosal, the undersigned must first and foremost examine the plain and ordinary meaning of these three statutory terms.

Applying accepted canons of statutory interpretation and following a review of common dictionary definitions of the terms "adulterant" and "contaminant," the court finds that a preservative

is not an intentionally added ingredient of the vaccine meant to make impure, inferior, or contaminated the vaccine end product. Rather, a preservative is the antithesis of these descriptions, as it actually prevents corruption of the vaccine. Upon further exploration of dictionary references, the court also finds that the plain meaning of the term "vaccine" allows for the composition of different ingredients in the vaccine product, including a preservative such as thimerosal; therefore, a vaccine preservative is a constituent part or a component of the vaccine. Consequently, based upon the plain meaning of the statutory terms, any injury arising from the thimerosal preservative in vaccines is encompassed within the statutory definition of "vaccine-related injury," thereby granting jurisdiction over such claims to this court. To that end, the court's findings are well-supported by recent federal case law addressing the identical issue. The court's analysis follows.

### A.    The Preservative Thimerosal Is Neither an "Adulterant" Nor a "Contaminant" as Ordinarily Defined

Using accepted principles of statutory interpretation, several federal courts have decided that thimerosal is not an "adulterant" or "contaminant" within the meaning of the Vaccine Act and, therefore, excluded under the Program by the Act's definition of "vaccine-related injury." See, e.g., Liu v. Aventis Pasteur, Inc., 2002 WL 31007709 (W.D. Tex. Aug. 23, 2002); Owens v. American Home Products Corporation, 203 F. Supp. 2d 748 (S.D. Tex. May 7, 2002); O'Connell v. American Home Products Corporation, No. G-02-184, slip op. (S.D. Tex. May 7, 2002). See also Bertrand v. Aventis Pasteur, Labs., Inc., 2002 WL 31194226, at *5-*6 (D. Ariz. Sept. 23, 2002) (declining to resolve whether thimerosal is an adulterant or contaminant, but noting that "every federal court to have ruled on the issue has held that injuries resulting from Thimerosal contained in vaccines are vaccine-related under the meaning of the Act"); Liu, 2002 WL 31007709, at *2-*3 (citing Blackmon v. American Home Products Corporation, No. G-02-179, slip op. (S.D. Tex. May 8, 2002), as holding that thimerosal cases are vaccine-related cases under the meaning of the Vaccine Act, and citing Collins v. American Home Products Corporation, No. 01-979, slip op. (S.D. Miss. Aug. 1, 2002), as "dismissing thimerosal claims because Autism Order #1 'foreclose[d] any reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants'"). In Owens and O'Connell,[9] Judge Kent concluded that plaintiffs' claims fell squarely

---

[9]    While petitioners cite to Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss in Owens v. American Home Products Corporation, they fail to cite directly to the decision in that case which is contrary to their position in this matter. See Owens v. American Home Products Corporation, 203 F. Supp. 2d 748 (S.D. Tex. 2002). ABA Model Rule of Professional Conduct 3.3 states that "[a] lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal; . . . [or] (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client." Model Rules of Prof'l Conduct R. 3.3 (1983). Comment 3 to Model Rule 3.3 likewise states that "[a] lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities." Model Rules of Prof'l Conduct R. 3.3 cmt (1983). Most states adopt the Model Rules or have similar variations in pertinent part. In this case, the Texas federal district court is not a controlling

(continued...)

8

within the scope of the Act and should be decided by the Court of Federal Claims [10] Relying on an accepted canon of statutory interpretation, the Owens court first looked to the plain meaning of the Vaccine Act's language. Since the statute explicitly precludes compensation for injuries arising from an "adulterant" or "contaminant," Judge Kent sought to define these terms  Recognizing that "adulterant" and "contaminant" are not defined by the Vaccine Act, the Owens court turned to dictionary definitions for guidance. It found that "[t]himerosal, when used in vaccines, fails to correspond with any of th[e] definitions [of adulterant and contaminant] "[11] Owens, 203 F. Supp. 2d at 755; O'Connell, slip op. at *7. He thus concluded that "[c]learly, the *plain language* of the Vaccine Act indicates that the [vaccinee's] injuries cannot be 'thimerosal-related' without being 'vaccine-related' as well." Owens, 203 F. Supp. 2d at 756 (emphasis added), O'Connell, slip op. at *9. Judge Kent further opined that "because the [vaccinee's] injuries are allegedly linked to a vaccine ingredient, their injuries are definitely 'vaccine-related.'" Owens, 203 F. Supp. 2d at 755; O'Connell, slip op. at *8 (citations omitted)  The undersigned agrees completely with Judge Kent's well-reasoned analysis of this issue.

---

[9](...continued)

jurisdiction; however, petitioners' counsel was ethically obligated to reference Judge Kent's contrary findings given that the decision is directly on point to the jurisdictional issue raised in the case sub judice.

[10]    Other federal district courts have followed Judge Kent's line of reasoning in Owens and O'Connell. See, e.g., Liu v. Aventis Pasteur, Inc., 2002 WL 31007709, at *2 (W.D. Tex. Aug. 21, 2002) (stating "it appears every federal court to have ruled on the issue has held injuries resulting from thimerosal contained in vaccines are vaccine-related under the meaning of the Vaccine Act") (citing Blackmon v. American Home Products Corporation, No. G-02-179, slip op. (S.D. Tex. May 8  2002); Owens v. American Home Products Corporation, 203 F. Supp. 2d 748 (S.D. Tex. May 7, 2002)). See also Cheskiewicz v. Aventis Pasteur, Inc., 2002 WL 1880524, at *2 (E.D. Pa. Aug. 15, 2002) (discussing defendant's reliance on McDonald v. Abbott Labs., No 02-77, slip op. (S.D. Miss. Aug. 1, 2002); Collins v. American Home Products Corporation, No. 01-979, slip op. (S.D. Miss. Aug. 1, 2002); and Stewart v. American Home Products Corporation, No. 02-427, slip op. (S.D. Miss. Aug. 1, 2002), for the proposition that claims arising from thimerosal are covered by the Vaccine Act). Like Owens and O'Connell, all three of the cases discussed in Cheskiewicz were cited as dismissing claims that were covered under the Vaccine Act. See Cheskiewicz, 2002 WL 1880524, at *2.

[11]    Quoting The American Heritage Dictionary 58 (2d ed. 1992) and Stedman's Medical Dictionary 30 (27th ed. 2000) respectively, Judge Kent found "adulterant" defined as "a substance which makes an item impure, spurious, or inferior by adding extraneous or improper ingredients" and "[a]n impurity; an additive that is considered to have undesirable effect or to dilute the active material so as to reduce its therapeutic or monetary value" Owens, 203 F Supp. 2d at 754-55.  A contaminant was defined as "[s]omething that makes impure or corrupt by contact or mixture." Id. at 755 (quoting Webster's 9th New Collegiate Dictionary 283 (9th ed. 1991)).

In support of their respective positions, petitioners and respondent cite the same, or slight variations of, definitions relied on by the <u>Owens</u> court [12]. For instance, <u>Dorland's Illustrated Medical Dictionary</u> 33 (27th ed. 1988) defines "adulterant" as "a substance used as an addition to another substance for sophistication or adulteration." "Adulteration" is defined as the "addition of an impure, cheap, or unnecessary ingredient to cheat, cheapen, or falsify a preparation, in legal terminology, incorrect labeling, including dosage not in accordance with the label." <u>Id.</u> A "contaminant" is defined as "something that causes contamination." <u>Id.</u> at 376. "Contamination" is "the presence of any substance or organism that makes a preparation impure." <u>Id.</u> Petitioners provide no persuasive evidence advancing a substantively different definition for "adulterant" or "contaminant." Nor do they provide any persuasive evidence in the record that Congress intended "adulterant" or "contaminant" to mean anything other than their plain meaning. Further, relevant to this discussion, a "preservative" is "a substance or preparation added to a product for the purpose of destroying or inhibiting the multiplication of microorganisms." <u>Id.</u> at 1353. Therefore, following Judge Kent's analysis, thimerosal is not an "adulterant" or "contaminant" as ordinarily defined. That is, by any ordinary meaning, a preservative is the antithesis of contaminant because a preserving agent actually prevents the impurity or corruption of the vaccine.[13] The same conclusion was reached in <u>Owens</u>:

> Thimerosal, when used in vaccines, fails to correspond with any of these definitions. Vaccine manufacturers intentionally add thimerosal to vaccine formulas because it

---

[12]    Petitioners and respondent cite numerous dictionaries defining "adulterant," "adulteration," and "contaminant," including <u>The American Heritage College Dictionary</u> 58 (2d ed. 1992); <u>Webster's New World College Dictionary</u> (3d ed. 1997), <u>Webster's 9th New Collegiate Dictionary</u> 283 (9th ed. 1991); <u>Dorland's Illustrated Medical Dictionary</u> (29th ed. 2000); <u>Barron's Medical Guides: Dictionary of Medical Terms</u> (4th ed. 2000), <u>Taber's Encyclopedic Medical Dictionary</u> (19th ed. 2001); <u>Mosby's Medical, Nursing & Allied Health Dictionary</u> (5th ed. 1998); <u>Stedman's Concise Medical Dictionary for the Health Professions</u> (4th ed. 2001); <u>Stedman's Medical Dictionary</u> 30 (27th ed. 2000); and <u>Merriam-Webster's Medical Desk Dictionary</u> (1996). Some definitions are duplicative of those quoted herein, but no definition differs significantly from the next.

[13]    The Institute of Medicine ("IOM") has explained:

> Thimerosal, an organic mercury compound that is metabolized to ethylmercury and thiosalicylate, has been used since the 1930s as a preservative in some vaccines. Food and Drug Administration (FDA) regulations require that preservatives be used in multidose vials of vaccines, except live viral vaccines, to prevent bacterial and fungal contamination (General Biologics Product Standards, 2000), which can lead to serious illness and death in recipients (Wilson, 1967). . . . Uses other than as a preservative contribute little to the final concentration of thimerosal in vaccines (Ball et al., 2001).

Immunization Safety Review, Institute of Medicine, <u>Thimerosal-Containing Vaccines and Neurodevelopmental Disorders</u> 13 (Kathleen Stratton et al eds. 2001) ("IOM Thimerosal Report").

10

deters microbial and fungal growth, thereby maintaining the safety, purity, and potency of vaccines    [T]himerosal cannot be said to "make impure or corrupt" a vaccine or to reduce a vaccine's therapeutic value   Furthermore, thimerosal cannot be characterized as having an undesirable effect or diluting the active material found within a vaccine. In fact, the opposite is true   As a preservative, thimerosal *prevents* a vaccine's corruption.  Hence, neither the plain meaning of "adulterant" nor "contaminant" applies to thimerosal when, as here, it is purposefully used as an ingredient in the approved formulation of a vaccine

*Owens*, 203 F. Supp. 2d at 755.  The undersigned finds no persuasive or logical reason to deviate from this cogent analysis of this issue.

> **B.    The Preservative Thimerosal Is a Component or a Constituent of the "Vaccine" as Ordinarily Defined**

The meaning of "vaccine-related injury or death," which is defined by the Act as "an illness, injury, condition, or death associated with one or more of the [Table] vaccines," includes injuries allegedly caused by the thimerosal component of a vaccine. §33(5).  Relying on the ordinary meaning of "vaccine," Judge Kent found in *Owens* that the vaccinee's claim was covered under the Program:

> A "vaccine" is defined as a "suspension of attenuated or killed microorganisms," Dorland's Medical Dictionary 1799 (27th ed. 1988), and "a preparation of killed microorganisms, living attenuated organisms, or living fully virulent organisms." Webster's 9th New Collegiate Dictionary 1301 (9th ed. 1991).  Neither of these definitions indicate that a vaccine is comprised of microorganisms alone.  On the contrary, they indicate that a vaccine is a "suspension" or "preparation" composed of both microorganisms and additional ingredients  And, as explained above, manufacturers of vaccines add thimerosal to the "preparation" or "suspension" of vaccines.

*Owens*, 203 F. Supp. 2d at 755 (footnotes omitted).

Here, petitioners offer definitions of the word "vaccine," all of which similarly define vaccine as a "suspension" or "preparation."  See Pet. Brief at 8-9 (Mosby's Medical Dictionary (5th ed. 1998) ("[a] suspension of attenuated or killed microorganisms"); Stedman's Medical Dictionary (27th ed. 2000) ("a preparation"); Taber's Encyclopedic Medical Dictionary (19th ed. 1997) ("[a]ny suspension containing antigenic molecules"); Dorland's Illustrated Medical Dictionary (29th ed. 2000) ("[a] suspension of attenuated or killed microorganisms"); The Bantam Medical Dictionary (3d ed. 2000) ("a special preparation of antigenic material"); Compact American Medical Dictionary (3d ed. 1998) ("[a] preparation of a weakened or killed pathogen"); Webster's New World Medical Dictionary (2000) ("preparations of killed or modified microorganisms"); Merriam-Webster's Medical Desk Dictionary (1996) ("a preparation of killed microorganisms")).  A "suspension" is "a preparation of a finely divided drug intended to be incorporated (suspended) in some suitable liquid vehicle before it is used, or already incorporated in such a vehicle." Dorland's Illustrated Medical

Dictionary 1617 (27th ed 1988). A "preparation" is "a medicine made ready for use." Id. at 1351. Petitioners argue that none of the definitions of "vaccine" mention thimerosal, specifically, or a preservative, generally, leading one to conclude that a preservative is a non-component or non-constituent of the vaccine Pet Brief at 8. Petitioners' argument is unreasonably strained.

Once again, Judge Kent's analysis in Owens is persuasive. It is reasonable to construe the plain meaning of "vaccine" to encompass the thimerosal *component* because, within its ordinary usage, the term "vaccine" strongly implies the inclusion of bacterium and additional ingredients. See Owens, 203 F. Supp. 2d at 755 It is also clear from the FDA regulations cited in petitioners' brief, at 13-14 and Appendix 3, that those vaccines sold in multiple-dose vials indeed must contain such an additional ingredient, a preservative.[14] See 21 C.F.R. §610.15 (West 2002) Section 610 15 states in relevant part:

> Products in multiple-dose containers shall contain a preservative, except that a
> preservative need not be added to Yellow Fever Vaccine; Poliovirus Vaccine Live
> Oral; viral vaccines labeled for use with the jet injector; dried vaccines when the
> accompanying diluent contains a preservative, or to an Allergenic Product in 50
> percent or more volume in volume (v/v) glycerin.

21 C.F.R. §610.15(a). See also Owens, 203 F. Supp. 2d at 755, n. 10 (stating "[t]he FDA has long recognized that preservatives (i.e. thimerosal) are 'constituent materials' of vaccines. See 21 C.F.R. §610.15 (indicating that constituents of biological materials include ingredients, preservatives, diluents and adjuvants)"). That thimerosal is not mentioned by name in the regulation does not necessarily exclude it as an acceptable additive or as a component of the vaccine preparation. Moreover, nothing in the legislative history suggests that Congress intended the word "vaccine" to adopt a meaning different from its common usage. Indeed, throughout the House Report, the word "vaccine" is used in its ordinary sense See generally H.R. Rep. 99-908, reprinted in 1986 U S.C.C.A.N. 6344. The plain language of the statute is conclusive, in the absence of clear legislative intent to the contrary. See Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). Hence, as Judge Kent recognized and as this court agrees, injuries allegedly arising from the thimerosal component (a vaccine ingredient) are reasonably construed as "definitely 'vaccine-related'" within the plain meaning of the language of the Vaccine Act. Owens, 203 F. Supp. 2d at 755; O'Connell, slip op. at *8.

### III.   The Legislative History Supports the Court's Analysis

It is a time-honored principle that "[t]he court will defer to the clear meaning of a statute when the language is sufficiently clear, and the plain meaning of the statute is supported by the legislative history." Klahn v. Secretary of HHS, 31 Fed. Cl. 382, 386 (1994). "The statutory language should be conclusive '*except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.*'" Warner Cable v.

---

[14]     For a more detailed discussion of the FDA regulations, see Part V of this decision

Doyle, 66 F.3d 867, 876 (7th Cir. 1995), cert. denied, 516 U.S. 1141 (1996) (citations omitted) (emphasis added), as quoted in DeRoche v. Secretary of HHS, No. 97-643V, 2002 WL 603087, at *28 (Fed. Cl. Spec. Mstr. Mar. 28, 2002)  The Secretary argues that the legislative history supports "the finding that Congress intended that injuries allegedly related to thimerosal be brought under the Program." Resp. Brief at 10-11  The Secretary contends that "[g]iven the congressional purpose of channeling liability for vaccine injuries to the Program and the fact the vaccines chosen for coverage contained thimerosal, it is incongruous to argue that at the same time Congress extended coverage to these vaccines, it intended to define away that coverage for any injury related to thimerosal." Id. at 11.  Additionally, the Secretary submits that not only is petitioners' argument legally in error, but it would undermine the Program's legislative purpose by leading to a "multiplicity of litigation." Id. at 14.  Although the government cannot provide direct evidence in the legislative history relevant to the interpretation of "adulterant" or "contaminant," the respondent notes that Congress created a Table injury in response to a concern over possible hypersensitivity reactions to the inactivated polio vaccine because it contained trace amounts of antibiotics. Id. at 11.  The government emphasizes this is an indication that Congress intended the Act to compensate vaccinees injured by any component of the vaccine. Id.  The court finds the Secretary's arguments persuasive.[15]

The court's own review of the legislative history supports fully respondent's interpretation of the Act.  The statute's purpose is to ensure vaccine safety and supply and reduce civil litigation while still providing compensation to injured vaccinees  See H.R. Rep. 99-908, at 3-5, reprinted in 1986 U.S.C.C.A.N. at 6344-46.  The court may not read limitations into the definition of "vaccine-related injury" that are clearly at odds with the Program's congressionally-stated purpose.  Distinguishing thimerosal-related injuries from vaccine-related injuries, as petitioners advocate, would likely result in a "multiplicity of litigation."  See Resp. Brief at 14.  That is, Program petitioners alleging injury resulting from both the vaccine antigen and its component parts would be required to maintain actions in two different courts: a Program claim in the Court of Federal Claims based upon the antigen-causing-injury theory, and a second action in state or federal civil court based upon a theory that injury resulted from the non-antigen component part of a vaccine.  Id.  This litigative scheme would clearly defeat the stated legislative purpose of the Act and expose manufacturers and administrators to the same litigation the Act was designed to reduce or eliminate.  To be sure, the value by which Congress held these goals is unequivocally evident in the Act's express statutory scheme at §11(a)  As the Federal Circuit has determined, the statute prevents petitioners from maintaining actions in two fora  See Flowers v. Secretary of HHS, 49 F.3d 1558 (Fed. Cir. 1995) (affirming the dismissal of a Program petition for lack of jurisdiction pursuant to §11(a)(5)(B), when a civil suit was still pending at the time petitioner filed her petition).  The Act also does not allow a petitioner to continue under the Program if the vaccinee has previously collected a civil action award or settlement for his injury.  See §11(a)(7) and §11(c)(1)(E).  Thus, petitioners' interpretation of the statutory text violates the statutory scheme by promoting dual actions for compensation.

---

[15]    Although the courts are the final arbiters on issues of statutory interpretation, an administrative agency's interpretations of the statutory scheme they are entrusted to administer have been given considerable deference  See Chevron, USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844-45 (1984).

Compliance with the legislative purpose and the statutory scheme was discussed at length by the Federal Circuit in Amendola v. Secretary of HHS, 989 F.2d 1180 (Fed. Cir. 1993). As in the case sub judice, Amendola involved the interpretation of §11(a) of the Act (specifically §§11(a)(4) and (a)(5)), which encompasses "the gate-keeping provisions" of the Vaccine Act.[16] Amendola, 989 F.2d at 1182. See also Klahn v. Secretary of HHS, 31 Fed. Cl. 382, 385 (1994). Judge Plager, writing for the panel in Amendola, cautioned that statutory interpretation is an art "constrained by the fundamental obligation of the judicial branch to implement, not rethink, the purpose of the legislative branch."[17] Amendola, 989 F.2d at 1182. Judge Plager wrote: "When the legislative purpose is incorporated in a complex piece of legislation, such as those establishing a major regulatory or entitlement program, the meaning of any particular phrase or provision cannot be securely known simply by taking the words out of context and treating them as self-evident."[18] Id. In the case of the Vaccine Act, Judge Plager determined that "Congress'[s] purpose is both clear and clearly evidenced by the statutory framework. The statute provides a strong bias in favor of bypassing the civil litigation route in favor of compensation claims under the Act." Id. at 1184. Judge Plager noted

---

[16]     The gate-keeping provisions are as follows. Section 11(a)(1) requires that a petitioner allege a vaccine-related injury or death and serve a petition for compensation on the Secretary of the Department of Health and Human Services. Section 11(a)(2) describes when an injured vaccinee can sue civilly, specifically only if his or her claim is less than $1,000, or the vaccinee stays in the Program for a required period of time after which the vaccinee chooses to withdraw from the Program, or the vaccinee rejects the judgment in this court. De minimis claims can be filed in either state or federal court. §11(a)(2)(A). Section 11(a)(3) limits suits against vaccine administrators and manufacturers, unless the vaccinee complies with §11(a)(2). Sections 11(a)(4) permits the filing of Program petitions where pre-Act civil suits resulted in a denial of damages or dismissal with prejudice. Section 11(a)(5) limits when a vaccinee with a pending civil action may bring an action here. Similarly, §§11(a)(6) through (a)(8) lay ground rules for whether a vaccinee may bring a petition under the Program

[17]     The Amendolas filed a Program petition after they had already brought a state civil action against the administrating physician for their son's injuries which resulted in an unfavorable judgment in 1989. Amendola, 989 F.2d at 1181. The government moved to dismiss under §11(a)(5)(A) of the statute, which allowed vaccinees with civil suits pending when the Act became effective to dismiss the civil suit without prejudice prior to judgment or by October 1, 1990 (whichever occurred first), and file a petition in this court. The special master granted the government's motion, reasoning that the Amendolas' civil case had already gone to judgment in 1989, precluding them from filing a claim in this court under the Vaccine Act. Amendola v. Secretary of HHS, No. 90-766V, 1991 WL 43027 (Cl. Ct. Spec. Mstr. Mar. 14, 1991). The Federal Circuit ultimately affirmed the dismissal. Amendola v. Secretary of HHS, 989 F.2d 1180 (Fed. Cir. 1993).

[18]     Judge Plager relied upon the "rather straightforward homily . . . captured in the more pretentious proposition that parts of a statute in pari materia must be construed together." Amendola, 989 F.2d at 1182. In interpreting the interplay between subsections (a)(4) and (a)(5) of §11, Judge Plager construed subsection (a)(4) as prohibiting a plaintiff who had a civil suit pending on the effective date of the Act from taking the suit to judgment, then after receiving an unfavorable judgment, bringing a petition under the Act. Id. at 1184.

further that "[c]learly, the motivating factor behind enactment of the legislation was the desire to protect the vaccine supply by shielding manufacturers from exposure to liability resulting from the small but nevertheless statistically significant incidence of unavoidable injury or death from widespread use of the vaccine." Id. at 1186

Although Judge Plager analyzed a different subsection of §11(a) than is at issue here, he interpreted a gate-keeping provision consistent with the statutory scheme which evinced Congress's strong preference for an alternative forum for resolving vaccine claims  Following the Federal Circuit's direction, the undersigned will not improperly "rethink" the purpose for the Vaccine Act As Judge Plager correctly implied, that is a job for Congress  Amendola, 989 F.2d at 1182.  Notably, there is legislation addressing provisions of the Vaccine Act currently pending before Congress  See, e.g., Vaccine Injury Compensation Reform Act, H.R. 2056, 107th Cong. (2001), National Vaccine Injury Compensation Program Improvement Act of 2002, H.R. 3741, 107th Cong. (2002)  If Congress desires to exclude from the Vaccine Act injuries that allegedly result from a component of a vaccine, such as the thimerosal preservative, thus enabling vaccinees to seek initial relief in civil court, Congress has the power to do so.  This court does not.  In its final analysis, the court's interpretation of "vaccine-related injury" under §11(a)(1) and §33(5) is fully consistent with the legislative history and the statutory scheme.[19]

---

[19]    Incidentally, the Amendolas also argued that their negligence and malpractice suit against the physician was not a "'civil action for damages' as contemplated by the Act."  Amendola, 989 F.2d at 1181, 1185-86.  From their perspective, the Vaccine Act was only meant to protect manufacturers and administrators from strict liability claims  Id. at 1186.  Judge Plager analyzed their argument in the context of §33(5).  Id.  Recognizing that the only exclusion to the definition of "vaccine-related injury" is an injury associated with a "foreign substance" or an "extraneous material," Judge Plager dismissed the Amendolas' argument that their civil court claim was not one contemplated by the Act.  Id.  In further rejecting petitioners' position that the injury was not "vaccine-related," he wrote: "If this were a situation in which the direct cause of the injury was a contaminated needle, or the doctor's negligent dropping of an infant patient, or other negligence facially *unrelated to the vaccine's effects*, then [petitioners' arguments] might require further examination "  Id. at 1186-87.  Petitioners in the instant case cite Amendola for the proposition that adulterant or contaminant "extends to the addition of 'foreign' substances or 'extraneous' materials."  Pet. Brief at 11.  However, the scenarios that Judge Plager suggest, in dicta, require "further examination" are not similar to the case we have here, where Nicholas's alleged injury arises directly from a required vaccine component added to some of the vaccines on his immunization schedule  To the contrary, Nicholas's case is similar to the situation in Amendola where the child allegedly suffered an adverse reaction to *a series* of DPT shots

15

**IV.    Petitioners' Supplemental Legal Arguments Disputing Jurisdiction Are Unpersuasive**

Petitioners present other legal arguments in support of their claim, all of which the court finds unpersuasive.

First, petitioners rely on language from Special Master Edwards's Order in Geppert v. Secretary of HHS, No 00-286V (Fed Cl Spec. Mstr. Mar 21, 2001) (unpublished order raising the issue whether thimerosal is an adulterant or contaminant and directing respondent to file a brief on the jurisdictional issue), as further proof that claims based on thimerosal are not within this court's jurisdiction  Pet. Brief at 5-6; P  Reply at 2  The language referenced by petitioners reads:

> A simple, lay reading of the plain language of § 300aa-33(5) suggests that the Act does not encompass injuries related to "mercury, aluminum and other materials" in vaccines.  A cursory review of the legislative history does not yield support for a contrary interpretation.

Order at 2.  A closer examination of the entire Order reveals that this passage simply expresses the special master's tentative analysis of the jurisdictional issue raised by the statute, rather than his final legal "conclusion," as petitioners contend.  Indeed, in the Order, Special Master Edwards directed respondent to brief the issue of whether an injury allegedly arising from the thimerosal component of a vaccine is a "vaccine-related injury" within the meaning of the Vaccine Act.  In response to that Order, the Secretary filed a brief in support of the special master's jurisdiction over the claim.  Based on respondent's position and petitioners' apparent acquiescence to jurisdiction by this court,[20] Special Master Edwards determined that "he [did] not have to render an interpretation of 42 U.S.C. § 300aa-31(5)" and directed further proceedings in the case.  See Geppert v. Secretary of HHS, No. 00-286V, Order at 1 (Fed. Cl  Spec. Mstr. Oct. 12, 2001) (unpublished).  Clearly, Geppert provides no persuasive support for petitioners' contention that this court is an improper forum for their case.

Second, petitioners rely on the federal magistrate's conclusion in King v. Aventis Pasteur, Inc., No. 01-1305-AS, Findings and Recommendation, slip op (D. Or June 7, 2002). Pet. Brief at 7-8.  Following the defendant manufacturer's removal of the case to federal court, the federal magistrate declined to find federal question jurisdiction over claims by plaintiffs alleging that thimerosal caused the vaccinee to sustain injury.  King, slip op. at 3-5, see also Pet. Brief at Appendix 2  The magistrate recommended the case's remand on the belief that the state court was the appropriate forum for plaintiffs' claim even though the defendants' defense involved the interpretation of § 11(a) and § 33(5) of the Vaccine Act.  King, slip op. at 3-5.  The magistrate determined that

---

[20]    Special Master Edwards wrote: "Indeed, in the special master's view, petitioners have acquiesced to the special master's jurisdiction – first, by filing a Program petition, and second, by electing to have their petition remain pending before the special master after the expiration of 420 days from the filing of the petition."  Geppert v. Secretary of HHS, No 00-286V, Order at 1, n.1 (Fed. Cl. Spec. Mstr. Oct. 12, 2001) (unpublished)

Congress did not "craft an exclusive federal remedy for all vaccine-related injuries," but allowed the state courts to retain jurisdiction over certain vaccine claims  Id. at 4-5  For diversity jurisdiction purposes, in further determining whether plaintiffs had viable claims against the doctors administering the vaccinations, Magistrate Judge Ashmanskas ruled that although the doctors were covered by the Act as "vaccine administrators," "a state court could find the injuries were not 'vaccine-related.'" Id. at 6-7.  He stated:

> [I]t is entirely possible that the state court would find that Plaintiffs' injuries, which are attributed solely to the toxic mercury found in Thimerosal, do not qualify as "an illness, injury, condition or death associated with one or more of the vaccines set forth in the Vaccine Injury Table" and are not covered by the Act.

Id. at 7-8.  The federal district court judge ultimately adopted the federal magistrate's findings and recommendations.  See King v. Aventis Pasteur, Inc., 210 F. Supp. 2d 1201 (D. Or. June 7, 2002).[21]

---

[21]    Other federal district courts have declined to find federal question jurisdiction over tort claims alleging injury from the thimerosal component of a vaccine.  See, e.g., Doherty v. Pasteur, 2002 WL 1034044 (N.D. Cal May 17, 2002); Garcia v Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 15122 (W.D. Wash. Apr. 23, 2002); Demos v. Aventis Pasteur, No 01-04504-CIV-GRAHAM, slip op. (S.D. Fla Mar. 21, 2002)  The district courts have based their analyses on the "well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Doherty, 2002 WL 1034044, at *1; see also Garcia, 2002 U.S Dist LEXIS 15122, at *5-*6, Demos, slip op at 15-16.  Defendants have argued, in support of removal, that the Vaccine Act created and/or preempted plaintiffs' causes of action or state law and that the claims involve substantial federal questions in the interpretation of the scope of the Vaccine Act  Doherty, 2002 WL 1034044, at *1-*3; Garcia, 2002 U.S. Dist. LEXIS 15122, at *4-*10; Demos, slip op  at 15.  The federal district courts rejected these arguments, concluding that the Vaccine Act neither created nor preempted the state claims or law because the statute explicitly contemplated the state courts as alternative fora for the tort claims.  Doherty, 2002 WL 1034044, at *2 ("It is axiomatic that a federal remedy that leaves intact alternative civil fora cannot be the basis for 'creation' of claims that may be brought in those fora.") (citation and footnote omitted); Demos, slip op. at 15-17.  That is, the Act simply postponed, rather than eliminated, the pursuit of civil suits in state or federal court.  Doherty, 2002 WL 1034044, at *3. The courts have also determined that the federal issues were not substantial enough to confer federal question jurisdiction.  Doherty, 2002 WL 1034044, at *3; Demos, slip op. at 16.  See also Bertrand v. Aventis Pasteur Laboratories, Inc., 2002 WL 31194226 (D  Ariz. Sept. 23, 2002).  But see Cheskiewicz v. Aventis Pasteur, Inc., 2002 WL 1880524, at *1 (E.D. Pa  Aug. 15, 2002) (finding that the complaint did not raise a federal question and noting that defendants, at oral argument, "expressly disclaimed any argument that [the Vaccine Act] create[d] a federal question").  Conversely, more recently in Liu v. Aventis Pasteur, Inc., 2002 WL 31007709, at *1-*3 (W.D. Tex. Aug. 23, 2002), the federal district court dismissed plaintiffs' claim brought before it on federal question jurisdiction, finding that the plaintiffs must exhaust their remedies first under the Vaccine

(continued...)

17

The undersigned finds little persuasive value in the magistrate's findings and recommendation. As respondent notes, the federal district court never reached the issue of whether thimerosal is an adulterant for purposes of the Vaccine Act, nor, as of this time, has the state court on remand. Moreover, Magistrate Judge Ashmanskas's suggestive words focus not on whether plaintiffs' injuries are vaccine-related because thimerosal is an adulterant or contaminant, but focus instead on whether thimerosal-related injuries flow from *vaccines set forth in the Vaccine Injury Table*. See *King*, slip op. at 7-8. Whether the injury was caused by thimerosal in the vaccine or by some other component in the vaccine begs the question as to the proper fora for addressing that issue. As discussed infra, this court finds no basis for distinguishing between the component parts of the vaccine and, thus, finds the *King* analysis inapposite.

Furthermore, the magistrate's analysis depends on cases with fact scenarios that are dissimilar to the factual allegations made in this case. Magistrate Judge Ashmanskas wrote: "Thimerosal is not listed as a vaccine in the Vaccine Injury Table, which courts have tended to construe in an extremely narrow and strict manner." *King*, slip op. at 7    See also Pet. Brief at 7. In support of this statement, he relied on two cases where the special master or judge found the vaccinee did not "receive" a vaccine within the meaning of §11(c)(1)(A) and §14(a) of the Act. In *Brausewetter v. Secretary of HHS*, petitioner received an injection of Hyper-Tet which was "created from the blood plasma of people whom ha[d] been immunized with the tetanus toxoid." *Brausewetter v. Secretary of HHS*, No. 99-278V, 1999 WL 562700, at *1 (Fed. Cl. Spec. Mstr. July 16, 1999). The special master rejected the claimant's arguments that he had directly or indirectly "received" a tetanus toxoid-containing vaccine as set forth in the Vaccine Injury Table.[22] *Id.* at *2. Because the Hyper-Tet inoculation did not actually contain tetanus toxoid, petitioner did not "personally" receive a Table vaccine. *Id.* Mr Brausewetter also did not "indirectly" receive a tetanus toxoid-containing vaccine under §11(c)(1)(A), he actually received injections of tetanus antibodies produced by third parties whom were administered directly the vaccine components. *Id.* at *3. The magistrate also cites *Staples v. Secretary of HHS*, 30 Fed. Cl. 348 (1994). In that case, tried and decided by the undersigned, petitioner was denied compensation under the Program when she contracted paralytic polio from her children who received the inactivated polio vaccine ("IPV") The Vaccine Act limits

---

[21](...continued)
Program.

[22]    See also *Melton v. Secretary of HHS*, No. 01-105V, 2002 WL 229781 (Fed. Cl. Spec. Mstr. Jan. 25, 2002) (ruling that an *in utero* unborn child had not "received" the vaccine as required under §11(c)(1)(A) when the vaccine was administered to a mother while she was pregnant); *Burch v. Secretary of HHS*, No. 99-946V, 2001 WL 180129 (Fed. Cl. Spec. Mstr. Feb. 8, 2001) (ruling that as a matter of law the *in utero* unborn child had not "received" the vaccine as required under §11(c)(1)(A)). But see *Rooks v Secretary of HHS*, 35 Fed. Cl. 1 (1996) (holding that an *in utero* child "received" a vaccine within the meaning of §11(c)(1)(A) when the vaccine was administered to a mother while she was pregnant)

compensation for injuries from *community contact-related* incidences to those sustained from contact with a live virus oral polio vaccine ("OPV") recipient  Staples, 30 Fed. Cl. 348, 350-51, 354-60 (1994). Thus, petitioner in that case neither "received" a Table vaccine directly nor contracted her illness from a person administered OPV. Id. at 359. Both Staples and Brausewetter involved factual scenarios wholly different from the one here  Without a doubt, Nicholas personally received a series of Table vaccines covered under the Program, he further sustained, allegedly, developmental problems arising from a component of some of those vaccines  The magistrate judge's reliance on these cases again reveals the focus of his analysis  whether thimerosal-related injuries flow from vaccines set forth in the Vaccine Injury Table, rather than whether thimerosal is an adulterant or contaminant. See King, slip op. at 7-8. See also Pet. Brief at 7 (stating incorrectly that "Federal Magistrate Ashmansks [sic] . . . recently concluded that it was 'entirely possible' that a state court would find Thimerosal to be an 'adulterant'"). Thus, the cases cited by Magistrate Judge Ashmanskas are not "directly in line" with the factual or jurisdictional issues raised in this case, as petitioners aver, and his finding based on these decisions is unpersuasive  See Pet. Brief at 8.

Moreover, as respondent argues, "the Vaccine Act has broad scope over claims related to vaccinations[.] . . related not only to the vaccine itself, but also to those related to misadventures from the act of administering the vaccine "  Resp. Brief at 4 (citing Pociask v. Secretary of HHS, No. 96-569V, 1999 WL 199053 (Fed. Cl. Spec. Mstr. Mar. 24, 1999) (compensating petitioner for her arm abscess after she experienced a reaction to the tetanus vaccine); Amorella Moore v. Secretary of HHS, No. 91-1558V, 1992 WL 182194 (Fed. Cl. Spec. Mstr. July 13, 1992) (awarding damages for sterile arm abscess resulting from the DPT vaccine). Petitioners' claim is more in line with these two cases involving vaccinees who sustained an injury from the administration of a Table vaccine even though the specific injury is not designated as a Table injury. In sum, petitioners' reliance on King does little to support their interpretation of §11(a)(1) or §33(5).

## V.    Relevant Evidence from the Scientific Community Is Persuasive

While there is an absence of legislative history that directly addresses this vaccine-preservative issue, pertinent evidence from the scientific community tends to refute petitioners' claims that thimerosal is a separate entity of a vaccine or that it is an "adulterant" or "contaminant" within the meaning of the Vaccine Act  An examination of the research and directives of the Food and Drug Administration and the Institute of Medicine ("IOM") reveals strong support for the proposition that the thimerosal preservative is, indeed, a component or constituent of its parent vaccine.  The same information also tends to support the proposition that a substance must be improperly added to a vaccine before it can be considered an "adulterant" or "contaminant" under §33(5) of the Vaccine Act.

19

### A. FDA Regulations and the Federal Food, Drug and Cosmetic Act Support the Court's Interpretation of the Disputed Statutory Language

#### 1. The Preservative Thimerosal Is a Component or a Constituent of the Vaccine

Petitioners argue that thimerosal is toxic to the recipient, "has no therapeutic effect," and thus, cannot be a component of any vaccine, even though they concede thimerosal is an approved preservative in childhood vaccines See, e.g., Pet. Brief at 3-5; Pet. Reply at 5-7 They further allege that "[o]nly the vaccine and its component parts, the parts designed and intended to prevent the targeted disease, are part of the vaccine." Pet. Brief at 4. They note that thimerosal has been removed from "numerous vaccines" and, in its absence, the vaccines are "carrying out their intended purpose of preventing targeted diseases." Id. Thus, if thimerosal is indeed a "component," its removal should render the vaccine ineffective.[23] Id.

Petitioners offer, other than argument, no support for their proposition that to be a component part of a vaccine, thimerosal must be "intended to prevent the targeted disease." As shown supra in Part II (subpart B), the accepted definition of "vaccine" is vastly broader. Thimerosal has an accepted, FDA-approved role as a preservative Petitioners concede that point Pet Reply at 6-7 ("[T]he thimerosal might actually be fulfilling the purpose for its intentional inclusion . . . ."). Petitioners' creative argument that thimerosal's limited role as an FDA-approved preservative nonetheless renders it not part of the vaccine is just that, creative. As with much of petitioners' arguments, no support is given and none can be found

With respect to the FDA guidelines, petitioners repeatedly discount the fact that thimerosal remains an FDA-approved component of the vaccines at issue. Pet. Brief at 13-14; Pet. Reply at 5-8. Respondent argues persuasively that FDA regulations treat preservatives as a constituent part of vaccines, and thus are "part and parcel" of vaccines Resp Brief at 11 Furthermore, respondent points out that all vaccines must be manufactured in accordance with FDA-approved specifications as set forth in an effective biologics license. Id. at 9. To obtain approval for a biologics license, the applicant must show that "the biological product that is the subject of the application is safe, pure, and potent." 42 U.S.C.A. §262(a) (West 2002). Further, to maintain a biologics license, the licensee must comply with FDA regulations. Resp. Brief at 9. In the case at bar, all vaccines are licensed as such. The FDA requires a preservative, like thimerosal, to be added to licensed vaccines sold in multiple dose vials. See 21 C.F.R. §610.15 (stating "[p]roducts in multiple dose containers shall contain a preservative"). See also IOM Thimerosal Report at 13. As emphasized in Owens, thimerosal was an FDA-approved preservative in many drugs since the 1930s. See Owens, 203 F.

---

[23]     Respondent counters that a component part of a vaccine (like thimerosal) can be removed without altering the effectiveness of the vaccine (as, indeed, is the case with thimerosal). Resp. Brief at 13 Respondent illustrates this rebuttal by submitting that the cell wall (arguably a "component") of the whole-cell bordatella pertussis was removed without reducing the vaccine's effectiveness. Id.

Supp. 2d at 755 (citing the Statement by William Egan, Ph.D., FDA, before the Committee on Government Reform, U.S. House of Representatives, July 18, 2002). See also IOM Thimerosal Report at 19. The vaccines in question were approved through this comprehensive licensing process. In fact, only recently has thimerosal's utility been questioned.[24] Nonetheless, respondent persuasively notes that the "FDA has found no ground upon which to order a recall of vaccines containing thimerosal as a preservative or to revoke or suspend the approved licenses for such vaccines." Resp. Brief at 9. Petitioners' argument is devoid of legal and scientific support.

> ## 2. The Preservative Thimerosal Is Neither an "Adulterant" Nor a "Contaminant"

Petitioners further contend that because thimerosal is toxic and not a necessary vaccine component, it is an "adulterant" or "contaminant" within the meaning of the Vaccine Act. Pet. Brief at 10, 14-15; Pet. Reply at 6-8. Today, this court finds that the preservative thimerosal is not an "adulterant" or "contaminant" within the meaning of §33(5). Even if it is ultimately found that thimerosal is harmful to the recipient, this legal finding remains valid because thimerosal's intended purpose, *at the time it was intentionally added*, was to preserve vaccines, not corrupt them.[25] Petitioners' inflammatory statements that thimerosal was added to vaccines only for profit and without regard to the public health are unsupported and irrelevant to the jurisdictional issue.[26]

---

[24]    In October 2001, the IOM issued a report after it examined "whether or not the use of vaccines containing the preservative thimerosal can cause neurodevelopmental disorder in vaccinees." IOM Thimerosal Report at 13. The IOM did not have sufficient evidence "to accept or reject" a causal relationship between thimerosal and neurodevelopmental disorders. Id. at 57. Nevertheless, the report recommends additional research in order to assess the risk of exposure to thimerosal. Id. The concern over the use of thimerosal in vaccines arose when the FDA discovered that children were being exposed to doses of ethyl mercury, an organic mercury, that exceeded the federal safety standards for another form of organic mercury; their exposure to ethyl mercury was attributed to the thimerosal preservative. Id. at 13. The American Academy of Pediatrics and the U.S. Public Health Service issued a joint statement recommending the removal of thimerosal from childhood vaccines in 1999 based upon this information. Id. All vaccines in the recommended childhood immunization schedule that are given to children six years of age and younger are now available thimerosal-free. Id. at 13-14.

[25]    Of course, this court's rejection of petitioners' toxicity arguments for jurisdictional purposes does not prevent them from later demonstrating, in the general and specific causation phases of the case, that the thimerosal component of the vaccines administered to their son was in-fact toxic and injurious.

[26]    In an attempt to muster some support for their allegations that the thimerosal preservative is toxic, petitioners append various exhibits to their Reply Brief, none of which support their plea that jurisdiction more properly lies with another court.

21

While finding superficially attractive petitioners' theory that if a preservative is toxic, it should not be considered a part of the vaccine pursuant to 21 C.F.R. §610 15 (providing that preservatives serving as a constituent material should be "sufficiently nontoxic"), public health officials have not determined that licenses for vaccines containing thimerosal should be revoked because their toxicity reached levels incompatible with FDA regulations. See Pet. Brief at 14; Resp. Brief at 9. Respondent aptly points out that adopting petitioners' interpretation of adulterant or contaminant presupposes that an FDA-approved preservative is harmful. Resp. Brief at 5. For example, petitioners conclude prematurely that "[t]he undisputed reality of its inclusion has been nothing short of neurologic poisoning to thousands of unsuspecting recipients." Pet. Reply at 5. Evidence supporting such a medical conclusion has yet to be presented. The only relevant medical evidence at the court's disposal is from the IOM publication (below at subpart B), which supports the opposite finding.

Respondent also refers to the Federal Food, Drug and Cosmetic Act ("FDCA"), enacted prior to the Vaccine Act and referenced by the Act itself, for a definition of "adulterant." Further insisting that the court adopt this definition, respondent cites Lorillard v. Pons, 434 U.S. 575, 580-81 (1978), and American Federation of Government Employees v. United States, 46 Fed Cl. 586, 599-600 (2000), for the proposition that "Congress normally can be presumed to have had the knowledge of the interpretation given to the incorporated law, at least in so far as it affects a new statute." Resp. Brief at 10. Respondent states that the FDCA defines "adulterated" as "putrid, unsanitary or, 'if it is a drug . . . its manufacture, processing, packing, or holding, do not conform to or are not operated or administered in conformity with current good manufacturing practice.'" Id. (quoting 21 U.S.C. §351(a)(2)(B)). Respondent argues that "[i]t would be incongruous to find that a vaccine component added in compliance with current good manufacturing practices referenced by the FDCA is also an adulterant under that same Act." Id.

This court agrees with respondent's position. "Adulterated" is clearly defined by the FDCA and its meaning is consistent with those ordinary definitions outlined and accepted earlier in the court's discussion. It seems illogical to interpret "adulterant" under the Vaccine Act to encompass an approved ingredient in a vaccine, which is mandated by and in full compliance with FDA regulations.[27] Petitioners have not produced a scintilla of evidence or any persuasive argument to suggest otherwise.

### B. The Institute of Medicine's Report Does Not Support Petitioners' Toxicity Argument

The only other available evidence addressing thimerosal's potential toxicity is a recent publication by the Institute of Medicine. In 2001, the IOM Immunization Safety Review Committee, comprised of a fifteen member panel, all of whom possess expertise in various fields, such as pediatrics, neurology, immunology, internal medicine, infectious diseases, genetics, epidemiology,

---

[27]    Judge Kent found likewise in Owens: "[N]either the plain meaning of 'adulterant' nor 'contaminant' applies to thimerosal when, as here, it is *purposefully used as an ingredient in the approved formulation of a vaccine.*" Owens, 203 F Supp 2d at 755 (emphasis added).

biostatistics, and public health, explored the medical issue   The IOM committee assessed the scientific plausibility of whether thimerosal can be associated with neurodevelopmental injury Reviewing both published and unpublished reports and data, the committee examined biologic plausibility, causality, the health risks associated with vaccine-preventable diseases, and the specific adverse event in question   IOM Thimerosal Report, Executive Summary at 2.  Due to insufficient evidence "to accept or reject" a causal relationship between thimerosal and neurodevelopmental disorders, the IOM's report was ultimately inconclusive  IOM Thimerosal Report at 57.  Rather, the IOM merely recommended a response by public health officials in the areas of policy review and analysis, public health and biomedical research and communications  Id.

Despite the IOM's inconclusive findings, petitioners nonetheless proffer the argument that "a preservative [thimerosal] which is toxic to the recipient becomes an adulterant."[28]  Petitioners cite an FDA regulation which provides that all preservatives introduced into a drug "shall be sufficiently non-toxic so that the amount present in the recommend [sic] dose of the product will not be toxic to the recipient."  Pet. Brief at 14.  Further, petitioners contend that public health officials agree that "thimerosal is dangerous, it poses a neurotoxic threat to recipients." Pet. Reply at 1.  They base this on their belief that "[thimerosal] was removed from vaccines due to its toxicity and contaminating effect."  Id.  Again, petitioners rely upon unsupported extrapolations from scientific reviews for their baseless conclusions  The scientific community has not reached the consensus petitioners advance. For the reasons discussed supra, thimerosal, as an FDA-approved preservative, is in all respects part of the vaccine as "vaccine" is defined in scientific parlance.   In light of the aforementioned pronouncement from the IOM, the undersigned finds petitioners' argument inconsistent with the scientific community's current posture.[29]

---

[28]       Incidentally, petitioners offer only one definition, for "adulteration," which includes the word "toxic."  See P. Brief at 10 ("The addition or substitution of an impure, weaker, cheaper, or possibly toxic substance in a formulation or product.") (quoting Taber's Encyclopedic Medical Dictionary (19th ed. 2001))  In light of the evidence from the FDA, FDCA, and the IOM, this court cannot accept petitioners' unreasonably strained application of this definition

[29]       The law establishing the Vaccine Program, P.L. 99-660, charged the Institute of Medicine of the National Academy of Sciences to review the medical and scientific literature regarding risks associated with the various vaccines covered under the Program.  In light of the IOM's statutory charge, the scope of its review, and the cross-section of experts making up the reviewing committees, the court has given considerable weight to the IOM's findings  See Stevens v. Secretary of HHS, No  99-594V, 2001 WL 387418, at *2 (Fed  Cl  Spec. Mstr  Mar. 30, 2001) See also Salmond v. Secretary of HHS, No  91-123V, 1999 WL 778528, at *5 (Fed  Cl  Spec. Mstr Sept. 16, 2000) (recognizing that the special masters have consistently afforded deference to the IOM's conclusions in vaccine cases largely because of "its mandate and independent role in reviewing existing literature relating to the adverse consequences of vaccines").

## VI.    The Court of Federal Claims Has Exercised Jurisdiction Over Similar Claims

As respondent notes, the Court of Federal Claims has previously exercised jurisdiction over a case involving a preservative that allegedly worsened or triggered injury. Resp Brief at 4. In Grant v. Secretary of HHS, No 88-70V, 1990 WL 293410 (Cl. Ct Spec Mstr. July 13, 1990), the undersigned awarded compensation to a vaccinee who was administered a Quadrigen vaccine. The court was persuaded by the government's medical studies but distinguished them from the facts before him because of the uniqueness of the Quadrigen vaccine. The court found persuasive petitioners' evidence "that pertussis as part of the Quadrigen vaccine has a heightened potential to cause serious harm." Grant, 1990 WL 293410, at *7. The undersigned explained that

> Quadrigen was developed by Parke-Davis as a quadruple antigen product combining pertussis vaccine with diphtheria and tetanus toxoids and with the Salk polio vaccine. All vaccines require a *preservative to keep them sterile and one problem encountered by Parke-Davis with the development of Quadrigen was the selection of an appropriate preservative.* Ultimately, benezethonium chloride (trade name Phemerol) was selected . . . Later research indicated that the use of Phemerol caused certain endotoxins in the pertussis vaccine to leak out from the bacterial cell into the fluid which was injected causing fever leading to convulsions and brain damage.

Id. (emphasis added). This phenomenon was referred to by experts as the leakage theory. Id. at *8 (citing Ezagui v. Dow Chemical Corp., 598 F.2d 727 (2d Cir 1979) (discussing the "Phemerol [preservative] causes leakage" theory which was found to proximately cause personal injury to the vaccinee). The court treated the injury as vaccine-related even though it was caused by a "combination of the pertussis vaccine with *other in [sic] Quadrigen chemicals*," a preservative to be exact, that materially increased the risk of injury. Id. at *10 (emphasis added).

Throughout the court's consideration of whether the vaccinee suffered a Table injury, whether petitioners established a prima facie case of causation-in-fact, and whether a factor unrelated to the vaccine caused the injury, the court never questioned that the vaccinee's injury was a "vaccine-related injury" within the meaning of the Act. In fact, the undersigned stated that "overwhelming evidence supports a finding that Quadrigen is capable of causing exactly the symptoms that occurred to Scott and no other apparent cause of these symptoms was ever brought to light." Id. at *10. The Secretary appealed the court's findings arguing that the undersigned improperly weighed the evidence to reach a final conclusion that the vaccinee was entitled to an award. See Grant v. Secretary of HHS, 956 F.2d 1144, 1148 (Fed. Cir. 1992). Neither the Secretary nor the petitioners ever questioned the undersigned's jurisdiction to decide the ultimate causation issue – nor did the Court of Federal Claims or the Federal Circuit, sua sponte. Instead, on *de novo* review of the Court of Federal Claims's decision, the Federal Circuit affirmed the undersigned's award, finding the court "relied on a preponderance of relevant scientific and medical evidence about the *particular nature* of the Quadrigen." Id. at 1149 (emphasis added). The Circuit "discern[ed] nothing arbitrary, capricious, or unlawful in that reliance." Id. The Federal Circuit quoted the undersigned's findings about the Quadrigen vaccine: "'[M]ost persuasive, however, was the evidence that pertussis as part of the Quadrigen vaccine has a heightened potential to cause serious harm . . .'" Id. at 1148. Further, the

undersigned "gave great weight to testimony about the uniqueness of Quadrigen," which revealed that "Quadrigen uses preservative agents" which when combined with pertussis bacteria can cause neurological damage. Id. at 1149. Thus, clearly the key to both the special master's decision in Grant and the Federal Circuit's affirmance of that decision was the *preservative's* role as a trigger for injury, without which petitioners would not have prevailed on causation.

Petitioners in the instant case attempt to distinguish their case by alleging it is *solely* the thimerosal's *toxicity* which "neurologically poisoned" their son, not the preservative's combination with any other part of or antigen in the vaccine, as was the case in Grant.[10] Pet. Brief at 1-2. Petitioners argue the Federal Circuit "found the preservative(s) . . . did not cause the damage, [but that] the celluar [sic] structure of the pertussis caused the harm. For the Respondents to claim the preservative(s) used in Quadrigen were injurious is simply inaccurate." Pet. Reply at 4. Petitioners draw too fine a distinction here between their case and Grant. The Federal Circuit affirmed the undersigned's findings which were based largely on evidence that the addition of the preservative Phemerol to the Quadrigen vaccine made its administration harmful to the recipient. But for the role of Phemerol, the Federal Circuit found persuasive respondent's epidemiologic evidence against causation. Grant, 956 F.2d at 1148-49. Thus, the triggering role of the preservative, Phemerol, was the evidentiary difference in Grant. Given that the preservative's role is key to the causation theory in the case sub judice, just as it was in Grant, again a case over which the Court of Federal Claims and the Federal Circuit exercised jurisdiction, the court sees no compelling reason why petitioners' claim is not likewise covered by the Vaccine Act.

---

[10]    As a related argument, petitioners contend that it is the toxicity of thimerosal which makes the preservative an "adulterant" or "contaminant" under the Act. This argument was fully addressed in Part V of this decision.

## CONCLUSION

Based on the aforesaid discussion, the court finds that the thimerosal preservative in vaccines is not an "adulterant" or "contaminant" under §33(5) of the Vaccine Act. Consequently, any injury or death arising from the thimerosal component is encompassed within the statutory definition of "vaccine-related injury or death," thereby granting jurisdiction over such claims to this court. Therefore, petitioners alleging an injury or death from the thimerosal preservative in vaccines are statutorily obligated to file their claim against a manufacturer or administrator of the vaccine in the Court of Federal Claims, *in the first instance* Thus, petitioners' claim is properly before this court

While petitioners have the right to pursue this case in civil court, they are first obligated to either submit to this court's jurisdiction for 240 days (excluding suspension periods) or until a judgment is rendered, whichever occurs first. Petitioners shall contact the undersigned's law clerk, Chris Hartley, at (202) 504-2183, by <u>October 25, 2002</u>, to schedule a status conference in order to discuss how they intend to proceed in this case.

**IT IS SO ORDERED.**

Gary J. Golkiewicz
Chief Special Master

26

A TRUE COPY:
TEST:

MARGARET M. EARNEST
Clerk, U.S. Court of Federal Claims

By _____
Deputy Clerk

In the United States Court of Federal Claims

OFFICE OF SPECIAL MASTERS

(Filed: November 7, 2003)

FILED

NOV 7 2003

U.S. COURT OF
FEDERAL CLAIMS

* * * * * * * * * * * * * * * * * * * * * * * * * *
IN RE: CLAIMS FOR VACCINE INJURIES &ast;
RESULTING IN AUTISM SPECTRUM &ast;
DISORDER OR A SIMILAR &ast;
NEURODEVELOPMENTAL DISORDER &ast;          AUTISM MASTER FILE
&ast;
VARIOUS PETITIONERS, &ast;
&ast;
v. &ast;
&ast;
SECRETARY OF HEALTH AND &ast;
HUMAN SERVICES, &ast;
&ast;
Respondent. &ast;
&ast;
* * * * * * * * * * * * * * * * * * * * * * * * * *

AUTISM UPDATE AND ORDER--NOVEMBER 7, 2003

This Update describes a number of recent developments in the Omnibus Autism Proceeding that have occurred since the last Update dated September 24, 2003. I note that counsel for both parties and I have continued to work diligently on the Proceeding during that time period. Unrecorded status conferences were held on September 26, October 3, October 6, October 21, October 28, and November 3, 2003,[1] while counsel were also working extensively with one another throughout this period, in order to keep the Proceeding moving forward.

A. *Number of cases*

At this time, more than 3350 petitions in autism cases have been filed, and are stayed pending the conclusion of the Omnibus Autism Proceeding. Additional petitions continue to be filed regularly.

B. *Discovery*

---

[1] Counsel participating in those conferences included Michael Williams, Kathleen Dailey, Thomas Powers, and Ghada Anis for petitioners; Vincent Matanoski, Mark Raby, Linda Renzi, Traci Manning, and Ann Donohue for respondent.

As indicated in my previous Autism Updates, a tremendous amount of work has been done by counsel for both parties concerning the petitioners' extensive discovery requests. I will not reiterate developments covered in my previous updates, but I will summarize below our progress and certain new developments in the discovery area.

### 1.  General progress concerning initial Requests for Production

Much material responsive to the petitioners' extensive initial set of Requests for Production was made available to petitioners during the fall of 2002 via various government web sites, and petitioners' counsel have analyzed that data. Thousands of pages of additional material has been supplied to petitioners since December of 2002, and petitioners' counsel have analyzed those documents as well. At this point, the respondent has now essentially finished compliance with all of the petitioners' initial set of Requests for Production, except for the items discussed at points 2 and 3, immediately following.

### 2.  The vaccine license application files

One category of documents requested, pursuant to petitioners' Requests for Production Nos. 10 and 12, involves vaccine license applications. In this area, efforts to produce material have proceeded more slowly, as detailed in my previous Autism Updates. The process of production of that material continues to move forward. Recently, the bulk of the Food and Drug Administration (FDA) file with respect to the Merck measles vaccine was submitted to the Petitioners' Steering Committee (hereinafter "the Committee"). Previously, the bulk of the files for the Merck MMR combined vaccine and the Merck mumps vaccine were submitted to the Committee. Large portions of the files pertaining to the Glaxo/SmithKline Hepatitis B vaccine, the North American Healthcare DtaP vaccine, and the Merck Hepatitis B vaccine will soon be submitted. And the files with respect to many additional vaccines are continuing to move at various stages through the arduous process toward disclosure.

### 3.  Issue of access to study data

As indicated in previous Autism Updates, the parties have been in disagreement concerning the issue of production of materials relating to certain "ongoing and proposed studies." As previously indicated, they had chiefly focused their efforts on the goal of providing the Committee with pre-publication access to the data set of one particular study, known as the "Thimerosal Screening Analysis," but it was recently learned that the results of that study will in fact be published in early November of 2003, earlier than previously anticipated. The parties are currently working to see how they can enable the Committee to access the data promptly after the study is published.

The parties have also recently focused on a second recently-published study, known as the Stehr-Green study. The Committee has submitted a request for production of documents in the files

of the Center for Disease Control and Prevention ("CDC") relating to that study, respondent has filed a response,[2] and the parties are working to resolve the matter.

### 4. *Organizational Depositions*

The Committee has also recently filed an additional discovery request,[3] seeking to depose a representative of the CDC. Respondent filed a response to that request on October 27 (again, into the file in *Taylor v. HHS*, No. 02-699V). However, after discussion of that request at the status conferences held on October 28 and November 3, respondent sought and received permission to file a supplemental response on November 7, 2003. We will then further discuss the matter at a conference scheduled for November 10, 2003.

The Committee intends to later file a similar request for deposition of an FDA official.

### 5. *Non-party discovery*

On October 7, 2003, the Committee filed a request for authorization to issue a subpoena to the vaccine manufacturer, Merck and Company, for certain documents pertaining to that company's vaccination for Hepatitis B known as "Recombivax." That request was discussed at status conferences on October 21 and October 28, 2003, with counsel from Merck participating in a portion of the latter conference. Merck's counsel indicated that Merck opposes the request. On October 29, the Committee filed a revised request for subpoena authorization. On October 30, I filed an Order setting a briefing schedule concerning the request, with Merck and the Committee to file briefs between November 14 and December 15, and oral argument to follow soon thereafter. I will promptly rule on the request once briefing and argument are complete.

### C. Issue of the proper date for issuing "§ 12(g)(1) notices"

As discussed in my Update of September 24, a controversy has arisen in the autism cases concerning when the special master should issue the notice pursuant to 42 U.S.C. § 300aa-12(g)(1) (hereinafter the "§ 12(g)(1) notice"), which notice triggers the right of a Vaccine Act petitioner to withdraw his petition pursuant to 42 U.S.C. § 300aa-21(b). On September 3, 2003, I filed, in the individual autism case of *Stewart v. Secretary of HHS*, No. 02-819V, an opinion ruling against the respondent's proposed statutory interpretation concerning this controversy. (That published ruling was put into the Autism Master File by my Order of September 9, 2003, and thus can be accessed

---

[2]That response was filed into the file of the individual autism case of *Taylor v. HHS*, No. 02-699V, rather than into the Autism Master file.

[3]With that discovery request, the discovery request noted above for the Stehr-Green study, and the "non-party discovery" to be discussed immediately below, the Omnibus Autism Proceeding has now moved into the "second round" of discovery, discussed in the initial general plan for the Proceeding.

3

on this court's Internet website, along with all other materials filed in the Autism Master File, at www.uscfc.uscourts.gov/osm/osmautism.htm.) Further, at the status conference held on October 3, 2003, respondent's counsel indicated that respondent will not attempt at this time to obtain interlocutory appellate review of my ruling concerning this issue in the *Stewart* case. Accordingly, I am in the process of filing, in each autism case in which respondent filed a "Motion for Appropriate Relief" identical to respondent's Motion in *Stewart*, a denial of respondent's motion.

Of course, when I file a "§12(g)(1) notice" (also known as a "Formal Notice") in a case, that does *not* end the case, but merely gives the petitioner the *option* of withdrawing the petition if desired. As I have noted in such notices, I stress that the parties to the Omnibus Autism Proceeding and I are working diligently to resolve the general causation issues as quickly as possible. Regular updates on the progress of that proceeding will be available at the Office of Special Masters' page on the court's website. I encourage all of the autism petitioners to remain in the Program until the conclusion of the Omnibus Autism Proceeding, to see if that proceeding develops a theory of proof that might be applicable to this case.

### D. Issue of "judgments"

As noted in a previous Autism Update, I and other special masters are considering the overall issue when "judgments" should be entered in Vaccine Act cases. To assist in this review, the parties to the Omnibus Autism Proceeding filed briefs concerning this topic on July 30, 2003, and August 22, 2003, respectively. I then requested the parties' views on additional points with respect to that general issue, and briefs concerning those points were recently filed.

I will soon file an opinion discussing this topic, in an individual autism case. I will place that opinion into the Autism Master File.

### E. Issue of timeliness of petition filing

In several autism cases, there are pending motions by respondent seeking dismissal on the ground that the petitions were not timely filed. Such motions may be more complicated in autism cases than in previous Vaccine Act cases, due to the fact that in most of the autism cases it is alleged that the vaccinee was injured by a *series* of vaccinations, rather than a single vaccination. These motions have also been potentially made more complex by a recent ruling in *Setnes v. Secretary of HHS*, 57 Fed. Cl. 175 (2003). In one case in which a dismissal motion is pending, *Wood v. Secretary of HHS*, No. 02-1317V, I have invited the Petitioners' Steering Committee to file a brief, which was recently filed. I intend to rule soon on the dismissal motion in that case, and thereafter turn to the other pending dismissal motions. At the request of the Committee, I will consider placing certain documents from that *Wood* case--certainly including my ruling on the motion--into the Autism Master File.

4

### F. Filing records via compact disc

A committee, including a representative of the Petitioners' Steering Committee, a representative of respondent, and personnel from the Office of the Clerk of this court, is currently developing a procedure by which, in autism cases, voluminous records could be filed with the court via compact disc rather than via a "paper copy." That Committee will soon report to me, and I will then file into the Autism Master File an order permitting the filing of records in autism cases via such method.

### G. Attorneys' fees

The Petitioners' Steering Committee has recently forwarded to me a memorandum that outlines the Committee's proposed procedures concerning the eventual application for attorneys' fees and costs with respect to this Omnibus Autism Proceeding. At the status conference on October 28, respondent's counsel noted concerns about the proposed procedures and the notion that fees and costs could be compensated in any proceeding that was not a "proceeding on a petition." Respondent's counsel indicated that these views would be submitted in writing. On October 29, 2003, I filed into Autism Master File a Notice concluding that the memorandum presents an appropriate method for accounting for attorney time and expenditures in the Proceeding.

### H. Future proceedings

The next status conference in the Omnibus Autism Proceeding is scheduled for November 10, 2003.

 

_____
George L. Hastings, Jr.
Special Master

5

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## OF HINDS COUNTY, MISSISSIPPI

**CHANDLER McDAVID WHITE, By and Through**
**His Parents and Next Friend, MICHELLE M. WHITE**
**and LANEY McDAVID WHITE and MICHELLE M.**
**WHITE and LANEY McDAVID WHITE,**
**Individually, as Parents of Minor Child,**
**CHANDLER McDAVID WHITE**                                    **PLAINTIFFS**

    **v.**                                    **CIVIL ACTION NO. 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CIV**

**AVENTIS PASTEUR, INC., Individually and as**
**Successor-in-Interest to CONNAUGHT LABORATOIRES,**
**INC., PASTEUR MERIEUX, and PASTEUR MERIEUX**
**CONNAUGHT; ELI LILLY AND COMPANY;**
**GLAXOSMITHKLINE, Individually and as**
**Successor-in-Interest to SMITHKLINE BEECHAM**
**CORPORATION; MERCK & CO., INC., SIGMA-ALDRICH**
**CORPORATION, Individually and as Successor-in-Interest to**
**SIGMA-ALDRICH, INC.; SIGMA-ALDRICH, INC.,**
**Individually and as Successor-in-Interest to SIGMA-ALDRICH**
**CORPORATION; and WYETH d/b/a WYETH, INC., WYETH**
**LABORATORIES, WYETH-AYERST, WYETH-AYERST**
**LABORATORIES, WYETH LEDERLE, WYETH LEDERLE**
**VACCINES, and LEDERLE LABORATORIES and formerly**
**known as AMERICAN HOME PRODUCTS CORPORATION;**
**MITZI FERGUSON, M.D., THE CHILDREN'S CLINIC, PLLC;**
**RIVER OAKS HOSPITAL**                                    **DEFENDANTS**

## ORDER DISMISSING ELI LILLY AND COMPANY ,
## SIGMA-ALDRICH CORPORATION and SIGMA-ALDRICH, INC.

    This Cause came on for hearing on Eli Lilly and Company's, Sigma-Aldrich

Corporation's and Sigma-Aldrich, Inc.'s Motion to dismiss the Plaintiffs' Complaint. The Court

having heard oral arguments on November 7, 2003, and for the reasons cited in the attached

transcript of said hearing, (Exhibit "A"), hereby orders that the Complaint filed herein against Eli

Lilly and Company, Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. be dismissed without

JM MCC 224082 v1
2139874-000036 11/11/2003

prejudice pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C.§ 300 aa (2000) with each party to bear their own costs.

SO ORDERED AND ADJUDGED, this the 11ᵗʰ day of ____Nov____, 2003.

_____
CIRCUIT COURT JUDGE

ATTEST A TRUE COPY
NOV 11 2003
BARBARA DUNN, CIRCUIT CLERK
BY _____ D.C.

JM MCC 224082 v1
2139874-000036  11/11/2003

IN T    CIRCUIT COURT OF THE F   JT JUDICIAL

DISTRICT OF HINDS COUNTY, MISSISSIPPI


WHITE                                    PLAINTIFFS

V.                              NO. 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

PASTEUR, ET AL                          DEFENDANTS

*********************************************************

TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN THE

MOTION HEARING OF THE ABOVE STYLED AND NUMBERED CAUSE,

BEFORE THE HONORABLE BOBBY B. DELAUGHTER, CIRCUIT

JUDGE, SOLE PRESIDING, ON THE 7TH DAY OF NOVEMBER,

2003.

*********************************************************

APPEARANCES:


        CHARLES S. SIEGEL
        WATERS & KRAUS, LLP
        3219 MCKINNEY AVENUE
        DALLAS, TEXAS 75204
                REPRESENTING THE PLAINTIFFS.

        RICHARD L. JONES
        BRUNINI, GRANTHAM, GROWERS & HEWES, PLLC
        1400 TRUSTMARK BUILDING
        248 EAST CAPITOL STREET
        JACKSON, MISSISSIPPI 39205
                REPRESENTING DEFENDANT AVENTIS-PASTEUR.

        WALKER JONES, III
        MARK C. CARROLL
        BAKER DONELSON BEARMAN & CALDWELL
        P. O. BOX 14167
        JACKSON, MISSISSIPPI 39205
                REPRESENTING DEFENDANT ELI LILLY.



NEVILLE H. BOSCHERT
WATKINS LUDLAM WINTER & STENNIS, P.A.
633 NORTH STATE STREET
JACKSON, MISSISSIPPI 39202
          REPRESENTING DEFENDANT SIGMA ALDRIDGE.

REPORTED BY:
     BRENDA DALE HUNT, CSR
     P. O. BOX 327
     JACKSON, MISSISSIPPI 39205
     CSR NO. 1062

1           THE COURT:  Well, gentlemen, I am a

2     strict constructionist.  Unless there is some

3     ambiguity, I don't even get into the alleged

4     underlying purpose of an act or the intent.

5     I follow what the statute says for whatever

6     reason, and it's very plain to me and

7     unambiguous; therefore, I find that

8     thimerosal being a component rather than an

9     adulterant or a contaminant of a vaccine is a

10    vaccine-related injury or death when it

11    causes such an injury or death.  And under

12    Title 42 USC, Section 300aa-33, subsection 5,

13    that vaccine-related injury means any

14    illness, injury or condition associated with

15    one or more of the vaccines set forth in the

16    vaccine injury table which also includes

17    components or ingredients of which thimerosal

18    is, that that same definition also applies in

19    the subsection dealing with the term

20    manufacturer, or subsection 3.  The term

21    manufacturer means any corporation that

22    manufactures, imports, processes, or

23    distributes any vaccine set forth in the

24    vaccine injury table, including any component

25    or ingredient, which would include

1    thimerosal.  And under Title 42, USC Section

2    300aa-11, subsection (a)(2)(A), no person may

3    bring a civil action for damages in any

4    federal or state court against a vaccine

5    manufacturer unless a petition has been filed

6    in accordance with the Act.  No petition has

7    been filed in accordance with the Act and

8    under subsection B, this Court is totally

9    without the authority to stay anything.  It

10   says, "If such a civil action is filed

11   without a petition the Court shall," it

12   doesn't say "may."  It says, "shall dismiss

13   the action."

14        So the complaint against Eli Lilly and

15   Sigma will be dismissed without prejudice.

16   If you will just prepare me an order.

17        MR. SIEGEL:  Your Honor, could I ask one

18   question in clarification.

19        THE COURT:  Yes, sir.

20        MR. SIEGEL:  Sigma is a supplier of

21   thimerosal, and I understand the Court's

22   ruling there.  Eli Lilly is also being sued

23   as a--not for manufacturing or supplying, but

24   as for different claims about fraud and

25   having made misrepresentations in the

1    invention and early development of it.  And
2    so they would not--I don't think they could
3    be encompassed even within the
4    definition--even if you extend thimerosal to
5    vaccine, they are not a vaccine/thimerosal
6    manufacturer in this case.  They are
7    something else.  And I understand they don't
8    think we make out a cognizable tort claim in
9    that other capacity, but that's a separate
10    argument.  And so we are pursuing--and I
11    understand the Court's ruling as it applies
12    to Sigma and as it applies to some
13    allegations, I guess, against Eli Lilly.  But
14    there are our allegations that don't have to
15    do with the manufacture of thimerosal, but
16    have to do with other conduct regarding
17    thimerosal.  Is Your Honor's ruling
18    encompassing those claims as well?
19        We would suggest respectfully that those
20    claims cannot be included in that ruling or
21    in that definition, and maybe the remedy, I
22    guess, at this point with only those claims
23    remaining would be to stay those claims, but
24    we respectfully say those claims aren't
25    covered within the tort suit prohibition that

1    you are extending to Eli Lilly and Sigma, in

2    other words.

3        THE COURT:  What damages are you

4    alleging arise out of any other conduct that

5    you don't feel would be barred by the act?

6        MR. SIEGEL:  Well, Your Honor, we say

7    that if they hadn't distorted the early

8    science and development of thimerosal perhaps

9    thimerosal vaccines would have never have

10   been--or thimerosal in these vaccines would

11   have never been used.  So in a way that claim

12   can encompass the full range of damages that

13   we seek.

14       THE COURT:  Well, my reading of

15   subsection (a)(2)(A) is that the act would

16   pertain from all damages arising from a

17   vaccine related injury associated with the

18   administration of a vaccine.  So, yes, my

19   ruling applies to those claims as well.

20       MR. SIEGEL:  I understand.  Thank you.

21       MR. JONES:  I will submit an order, Your

22   Honor.

23       THE COURT:  Court will be adjourned.

24       * * * HEARING CONCLUDED * * *

25

## COURT REPORTER'S CERTIFICATE

STATE OF MISSISSIPPI
COUNTY OF HINDS

I, Brenda Dale Hunt, Official Court Reporter for the Seventh Circuit Court District of the State of Mississippi, hereby certify that to the best of my Skill and ability I have reported the proceedings had and done in the trial of WHITE V. PASTEUR, ET AL, being No. 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 on the docket of the Circuit Court of the First Judicial District of Hinds County, Mississippi, and that the above and foregoing six (6)pages contain a true, full and correct transcript of my stenographic notes and tape taken in said proceedings.

I do further certify that my certificate annexed hereto applies only to the original and certified transcript. The undersigned assumes no responsibility for the accuracy of any reproduced copies not made under my control or direction.

This the 11th _____ day of November, 2003.



BRENDA DALE HUNT
Official Court Reporter


CSR NO. 1062



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

OCT - 2 2003

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | | |
|---|---|---|
| BENNETTA CHILES, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | NO. 4:03-CV-802-A |
| | § | |
| AMERICAN HOME PRODUCTS | § | |
| CORPORATION, ET AL., | § | |
| | § | |
| Defendants. | § | |

### ORDER

Came on for consideration the motion of defendants Abbott Laboratories,[1] SmithKline Beecham Corporation, Aventis Pasteur, Inc., Merck & Co., Inc., and Wyeth[2] (collectively "vaccine defendants") and the motion of defendant Eli Lilly & Company ("Lilly") to dismiss. The court, having considered the motions, the response of plaintiffs, Bennetta Chiles, individually and as next friend of Toni Chiles, a minor; Holly Blackburn and Mark Blackburn, each individually and as next friends of Mitchell Reed Blackburn, a minor; Lori M. Reed, individually and as next friend

---

[1] Abbott Laboratories says that it was misnamed as "Abbott Laboratories, Inc."

[2] Wyeth says that it has been incorrectly named as Wyeth Laboratories, Wyeth-Ayerst, Wyeth-Ayerst Laboratories, Wyeth Lederle, Wyeth Lederle Vaccines, and Lederle Vaccines. Mot. to Dismiss at 1 n.1. The petition names American Home Products, doing business as Wyeth, Wyeth Laboratories, Wyeth-Ayerst, Wyeth-Ayerst Laboratories, Wyeth Lederle, Wyether Lederle, Wyether Lederle Vaccines, and Lederle Laboratories. Pls.' Original Pet. at 5, ¶ 3.05. The court considers Wyeth to be the intended defendant.

of Ryan Joseph Reed, a minor; and Krissy Fagan and Carl Fagan, each individually and as next friends of Bradley Kole Fagan, a minor, the replies, the record, and applicable authorities, finds that the motions should be granted as set forth herein.

On June 30, 2003, plaintiffs filed their original petition in the 96th Judicial District Court of Tarrant County, Texas. The action was removed by notice of removal filed July 21, 2003. Plaintiffs contend that they and their minor children were injured as a result of the children having received vaccines containing Thimerosal.[3] They identify causes of action for "strict liability--design defects," "strict liability--marketing defects," breach of common law implied warranties, negligence, violations of the Texas Deceptive Trade Practices--Consumer Protection Act, and assault.[4] They seek compensatory and punitive damages, including for the parent plaintiffs compensation for medical expenses, loss of earning capacity, loss of companionship and society, loss of consortium, and mental anguish.

Movants urge that plaintiffs' claims are barred under the National Childhood Vaccine Injury Compensation Act, 42 U.S.C.

---

[3] Plaintiffs' petition states: "The minor Plaintiffs were administered [Thimerosal] in their childhood vaccinations." Original Pet. at 15, ¶ 9.01.

[4] Contrary to the assertion in plaintiffs' brief, they have not pleaded a claim for fraud. Pls.' Br. at 19-20.

2

§§ 300aa-1 to 300aa-34 (the "Vaccine Act" or "Act"). They
further argue that the claims of the parent plaintiffs are barred
by state law.

Plaintiffs bring claims individually and on behalf of their
minor children. Despite their contention otherwise, it is clear
that all of the claims asserted on behalf of the minor plaintiffs
are for "vaccine-related injury." Owens ex rel. Schafer v. Am.
Home Prods., 203 F. Supp. 2d 748, 754-56 (S.D. Tex. 2002).
Therefore, the claims of the minor children must be pursued in
accordance with the Vaccine Act. 42 U.S.C. § 300aa-11(a)(2)(A).
Plaintiffs admit that they have not yet met all the requirements
of the Vaccine Act to pursue the minor plaintiffs' claims here.[5]
Accordingly, the claims asserted on behalf of the minor
plaintiffs must be dismissed. 42 U.S.C. § 300aa-11(a)(2)(B).

The court recognizes that parents are liable for medical
expenses incurred during the minority of their children; thus, a
cause of action for such expenses belongs to the parents. Walsh
v. Hershey, 472 S.W.2d 954, 957-58 (Tex. Civ. App.--Fort Worth
1971, writ ref'd n.r.e.). However, because the Vaccine Act
provides for payment of expenses incurred on the minor child's
behalf, such as medical expenses, these claims must also be
dismissed. See Strauss v. Am. Home Prods. Corp., 208 F. Supp. 2d

─────────────────

[5] Plaintiffs say only that certain child plaintiffs have
exhausted their administrative remedies and are eligible to opt
out of the vaccine court proceedings. Pls.' Br. at 9.

3

711, 715 n.8 (S.D. Tex. 2002); Benedict v. Sec'y of Dep't of Health & Human Servs., 29 Fed. Cl. 587, 591 (Fed. Cl. 1993).

The Vaccine Act does not otherwise prevent the parent plaintiffs from pursuing their other claims. Owens, 203 F. Supp. 2d at 756-57. The question is whether those claims are barred under Texas law. In this regard, movants urge that the parent plaintiffs have no cognizable claims for mental anguish, emotional distress, loss of consortium, or their own lost wages.

Texas law is clear that the parent plaintiffs do not qualify as bystanders for purposes of mental anguish or emotional distress claims. They were not in a "zone of danger" and did not perceive the type of shocking accident contemplated by the bystander theory of recovery. See United Servs. Auto. Ass'n v. Keith, 970 S.W.2d 540, 542 (Tex. 1998). "Rather, [the parent plaintiffs] witnessed the routine vaccination of their children and the children's subsequent medical problems that are allegedly linked to thimerosal." Owens, 203 F. Supp. 2d at 758. Thus, the bystander theory is inapplicable. Id. And, as for the loss of consortium claim, the Texas Supreme Court has ruled that such a claim does not exist. Roberts v. Williamson, 111 S.W.3d 113 (Tex. 2003). Finally, Texas does not provide for recovery of a parent's lost earnings as a result of caring for an injured child. See Gulf States Utils. Co. v. Reed, 659 S.W.2d 849, 853 (Tex. App.--Houston [14th Dist.] 1983, writ ref'd n.r.e.).

4

The court ORDERS that the motions to dismiss be, and are hereby, granted; that the claims of the minor plaintiffs, Toni Chiles, Mitchell Reed Blackburn, Ryan Joseph Reed, and Bradley Kole Fagan, as asserted through their respective next friends, against the vaccine defendants and Lilly, and the claims of Bennetta Chiles, Holly Blackburn, Mark Blackburn, Lori M. Reed, Krissy Fagan, and Carl Fagan ("adult plaintiffs"), individually, for recovery of medical expenses against the vaccine defendants and Lilly be, and are hereby, dismissed without prejudice; and, that all other claims asserted by the adult plaintiffs, individually, against the vaccine defendants and Lilly be, and are hereby, dismissed with prejudice.

The court determines that there is no just reason for delay in, and hereby directs, entry of final judgment as to the disposition of these claims.

SIGNED October 2, 2003.

JOHN McBRYDE
United States District Judge

5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2002 SP -9  AM 9: 54

U.S. CLERK'S OFFICE

BY:_____
                        DEPUTY

RON   RUSSAK   and   KARLA   RUSSAK,
Individually  and  as  Next  Friend  of  JORDAN
RUSSAK,

               **Plaintiffs,**

-vs-

AVENTIS PASTEUR, INC., Individually and as
Successor-in-Interest to Connaught Laboratories,
Inc., Pasteur Merieux, and Pasteur Merieux
Connaught; *et al.*,

               **Defendants.**

Case No.  A-02-CA-480-SS

## O R D E R

BE IT REMEMBERED on the  _7th_  day of September 2002 the Court reviewed the file in

the above-styled cause, specifically Defendant Eli Lilly and Company's Motion to Dismiss [#5] and

Plaintiffs' response thereto [#15]; Defendant Sigma-Aldrich Corporation and Sigma-Aldrich, Inc.'s

Motion to Dismiss [#3] and Plaintiffs' response thereto [#8]; the Vaccine Manufacturers' 12(b)

Motion to Dismiss and Alternative Motion to Stay [#6] and Plaintiffs' response [attached to #24];

and Defendant Austin Energy's Motion to Dismiss [#9], which was filed on August 13, 2002 and

to which the Plaintiffs have not responded.  Having considered the motions, responses, the case file

as a whole and the applicable law, the Court enters the following opinion and orders.

### Factual and Procedural Background

The plaintiffs, Ron Russak and Karla Russak, are Texas residents and the parents of Jordan

Russak, who is approximately five years old. *See* First Amended Petition, at ¶¶ 5; 24.  They appear

32

in this lawsuit as individuals and as next friend of Jordan Russak. *Id.* at ¶ 5. The plaintiffs contend their son suffered and continues to suffer neurological damage because he was poisoned by mercury contained in thimerosal, a preservative used in vaccines administered to him. *Id.* at ¶¶ 24-26. Jordan received the vaccines between October 2, 1996 and August 2, 2001. *Id.* at ¶ 24. The plaintiffs further contend Jordan's neurological damage was exacerbated by Austin Energy's emission of air toxins such as mercury from fossil-fuel-burning utilities near his residence. *Id.* at ¶¶ 33-34.

On May 30, 2002, the plaintiffs filed this lawsuit in the 53rd Judicial District Court of Travis County, Texas, Cause No. GN201793. The plaintiffs raise causes of actions for strict liability; negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products; gross negligence; fraud and conspiracy; negligence in the marketing, licensing, and design of thimerosal; and negligence in the release of mercury-containing emissions from the burning of fossil fuels. *See* First Amended Petition. The plaintiffs seek compensatory damages for expenditures necessitated by Jordan's injuries, Ron and Karla Russak's lost wages and income, Ron and Karla Russak's emotional distress and loss of consortium, and the lost services Ron and Karla Russak could have provided to each other and Jordan could have provided to them. *Id.* at 19. The plaintiffs also seek punitive damages for certain causes of action. *Id.* Defendant Wyeth, formerly known as American Home Products Corporation, removed the case to this Court on July 29, 2002 after having obtained consent of all other served defendants except Austin Energy.[1] *See* Notice of Removal [#1].

---

[1] In its motion to dismiss, Austin Energy states it did not learn of the removal until after the fact. In the notice of removal, Wyeth argues it did not need Austin Energy's consent because the plaintiffs' addition of Austin Energy as a defendant was a fraudulent joinder for the sole purpose of defeating diversity jurisdiction. The removing party bears the burden of proving fraudulent joinder. *Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98, 100 (5th Cir.), *cert. denied*, 498 U.S. 817 (1990). The plaintiffs' claims against Austin Energy are based on different facts than their vaccine-related claims against the other defendants. However, because this Court has no jurisdiction over Jordan

Defendant Aventis Pasteur Inc. ("Aventis"), Wyeth, SmithKline Beecham Corporation ("SmithKline"), and Merck & Co., Inc. ("Merck") (collectively, "the Vaccine Manufacturers") move to dismiss or, in the alternative, to stay because the plaintiffs did not first file an administrative claim in the Court of Federal Claims as required by the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-11(a)(2)(A). Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. move to dismiss on the same basis. Defendant Eli Lilly and Company ("Eli Lilly") moves to dismiss arguing it did not manufacture the vaccines or thimerosal that caused Jordan Russak's injuries and, therefore, cannot be held liable. Austin Energy moves to dismiss for lack of subject matter jurisdiction and failure to state a claim.

## Analysis

### I.    The Vaccine Act's Requirements

The Vaccine Manufacturers move to dismiss or, in the alternative, to stay the case because the plaintiffs did not first file a petition in the United States Court of Federal Claims. Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. move to dismiss on the same basis. The National Childhood Vaccine Injury Act of 1986 ("the Vaccine Act") sets forth a scheme for compensation for vaccine-related injuries or death. 42 U.S.C. § 300aa-11. Congress enacted the Vaccine Act to streamline the process of seeking compensation for vaccine-related injuries and to avoid the inconsistency, expense and unpredictability of the tort system. *Shalala v. Whitecotton*, 514 U.S. 268, 270, 115 S.Ct. 1477, 1478 (1995) ("For injuries and death traceable to vaccinations, the Act establishes a scheme of

―――――――――――――――――――

Russak's primary causes of action, the plaintiffs have not moved to remand the case for improper removal, and the record and briefing are too scant to determine the fraudulent joinder issue, the Court will treat Austin Energy the same as the other defendants. This ruling is without prejudice to any party raising the issue after the stay in the case is lifted.

recovery designed to work faster and with greater ease than the civil tort system."); H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 (noting for those injured by vaccines, "the opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered."). The Vaccine Act prevents plaintiffs from initiating lawsuits against vaccine administrators or manufacturers in state or federal court for unspecified amounts of damages resulting from vaccine-related injuries unless they first file a timely petition in the Court of Federal Claims for compensation under the Vaccine Act. 42 U.S.C. § 300aa-11(a)(2)(A); *see also Shalala*, 514 U.S. at 270, 115 S.Ct. at 1478. Petitions filed in the Court of Federal Claims are assigned to a special master familiar with Vaccine Act claims. 42 U.S.C. §§ 300aa-11(a)(1) & 300aa-12(d). The statute directs courts to dismiss such causes of action that were not first filed in the Court of Federal Claims. 42 U.S.C. § 300aa-11(a)(2)(B).

The plaintiffs have not filed a petition in the Court of Federal Claims. They contend the Vaccine Act does not require them to do so, because Jordan Russak's injuries are not vaccine-related. The Vaccine Act defines a "vaccine-related injury" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The plaintiffs contend Jordan's injuries are not "vaccine-related" because they were caused not by the vaccines themselves but by the thimerosal added to the vaccines as a preservative to deter microbial and fungal growth—an "adulterant . . . intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The terms "adulterant" and "contaminant" are not defined in the Vaccine Act.

-4-

The plaintiffs are unable to provide the Court any legal authority for their interpretation of the Vaccine Act as applied to thimerosal.[2] On the contrary, it appears every federal court to have ruled on the issue, including this one, has held injuries resulting from thimerosal contained in vaccines are vaccine-related under the meaning of the Vaccine Act. *E.g., Strauss v. American Home Prod. Corp., et al,* Cause No. G-02-226 (S.D. Tex. June 11, 2002) (finding injuries from thimerosal are "vaccine-related" under the Vaccine Act); *Blackmon, et al v. American Home Prod. Corp.,* Cause No. G-02-179 (S.D. Tex. May 8, 2002) (same); *Owens v. American Home Prod. Corp.,* 203 F.Supp.2d 748 (S.D. Tex. 2002) (same). Additionally, the Department of Health and Human Services ("HHS") has taken the position that thimerosal is not an adulterant or contaminant of vaccines.[3] Indeed, the HHS's determination that thimerosal is a component of vaccines,[4] not an adulterant, comports with common sense, since at the time Jordan Russak received the vaccines it was impossible to get the vaccines without thimerosal.

Moreover, the special masters in the Court of Federal Claims are experienced in Vaccine Act claims and are better equipped to handle thimerosal cases. The Court of Federal Claims has been inundated with cases alleging the thimerosal contained in vaccines caused neurodevelopmental

---

[2] The only legal authority the plaintiffs provide for this proposition is an intimation by special master John F. Edwards that thimerosal may be an adulterant in an order directing the government to file a brief on the issue. *See* Plaintiffs' Response to Vaccine Manufacturers' Motion, Ex. B. As the plaintiffs note, this order was later withdrawn.

[3] While the HHS's position is official, in that it is posted on the HHS web site and HHS has taken the position in court papers, it is not a regulation or other agency action entitled to judicial deference under the *Chevron* doctrine. *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837 (1984). However, the HHS's official position holds persuasive authority.

[4] The HHS regulation for general biological products standards includes "preservatives" in the category of "constituent materials," indicating the agency's view that preservatives are components of vaccines, not adulterants. 21 C.F.R. § 610.15.

disorders such as autism. *See* Vaccine Manufacturers' Reply, Ex. 1 ("Autism General Order #1"),
at 1-2. The plaintiffs' claims are identical to hundreds of those already before the Court of Federal
Claims. The Office of Special Masters within that court recently established procedures to
accommodate the thousands of thimerosal cases it expects to receive. *Id.* While the Court of Federal
Claims' acceptance of jurisdiction and creation of procedures is not binding on this Court, it
indicates the entity with the most experience applying the Vaccine Act finds thimerosal cases within
the statute's definition of a "vaccine-related injury" and is prepared and willing to handle such cases.
*See also Collins vs. American Home Prod. Corp.*, Cause No. 3:01-CV-979LN (S.D. Miss. Aug. 1,
2002) (dismissing thimerosal claims because Autism Order #1 "foreclose[d] any reasonable
possibility that the plaintiffs have stated a currently cognizable claim against the resident
defendants."). The Court holds thimerosal is not an adulterant or contaminant under the Vaccine Act
and, thus, Jordan Russak's alleged injuries are vaccine-related. Accordingly, the Vaccine Act
requires the Court to dismiss the parents' claims brought on behalf of Jordan Russak without
prejudice to refiling after they have exhausted the requirements of the Vaccine Act.

## II.    Claims against Non-Vaccine-Manufacturers

Eli Lilly moves to dismiss the plaintiffs' claims against it for failure to state a claim upon
which relief can be granted because it did not manufacture or distribute the thimerosal or vaccines
that allegedly caused Jordan Russak's injuries. Eli Lilly contends it stopped distributing childhood
vaccines prior to 1980, and all vaccines in 1985, and stopped distributing thimerosal by 1992. *See*
Eli Lilly's Motion to Dismiss [#5], Ex. A ("Fishman Affidavit"), at 1-2.

Eli Lilly asks this Court to adjudicate the merits of the plaintiffs' claims against it despite the
Court's need to dismiss or stay the plaintiffs' claims against the vaccine manufacturers until they

follow the exhaustion requirements of the Vaccine Act. The plaintiffs raise many of the same claims against Eli Lilly as against the vaccine manufacturer defendants, including strict liability, negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products, gross negligence, and fraud and conspiracy. To rule on the merits of Eli Lilly's substantive defenses would require a period of discovery allowing the plaintiffs to investigate its contentions. The Court will not allow the plaintiffs to conduct discovery on one defendant during the pendency of the minor's claims under the Vaccine Act against the other defendants. To do so would be wholly inconsistent with Congress's goal of minimizing litigation costs and, therefore, the Court will not allow any discovery until the plaintiffs have complied with the Vaccine Act. *See* H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 ("Lawsuits and settlement negotiations can take months or even years to complete. Transaction costs – including attorneys' fees and court payments – are very high. And in the end, no recovery may be available."). Accordingly, the Court will dismiss Jordan Russak's claims against all defendants rather than allow discovery on Eli Lilly.

**III.    Ron Russak and Karla Russak's Individual Claims**

Ron and Karla Russak bring claims individually and as next friend of Jordan Russak. Individually, they seek recovery for all past and future costs associated with Jordan's injuries, lost wages and income, emotional distress, loss of consortium and loss of services. *See* First Amended Petition, at 17. Under the Vaccine Act, "any person who has sustained a vaccine-related injury" or "the legal representative of such person if such person is a minor or is disabled" may file a petition for compensation in the Court of Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An individual may only file a petition on his own behalf if he received a vaccine and alleges a resulting injury. 42

U.S.C. §§ 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A). Thus, Ron and Karla Russak can only bring their claims as next friend of Jordan, not their individual claims, in the Court of Federal Claims.

The defendants move to dismiss Ron and Karla Russak's individual claims for damages because they are derivative of Jordan's claims, are duplicative of damages available under the Vaccine Act, or are not cognizable under Texas law. However, if the Court dismissed the parents' claims, their statutes of limitations could expire while the parents are representing Jordan's claims in the Court of Federal Claims.[5] TEX. CIV. PRAC. & REM. CODE § 16.003 (two-year statute of limitations in personal injury cases). The Court has discretion to stay proceedings. *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 649 (5th Cir. 2000). Courts often stay proceedings to avoid interference with related proceedings in another forum and to avoid the waste of duplication. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) ("The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."). The parents' claims brought on behalf of their minor son must first be heard in the Court of Federal Claims. Dismissing the parents' individual claims during the pendency of that court's jurisdiction might preclude the parents from bringing their claims in any forum. Accordingly, the Court will stay all proceedings in Ron and Karla Russak's individual causes of action against all defendants until Jordan's claims have been administered in the Court of Federal Claims under the Vaccine Act.

---

[5] The Vaccine Act does not toll the statute of limitations for the parents' claims while they are representing their child in the Court of Federal Claims. The Vaccine Act does, however, toll the statute of limitations for the minor's state law claims while his petition is pending before the court. 42 U.S.C. § 300aa-16(c). For the child's claims against the defendants who do not manufacture vaccines, the statute of limitations will not begin to run until he reaches the age of majority. *See* TEX. CIV. PRAC. & REM. CODE § 16.001.

In accordance with the foregoing:

IT IS ORDERED that the Vaccine Manufacturers' 12(b) Motion to Dismiss [#6] is GRANTED IN PART as to the claims of Jordan Russak to be presented in the Court of Federal Claims, and their Alternative Motion to Stay [#6] is GRANTED IN PART as to Ron Russak and Karla Russak's individual causes of action;

IT IS FURTHER ORDERED that Sigma-Aldrich Corporation and Sigma Aldrich, Inc.'s Motion to Dismiss [#3] is GRANTED IN PART as to the claims of Jordan Russak to be presented in the Court of Federal Claims, and DENIED IN PART as to Ron Russak and Karla Russak's individual causes of action;

IT IS FURTHER ORDERED that Eli Lilly and Company's Motion for Leave to File its Amended Motion to Dismiss [#28] is DENIED;

IT IS FURTHER ORDERED that Eli Lilly and Company's Motion to Dismiss [#5] is GRANTED IN PART as to the claims of Jordan Russak to be presented in the Court of Federal Claims, and DENIED IN PART as to Ron Russak and Karla Russak's individual causes of action;

IT IS FURTHER ORDERED that plaintiffs' claims brought as next friend of Jordan Russak against all defendants are DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that plaintiffs' claims brought in their individual capacities are STAYED pending further order of this Court;

IT IS FINALLY ORDERED that the plaintiffs SHALL FILE a status report with this Court on **May 9, 2003** informing the Court of the status of their petition, if any, filed on behalf of Jordan Russak in the Court of Federal Claims.

SIGNED this the 7th day of September 2002.


SAM SPARKS
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
AUSTIN DIVISION

2002 OC -8  AM II: 52

WESTERN DISTRICT OF TEXAS
U.S. CLERK'S OFFICE

BY:_____
                              DEPUTY

PETE CARABINE and HEIDI CARABINE,
Individually and as Next Friend of Collin
Carabine,

Plaintiffs,

-vs-                                                    Case No.  A-02-CA-501-SS

AVENTIS PASTEUR, INC., et al.,
Defendants.

---

## ORDER

BE IT REMEMBERED on the _8th_ day of October 2002 the Court reviewed the file in the above-styled cause, specifically Defendant Eli Lilly & Company's Amended Motion to Dismiss [#30], Plaintiffs' Response [#28] and Defendant's reply [#32]; Defendants Sigma-Aldrich Corporation's and Sigma-Aldrich, Inc's Motion to Dismiss [#11] and Plaintiffs' Response [#21]; Defendants' Sigma-Aldrich Corporation and Sigma-Aldrich, Inc.'s Alternative Motion to Stay Proceedings [#23]; Vaccine Defendants' Motion to Dismiss or Alternatively to Stay Proceedings [#25] and Plaintiffs' Response [#33]; and Defendant Reliant Energy's Motion for Summary Judgment [#31]. Having considered the motions and responses, the case file as a whole and the applicable law, the Court enters the following opinion and orders.

### Factual and Procedural Background

The plaintiffs, Pete Carabine and Heidi Carabine, are Texas residents and the parents of Collin Carabine, who is approximately six years old. *See* Petition, at ¶¶ 5; 25. They appear in this lawsuit as individuals and as next friend of Collin Carabine. *Id.* at ¶ 5. The plaintiffs contend their

OCT 1 1 2002

39

son suffered and continues to suffer neurological damage because he was poisoned by mercury contained in thimerosal, a preservative used in vaccines administered to him. *Id.* at ¶¶ 25-27. Collin received the vaccines between November 6, 1995 and October 25, 1999.[1] *Id.* at ¶ 25. The plaintiffs further contend Collin's neurological damage was exacerbated by Defendant Houston Lighting and Power Company's ("Reliant") emission of air toxins such as mercury from power plants that burn fossil fuels near his residence. *Id.* at ¶¶ 31-38.

On July 3, 2002, the plaintiffs filed this lawsuit in the 201st Judicial District Court of Travis County, Texas, Cause No. GN202160. The plaintiffs raise causes of actions for strict liability; negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products; gross negligence; fraud and conspiracy; negligence in the marketing, licensing, and design of thimerosal; and negligence in the release of mercury-containing emissions from the burning of fossil fuels. *See* Petition. The plaintiffs seek compensatory damages for expenditures necessitated by Collin's injuries, Collin's pain and suffering, Pete and Heidi Carabine's lost wages and income, Pete and Heidi Carabine's emotional distress and loss of consortium, and the lost services Pete and Heidi Carabine could have provided to each other and Collin could have provided to them. *Id.* at 20. The plaintiffs also seek punitive damages for certain causes of action. *Id.* Defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, ("SmithKline") removed the case to this Court on

---

[1] The petition states Collin received the vaccines through October 25, "199." Because this typographical error prevents the Court from discerning the relevant date, the Court uses the year 1999 merely as a potential correct date.

August 9, 2002 after having obtained consent of all other served defendants.[2]   *See* Notice of

Removal [#1].

Defendants Aventis Pasteur Inc. ("Aventis"), Wyeth, SmithKline, and Merck & Co., Inc.

("Merck") (collectively, "the Vaccine Manufacturers") move to dismiss or, in the alternative, to stay

because the plaintiffs did not first file an administrative claim in the Court of Federal Claims as

required by the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-11(a)(2)(A).   Sigma-

Aldrich Corporation and Sigma-Aldrich, Inc. move to dismiss on the same basis. Defendant Eli Lilly

and Company ("Eli Lilly") moves to dismiss arguing it did not manufacture the vaccines or

thimerosal that caused Collin Carabine's injuries and, therefore, cannot be held liable. Reliant

moves for summary judgment on the merits.

### Analysis

**I.    The Vaccine Act's Requirements**

The Vaccine Manufacturers move to dismiss or, in the alternative, to stay the case because

the plaintiffs did not first file a petition in the United States Court of Federal Claims. Sigma-Aldrich

Corporation and Sigma-Aldrich, Inc. move to dismiss on the same basis. The National Childhood

Vaccine Injury Act of 1986 ("the Vaccine Act") sets forth a scheme for compensation for vaccine-

---

[2] Defendant Reliant consented to the removal. Reliant appears to be a Texas corporation, which would defeat diversity jurisdiction. In the notice of removal, SmithKline argues the plaintiffs' addition of Reliant as a defendant was a fraudulent joinder for the sole purpose of defeating diversity jurisdiction. The removing party bears the burden of proving fraudulent joinder. *Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98, 100 (5th Cir.), *cert. denied*, 498 U.S. 817 (1990). The plaintiffs' claims against Reliant are based on different facts than their vaccine-related claims against the other defendants. However, because this Court has no jurisdiction over Collin Carabine's primary causes of action, the plaintiffs have not moved to remand, and the record and briefing are too scant to determine the fraudulent joinder issue, the Court will treat Reliant the same as the other defendants. This ruling is without prejudice to any party raising the issue or challenging this Court's jurisdiction after the stay in the case is lifted.

related injuries or death. 42 U.S.C. § 300aa-11. Congress enacted the Vaccine Act to streamline the process of seeking compensation for vaccine-related injuries and to avoid the inconsistency, expense and unpredictability of the tort system. *Shalala v. Whitecotton*, 514 U.S. 268, 270, 115 S.Ct. 1477, 1478 (1995) ("For injuries and death traceable to vaccinations, the Act establishes a scheme of recovery designed to work faster and with greater ease than the civil tort system."); H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 (noting for those injured by vaccines, "the opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered."). The Vaccine Act prevents plaintiffs from initiating lawsuits against vaccine administrators or manufacturers in state or federal court for unspecified amounts of damages resulting from vaccine-related injuries unless they first file a timely petition in the Court of Federal Claims for compensation under the Vaccine Act. 42 U.S.C. § 300aa-11(a)(2)(A); *see also Shalala*, 514 U.S. at 270, 115 S.Ct. at 1478. Petitions filed in the Court of Federal Claims are assigned to a special master familiar with Vaccine Act claims. 42 U.S.C. §§ 300aa-11(a)(1) & 300aa-12(d). The statute directs courts to dismiss such causes of action that were not first filed in the Court of Federal Claims. 42 U.S.C. § 300aa-11(a)(2)(B).

The plaintiffs have not filed a petition in the Court of Federal Claims. They contend the Vaccine Act does not require them to do so, because Collin Carabine's injuries are not vaccine-related. The Vaccine Act defines a "vaccine-related injury" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The plaintiffs contend Collin's injuries are not "vaccine-related" because they were caused not by the vaccines themselves

-4-

but by the thimerosal added to the vaccines as a preservative to deter microbial and fungal growth–an "adulterant . . . intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5).  The terms "adulterant" and "contaminant" are not defined in the Vaccine Act.

The plaintiffs are unable to provide the Court any legal authority for their interpretation of the Vaccine Act as applied to thimerosal.  On the contrary, it appears every federal court to have ruled on the issue, including this one, has held injuries resulting from thimerosal contained in vaccines are vaccine-related under the meaning of the Vaccine Act.  *E.g., Strauss v. American Home Prod. Corp., et al,* Cause No. G-02-226 (S.D. Tex. June 11, 2002) (finding injuries from thimerosal are "vaccine-related" under the Vaccine Act); *Blackmon, et al v. American Home Prod. Corp.,* Cause No. G-02-179 (S.D. Tex. May 8, 2002) (same);  *Owens  v. American Home Prod. Corp.,* 203 F.Supp.2d 748 (S.D. Tex. 2002) (same).  Additionally, the Department of Health and Human Services ("HHS") has taken the position that thimerosal is not an adulterant or contaminant of vaccines.[3]  Indeed, the HHS's determination that thimerosal is a component of vaccines,[4] not an adulterant, comports with common sense, since at the time Collin received the vaccines it was impossible to get the vaccines without thimerosal.

Moreover, the special masters in the Court of Federal Claims are experienced in Vaccine Act claims and are better equipped to handle thimerosal cases.  The Court of Federal Claims has been

---

[3] While the HHS's position is official, in that it is posted on the HHS web site and HHS has taken the position in court papers, it is not a regulation or other agency action entitled to judicial deference under the *Chevron* doctrine.  *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837 (1984).  However, the HHS's official position holds persuasive authority.

[4] The HHS regulation for general biological products standards includes "preservatives" in the category of "constituent materials," indicating the agency's view that preservatives are components of vaccines, not adulterants. 21 C.F.R. § 610.15.

inundated with cases alleging the thimerosal contained in vaccines caused neurodevelopmental disorders such as autism. *See* Vaccine Manufacturers' Reply, Ex. 1 ("Autism General Order #1"), at 1-2. The plaintiffs' claims are identical to hundreds of those already before the Court of Federal Claims. The Office of Special Masters within that court recently established procedures to accommodate the thousands of thimerosal cases it expects to receive. *Id.* While the Court of Federal Claims' acceptance of jurisdiction and creation of procedures is not binding on this Court, it indicates the entity with the most experience applying the Vaccine Act finds thimerosal cases within the statute's definition of a "vaccine-related injury" and is prepared and willing to handle such cases. *See also Collins vs. American Home Prod. Corp.*, Cause No. 3:01-CV-979LN (S.D. Miss. Aug. 1, 2002) (dismissing thimerosal claims because Autism Order #1 "foreclose[d] any reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants."). The Court holds thimerosal is not an adulterant or contaminant under the Vaccine Act and, thus, Collin Carabine's alleged injuries are vaccine-related. Accordingly, the Vaccine Act requires the Court to dismiss the parents' claims brought on behalf of Collin Carabine without prejudice to refiling after they have exhausted the requirements of the Vaccine Act.

## II.    Claims against Non-Vaccine-Manufacturers

Eli Lilly moves to dismiss the plaintiffs' claims against it for failure to state a claim upon which relief can be granted because it did not manufacture or distribute the thimerosal or vaccines that allegedly caused Collin Carabine's injuries. Eli Lilly contends it stopped distributing childhood vaccines prior to 1980, and all vaccines in 1985, and stopped distributing thimerosal by 1992. *See* Eli Lilly's Amended Motion to Dismiss [#30], Ex. A ("Fishman Affidavit"), at 1.

-6-

Eli Lilly asks this Court to adjudicate the merits of the plaintiffs' claims against it despite the Court's need to dismiss or stay the plaintiffs' claims against the Vaccine Manufacturers until they follow the exhaustion requirements of the Vaccine Act. The plaintiffs raise many of the same claims against Eli Lilly as against the vaccine manufacturer defendants, including strict liability, negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products, gross negligence, and fraud and conspiracy. To rule on the merits of Eli Lilly's substantive defenses would require a period of discovery allowing the plaintiffs to investigate its contentions. The Court will not allow the plaintiffs to conduct discovery on one defendant during the pendency of the minor's claims under the Vaccine Act against the other defendants. To do so would be wholly inconsistent with Congress's goal of minimizing litigation costs and, therefore, the Court will not allow any discovery until the plaintiffs have complied with the Vaccine Act. *See* H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 ("Lawsuits and settlement negotiations can take months or even years to complete. Transaction costs – including attorneys' fees and court payments – are very high. And in the end, no recovery may be available.").

The same reasoning holds true for Reliant's motion for summary judgment, to which the plaintiffs have not responded. Reliant contends it owed no duty to Collin preventing it from exposing him to normal power plant emissions because the risk of mercury poisoning to Collin was not foreseeable. *See* Reliant's Motion for Summary Judgment [#31], at 3-6. Reliant also argues the plaintiffs cannot establish Reliant's power plants caused Collin's injuries because the power plant emissions contain very low levels of mercury and no scientific studies have linked autism to power plant emissions. *Id.* at 7-10. These arguments on the merits obviously involve complicated factual determinations that this Court cannot make before allowing the plaintiffs a period of discovery

-7-

(despite the plaintiffs' failure to respond to Reliant's motion which, under the Local Rules, entitles the Court to grant the motion as unopposed). Additionally, the Court will not rule on the merits of the plaintiffs' claims against Reliant before determining if the claims are properly before this Court as an appendage to this cause of action. Accordingly, the Court will dismiss Collin Carabine's claims against all defendants rather than allow discovery on Eli Lilly and Reliant.

## III.    Pete and Heidi Carabine's Individual Claims

Pete and Heidi Carabine bring claims individually and as next friend of Collin Carabine. Individually, they seek recovery for all past and future costs associated with Collin's injuries, lost wages and income, emotional distress, loss of consortium and loss of services. *See* Petition, at 20. Under the Vaccine Act, "any person who has sustained a vaccine-related injury" or "the legal representative of such person if such person is a minor or is disabled" may file a petition for compensation in the Court of Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An individual may only file a petition on his own behalf if he received a vaccine and alleges a resulting injury. 42 U.S.C. §§ 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A). Thus, Pete and Heidi Carabine can only bring their claims as next friend of Collin, not their individual claims, in the Court of Federal Claims.

The defendants move to dismiss Pete and Heidi Carabine's individual claims for damages because they are derivative of Collin's claims, are duplicative of damages available under the Vaccine Act, or are not cognizable under Texas law. However, if the Court dismissed the parents' claims, their statutes of limitations could expire while the parents are representing Collin's claims in the Court of Federal Claims.[5] TEX. CIV. PRAC. & REM. CODE § 16.003 (two-year statute of

---

[5] The Vaccine Act does not toll the statute of limitations for the parents' claims while they are representing their child in the Court of Federal Claims. The Vaccine Act does, however, toll the statute of limitations for the minor's state law claims while his petition is pending before the court.

-8-

limitations in personal injury cases). The Court has discretion to stay proceedings. *Black Sea Inv.,*

*Ltd. v. United Heritage Corp.*, 204 F.3d 647, 649 (5th Cir. 2000). Courts often stay proceedings to

avoid interference with related proceedings in another forum and to avoid the waste of duplication.

*West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) ("The

concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the

authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result.").

The parents' claims brought on behalf of their minor son must first be heard in the Court of Federal

Claims. Dismissing the parents' individual claims during the pendency of that court's jurisdiction

might preclude the parents from bringing their claims in any forum. Accordingly, the Court will stay

all proceedings in Pete and Heidi Carabine's individual causes of action against all defendants until

Collin's claims have been administered in the Court of Federal Claims under the Vaccine Act.

In accordance with the foregoing:

IT IS ORDERED that Eli Lilly and Company's Motion to Dismiss [#4] is DISMISSED AS

MOOT;

IT IS FURTHER ORDERED that the Vaccine Manufacturers' Motion to Dismiss [#25] is

GRANTED IN PART as to the claims of Collin Carabine to be presented in the Court of Federal

Claims, and their Alternative Motion to Stay [#25] is GRANTED IN PART as to Pete Carabine and

Heidi Carabine's individual causes of action;

---

42 U.S.C. § 300aa-16(c). For the child's claims against the defendants who do not manufacture
vaccines, the statute of limitations will not begin to run until he reaches the age of majority. *See*
TEX. CIV. PRAC. & REM. CODE § 16.001.

IT IS FURTHER ORDERED that Sigma-Aldrich Corporation and Sigma Aldrich, Inc.'s

Motion to Dismiss [#11] is GRANTED IN PART as to the claims of Collin Carabine to be presented

in the Court of Federal Claims, and their Alternative Motion to Stay Proceedings [#23] is

GRANTED IN PART as to Pete Carabine and Heidi Carabine's individual causes of action;

IT IS FURTHER ORDERED that Eli Lilly and Company's Amended Motion to Dismiss

[#30] is GRANTED IN PART as to the claims of Collin Carabine to be presented in the Court of

Federal Claims, and DENIED IN PART as to Pete and Heidi Carabine's individual causes of action;

IT IS FURTHER ORDERED that Defendant Reliant Energy, Inc's Motion for Summary

Judgment [#31] is DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that plaintiffs' claims brought as next friend of Collin Carabine

against all defendants are DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that plaintiffs' claims brought in their individual capacities are

STAYED pending further order of this Court;

IT IS FINALLY ORDERED that the plaintiffs SHALL FILE a status report with this Court

on June 7, 2003 informing the Court of the status of their petition, if any, filed on behalf of Collin

Carabine in the Court of Federal Claims.


SIGNED this the _8th_ day of October 2002.


SAM SPARKS
UNITED STATES DISTRICT JUDGE


-10-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

2003 JA -6 PM 4:07

U.S. CLERK'S OFFICE

BY:_____

LESLIE YOUNG and LAURIE YOUNG,
Individually and Next Friend of Leslie Martin
Young,

          **Plaintiffs,**

-vs-                          **Case No. A-02-CA-734-SS**

AVENTIS PASTEUR, INC., et al.,
          **Defendants.**

---

## O R D E R

BE IT REMEMBERED on the 6ᵗʰ day of January 2003, the Court reviewed the file in the above-styled cause, specifically Defendant Eli Lilly and Company's Motion to Dismiss [#14] and Plaintiffs' response thereto [#20]; Defendant Sigma-Aldrich Corporation and Sigma-Aldrich, Inc.'s Motion to Dismiss [#4] and Alternative Motion to Stay [#5] and Plaintiffs' response thereto [#9]; the Vaccine Manufacturers' Motion to Dismiss or Alternatively to Stay [#6], Plaintiffs' response [#13] and Defendants' reply [#19]; Defendant Spectrum Laboratory Products, Inc.'s Motion to Dismiss [#7] and Plaintiffs' response thereto [#10]; and Defendant The Dow Chemical Company's Rule 12(b)(6) Motion to Dismiss and for Summary Judgment [#11] and Motion to Dismiss or, Alternatively, to Stay [#12] and Plaintiffs' Response thereto [#18]. Having considered the motions, responses, the case file as a whole and the applicable law, the Court enters the following opinion and orders.



### Factual and Procedural Background

The plaintiffs, Leslie and Laurie Young, are Texas residents and the parents of Leslie Martin Young, who is approximately four years old. *See* Petition, at ¶¶ 5, 23. They appear in this lawsuit as individuals and as next friend of Leslie Martin Young. *Id.* at ¶ 5. The plaintiffs contend their son suffered and continues to suffer neurological damage because he was poisoned by mercury contained in thimerosal, a preservative used in vaccines administered to him. *Id.* at ¶¶ 23-25. Leslie received the vaccines between September 15, 1998 and approximately September 10, 1999. *Id.* at ¶ 23.

On October 22, 2002, the plaintiffs filed this lawsuit in the 345th Judicial District Court of Travis County, Texas, Cause No. GN203822. The plaintiffs raise causes of actions for strict liability; negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products; gross negligence; fraud and conspiracy; and negligence in the marketing, licensing, and design of thimerosal. *Id.* at ¶¶ 29-69. The plaintiffs seek compensatory damages for expenditures necessitated by Leslie Martin Young's injuries, Leslie Martin Young's pain and suffering, all plaintiffs' lost wages and income, all plaintiffs' emotional distress and loss of consortium, and the lost services the plaintiffs could have provided to each other. *Id.* at 17. The plaintiffs also seek punitive damages for certain causes of action. *Id.* Defendant Wyeth, formerly known as American Home Products Corporation, removed the case to this Court on November 15, 2002 after having obtained consent of all other defendants. *See* Notice of Removal [#1].

Defendants Aventis Pasteur Inc. ("Aventis"), Wyeth, SmithKline Beecham Corporation ("SmithKline"), and Merck & Co., Inc. ("Merck") (collectively, "the Vaccine Manufacturers") move to dismiss or, in the alternative, to stay because the plaintiffs did not first file an administrative claim in the Court of Federal Claims as required by the National Childhood Vaccine Injury Act, 42 U.S.C.

-2-

Laboratory Products, Inc. ("Spectrum") and Eli Lilly and Company ("Eli Lilly") move to dismiss or alternatively to stay on the same basis. The Dow Chemical Company ("Dow") moves to dismiss and for summary judgment arguing it did not manufacture or sell the vaccines or thimerosal that caused Leslie Martin Young's injuries and, therefore, cannot be held liable. Dow has also filed a motion to dismiss or, alternatively, to stay based on the plaintiffs' failure to raise their claims first in the Court of Federal Claims.

**Analysis**

**I.    The Vaccine Act's Requirements**

The defendants move to dismiss or, in the alternative, to stay the case because the plaintiffs did not first file a petition in the United States Court of Federal Claims. The National Childhood Vaccine Injury Act of 1986 ("the Vaccine Act") sets forth a scheme for compensation for vaccine-related injuries or death. 42 U.S.C. § 300aa-11. Congress enacted the Vaccine Act to streamline the process of seeking compensation for vaccine-related injuries and to avoid the inconsistency, expense and unpredictability of the tort system. *Shalala v. Whitecotton*, 514 U.S. 268, 270, 115 S.Ct. 1477, 1478 (1995) ("For injuries and death traceable to vaccinations, the Act establishes a scheme of recovery designed to work faster and with greater ease than the civil tort system."); H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 (noting for those injured by vaccines, "the opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered."). The Vaccine Act prevents plaintiffs from initiating lawsuits against vaccine administrators or manufacturers in state or federal court for unspecified amounts of damages resulting from vaccine-related injuries unless they first file a timely petition in the Court of Federal

-3-

Claims for compensation under the Vaccine Act. 42 U.S.C. § 300aa-11(a)(2)(A); *see also Shalala*, 514 U.S. at 270, 115 S.Ct. at 1478. Petitions filed in the Court of Federal Claims are assigned to a special master familiar with Vaccine Act claims. 42 U.S.C. §§ 300aa-11(a)(1) & 300aa-12(d). The statute directs courts to dismiss such causes of action that were not first filed in the Court of Federal Claims. 42 U.S.C. § 300aa-11(a)(2)(B).

The plaintiffs have not filed a petition in the Court of Federal Claims. They contend the Vaccine Act does not require them to do so, because Leslie Martin Young's injuries are not vaccine-related. The Vaccine Act defines a "vaccine-related injury" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The plaintiffs contend Leslie's injuries are not "vaccine-related" because they were caused not by the vaccines themselves but by the thimerosal added to the vaccines as a preservative to deter microbial and fungal growth– an "adulterant . . . intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The terms "adulterant" and "contaminant" are not defined in the Vaccine Act.

The plaintiffs are unable to provide the Court any legal authority for their interpretation of the Vaccine Act as applied to thimerosal. On the contrary, it appears every federal court to have ruled on the issue, including this one, has held injuries resulting from thimerosal contained in vaccines are vaccine-related under the meaning of the Vaccine Act. *E.g., Strauss v. American Home Prod. Corp., et al*, Cause No. G-02-226 (S.D. Tex. June 11, 2002) (finding injuries from thimerosal are "vaccine-related" under the Vaccine Act); *Blackmon, et al v. American Home Prod. Corp.*, Cause No. G-02-179 (S.D. Tex. May 8, 2002) (same); *Owens v. American Home Prod. Corp.*, 203

-4-

F.Supp.2d 748 (S.D. Tex. 2002) (same).    Additionally, the Department of Health and Human Services ("HHS") has taken the position that thimerosal is not an adulterant or contaminant of vaccines.[1]  Indeed, the HHS's determination that thimerosal is a component of vaccines,[2] not an adulterant, comports with common sense, since at the time Leslie Martin Young received the vaccines it was impossible to get the vaccines without thimerosal.

Moreover, the special masters in the Court of Federal Claims are experienced in Vaccine Act claims and are better equipped to handle thimerosal cases.  The Court of Federal Claims has been inundated with cases alleging the thimerosal contained in vaccines caused neurodevelopmental disorders such as autism.  *See* Vaccine Manufacturers' Motion to Dismiss, Ex. 3 ("Autism General Order #1"), at 1-2.  The plaintiffs' claims are identical to hundreds of those already before the Court of Federal Claims.  The Office of Special Masters within that court recently established procedures to accommodate the thousands of thimerosal cases it expects to receive.  *Id.*  While the Court of Federal Claims' acceptance of jurisdiction and creation of procedures is not binding on this Court, it indicates the entity with the most experience applying the Vaccine Act finds thimerosal cases within the statute's definition of a "vaccine-related injury" and is prepared and willing to handle such cases.  *See also Collins vs. American Home Prod. Corp.*, Cause No. 3:01-CV-979LN (S.D. Miss. Aug. 1, 2002) (dismissing thimerosal claims because Autism Order #1 "foreclose[d] any

---

[1] While the HHS's position is official, in that it is posted on the HHS web site and HHS has taken the position in court papers, it is not a regulation or other agency action entitled to judicial deference under the *Chevron* doctrine.  *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984).  However, the HHS's official position holds persuasive authority.

[2] The HHS regulation for general biological products standards includes "preservatives" in the category of "constituent materials," indicating the agency's view that preservatives are components of vaccines, not adulterants.  21 C.F.R. § 610.15.

reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants."). The Court holds thimerosal is not an adulterant or contaminant under the Vaccine Act and, thus, Leslie Martin Young's alleged injuries are vaccine-related.[3]  Accordingly, the Vaccine Act requires the Court to dismiss the parents' claims brought on behalf of Leslie Martin Young without prejudice to refiling after they have exhausted the requirements of the Vaccine Act.

## II.    Claims against Non-Vaccine-Manufacturers

Dow moves to dismiss the plaintiffs' claims against it for failure to state a claim upon which relief can be granted and moves for summary judgment because it did not manufacture or sell the thimerosal or vaccines that allegedly caused Leslie Martin Young's injuries.  Dow contends it has not had a license to manufacture vaccines since 1978.

Dow asks this Court to adjudicate the merits of the plaintiffs' claims against it despite the Court's need to dismiss or stay the plaintiffs' claims against the vaccine manufacturers until the plaintiffs follow the exhaustion requirements of the Vaccine Act.  The plaintiffs raise the same claims against Dow as against the vaccine manufacturer defendants.  To rule on the merits of Dow's substantive defenses would require a period of discovery allowing the plaintiffs to investigate its contentions.  In fact, the plaintiffs have moved for a continuance to allow them to conduct discovery

_____

[3] Eli Lilly also relies on the Homeland Security Act of 2002 Congress recently passed, which amends the definition of "manufacturer" in the Vaccine Act to include manufacturers of "any component or ingredient" of any vaccine, and the definition of "vaccine" to include "a preparation or suspension containing an attenuated or inactive microorganism or subunit thereof or toxin" and "all components and ingredients listed in the vaccines's [sic] product license application and product label."  H.R. 5005 (attached as Ex. D to Eli Lilly's Motion to Dismiss).  The Homeland Security Act states it applies to all actions pending on the date of its adoption on November 19, 2002.  Because these amendments are quite new and the Court has relied in its previous thimerosal rulings on more established authorities, the Court need not interpret these amendments in this Order.  However, the Court does not preclude the defendants from raising the Homeland Security Act in future motions.

before the Court rules on the summary judgment motion. The Court will not allow the plaintiffs to conduct discovery on one defendant during the pendency of the minor's claims under the Vaccine Act against the other defendants. To do so would be wholly inconsistent with Congress's goal of minimizing litigation costs and, therefore, the Court will not allow any discovery until the plaintiffs have complied with the Vaccine Act. *See* H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 ("Lawsuits and settlement negotiations can take months or even years to complete. Transaction costs – including attorneys' fees and court payments – are very high. And in the end, no recovery may be available."). Accordingly, the Court will dismiss Leslie Martin Young's claims against all defendants rather than allow discovery on Dow.

**III.    Leslie Young and Laurie Young's Individual Claims**

Leslie and Laurie Young bring claims individually and as next friend of Leslie Martin Young. Individually, they seek recovery for all past and future costs associated with their son's injuries, lost wages and income, emotional distress, loss of consortium and loss of services. *See* Petition, at 17. Under the Vaccine Act, "any person who has sustained a vaccine-related injury" or "the legal representative of such person if such person is a minor or is disabled" may file a petition for compensation in the Court of Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An individual may only file a petition on his own behalf if he received a vaccine and alleges a resulting injury. 42 U.S.C. §§ 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A). Thus, Leslie and Laurie Young can only bring their claims as next friend of Leslie, not their individual claims, in the Court of Federal Claims.

The defendants move to dismiss Leslie and Laurie Young's individual claims for damages because they are derivative of Leslie's claims, are duplicative of damages available under the Vaccine Act, or are not cognizable under Texas law. However, if the Court dismissed the parents'

-7-

claims, their statutes of limitations could expire while the parents are representing their son's claims in the Court of Federal Claims.[4] TEX. CIV. PRAC. & REM. CODE § 16.003 (two-year statute of limitations in personal injury cases). The Court has discretion to stay proceedings. *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 649 (5th Cir. 2000). Courts often stay proceedings to avoid interference with related proceedings in another forum and to avoid the waste of duplication. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) ("The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."). The parents' claims brought on behalf of their minor son must first be heard in the Court of Federal Claims. Dismissing the parents' individual claims during the pendency of that court's jurisdiction might preclude the parents from bringing their claims in any forum. Accordingly, the Court will stay all proceedings in Leslie and Laurie Young's individual causes of action against all defendants until their son's claims have been administered in the Court of Federal Claims under the Vaccine Act.

In accordance with the foregoing:

IT IS ORDERED that the Vaccine Manufacturers' Motion to Dismiss [#6] is GRANTED IN PART as to the claims of Leslie Martin Young to be presented in the Court of Federal Claims, and

---

[4] The Vaccine Act does not toll the statute of limitations for the parents' claims while they are representing their child in the Court of Federal Claims. The Vaccine Act does, however, toll the statute of limitations for the minor's state law claims while his petition is pending before the court. 42 U.S.C. § 300aa-16(c). For the child's claims against the defendants who do not manufacture vaccines, the statute of limitations will not begin to run until he reaches the age of majority. *See* TEX. CIV. PRAC. & REM. CODE § 16.001.

-8-

their Alternative Motion to Stay [#6] is GRANTED IN PART as to Leslie and Laurie Young's individual causes of action;

IT IS FURTHER ORDERED that Sigma-Aldrich Corporation and Sigma Aldrich, Inc.'s Motion to Dismiss [#4] is GRANTED IN PART as to the claims of Leslie Martin Young to be presented in the Court of Federal Claims, and their Alternative Motion to Stay Proceedings [#5] is GRANTED IN PART as to Leslie and Laurie Young's individual causes of action;

IT IS FURTHER ORDERED that Eli Lilly and Company's Motion to Dismiss [#14] is GRANTED IN PART as to the claims of Leslie Martin Young to be presented in the Court of Federal Claims, and DENIED IN PART as to Leslie and Laura Young's individual causes of action;

IT IS FURTHER ORDERED that Spectrum Laboratory Products, Inc.'s Motion to Dismiss [#7] is GRANTED IN PART as to the claims of Leslie Martin Young to be presented in the Court of Federal Claims, and DENIED IN PART as to Leslie and Laura Young's individual causes of action;

IT IS FURTHER ORDERED that Defendant The Dow Chemical Company's Motion to Dismiss [#12] is GRANTED IN PART as to the claims of Leslie Martin Young to be presented in the Court of Federal Claims, and its Alternative Motion to Stay [#12] is GRANTED IN PART as to Leslie and Laura Young's individual causes of action;

IT IS FURTHER ORDERED that Defendant The Dow Chemical Company's 12(b)(6) Motion to Dismiss and Motion for Summary Judgment [#11] are DENIED without prejudice to refiling;

IT IS FURTHER ORDERED that Plaintiffs' Motion for Continuance [#18] is DENIED;

IT IS FURTHER ORDERED that Sigma-Aldrich Corporation's Motion for Leave to File Supplemental Memorandum in Support of Their Motion to Dismiss [#16] is GRANTED;

IT IS FURTHER ORDERED that plaintiffs' claims brought as next friend of Leslie Martin Young against all defendants are DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that plaintiffs' claims brought in their individual capacities are STAYED pending further order of this Court;

IT IS FINALLY ORDERED that the plaintiffs SHALL FILE a status report with this Court on **September 8, 2003** informing the Court of the status of their petition, if any, filed on behalf of Leslie Martin Young in the Court of Federal Claims.

SIGNED this the ___6th___ day of January 2003.


SAM SPARKS
UNITED STATES DISTRICT JUDGE

-10-

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



FILED

2003 MAR 10  AM 9: 48

**DARON SWAFFORD AND TINA SWAFFORD,**
**Individually  and  as  Next  Friend  of  JOEY**
**SWAFFORD,**
                              **Plaintiffs,**

-vs-                                                          **Case No.  A-03-CA-055-SS**

**AVENTIS PASTEUR, INC., et al.,**
                              **Defendants.**

---

## O R D E R

BE IT REMEMBERED on the _7th_ day of March 2003 the Court reviewed the file in the

above-styled cause, specifically Sigma-Aldrich Corporation and Sigma-Aldrich, Inc.'s Motion to

Dismiss [#4] and alternative Motion to Stay [#5], the response [#21] and reply [#30]; the Vaccine

Defendants' Motion to Dismiss or Alternatively to Stay [#6] (to which no response has been filed);

Spectrum Laboratory Products, Inc.'s Motion to Dismiss [#7] and the response thereto [#22]; and

Eli Lilly and Company's Motion to Dismiss and/or to Stay [#23] and supplemental memorandum

thereto [#24] and Plaintiffs' response [#26].  Having considered the motions, responses, case file as

a whole and the applicable law, the Court enters the following opinion and orders.

### Factual and Procedural Background

The plaintiffs, Daron and Tina Swafford, are Texas residents and the parents of Joey

Swafford, who is approximately three years old. *See* Petition, at ¶¶ 5, 23.  They appear in this

lawsuit as individuals and as next friend of Joey Swafford. *Id.* at ¶ 5.  The plaintiffs contend their

son suffered and continues to suffer neurological damage because he was poisoned by mercury

34

contained in thimerosal, a preservative used in vaccines administered to him. *Id.* at ¶¶ 23-25. Joey received the vaccines between September 1, 1999 and approximately January 5, 2001. *Id.* at ¶ 5.

On December 31, 2002, the plaintiffs filed this lawsuit in the 345th Judicial District Court of Travis County, Texas, Cause No. GN204657. The plaintiffs raise causes of actions for strict liability; negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products; gross negligence; fraud and conspiracy; and negligence in the marketing, licensing, and design of thimerosal. *Id.* at ¶¶ 29-69. The plaintiffs seek compensatory damages for expenditures necessitated by Joey Swafford's injuries, Joey Swafford's pain and suffering, all plaintiffs' lost wages and income, all plaintiffs' emotional distress and loss of consortium, and the lost services the plaintiffs could have provided to each other. *Id.* at 16. The plaintiffs also seek punitive damages for certain causes of action. *Id.* at 17. Defendant Wyeth, formerly known as American Home Products Corporation, removed the case to this Court on January 30, 2003 after having obtained consent of all other defendants. *See* Notice of Removal [#1].

Defendants Aventis Pasteur Inc. ("Aventis"), Wyeth, SmithKline Beecham Corporation ("SmithKline"), and Merck & Co., Inc. ("Merck") (collectively, "the Vaccine Manufacturers") move to dismiss or, in the alternative, to stay because the plaintiffs did not first file an administrative claim in the Court of Federal Claims as required by the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-11(a)(2)(A).    Defendants Sigma-Aldrich Corporation, Sigma-Aldrich, Inc., Spectrum Laboratory Products, Inc. ("Spectrum") and Eli Lilly and Company ("Eli Lilly") move to dismiss or alternatively to stay on the same basis.

## Analysis

I.     **The Vaccine Act's Requirements**

The defendants move to dismiss or, in the alternative, to stay the case because the plaintiffs did not first file a petition in the United States Court of Federal Claims. The National Childhood Vaccine Injury Act of 1986 ("the Vaccine Act") sets forth a scheme for compensation for vaccine-related injuries or death. 42 U.S.C. § 300aa-11. Congress enacted the Vaccine Act to streamline the process of seeking compensation for vaccine-related injuries and to avoid the inconsistency, expense and unpredictability of the tort system. *Shalala v. Whitecotton*, 514 U.S. 268, 270, 115 S.Ct. 1477, 1478 (1995) ("For injuries and death traceable to vaccinations, the Act establishes a scheme of recovery designed to work faster and with greater ease than the civil tort system."); H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 (noting for those injured by vaccines, "the opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered."). The Vaccine Act prevents plaintiffs from initiating lawsuits against vaccine administrators or manufacturers in state or federal court for unspecified amounts of damages resulting from vaccine-related injuries unless they first file a timely petition in the Court of Federal Claims for compensation under the Vaccine Act. 42 U.S.C. § 300aa-11(a)(2)(A); *see also Shalala*, 514 U.S. at 270, 115 S.Ct. at 1478. Petitions filed in the Court of Federal Claims are assigned to a special master familiar with Vaccine Act claims. 42 U.S.C. §§ 300aa-11(a)(1) & 300aa-12(d). The statute directs courts to dismiss such causes of action that were not first filed in the Court of Federal Claims. 42 U.S.C. § 300aa-11(a)(2)(B).

The plaintiffs have not filed a petition in the Court of Federal Claims. They contend the Vaccine Act does not require them to do so, because Joey Swafford's injuries are not vaccine-related.

-3-

The Vaccine Act defines a "vaccine-related injury" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The plaintiffs contend Joey's injuries are not "vaccine-related" because they were caused not by the vaccines themselves but by the thimerosal added to the vaccines as a preservative to deter microbial and fungal growth– an "adulterant . . . intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The terms "adulterant" and "contaminant" are not defined in the Vaccine Act. Similarly, the plaintiffs argue their claims are not against "vaccine administrators" or "vaccine manufacturers" as defined under the Vaccine Act, because the defendants are manufacturers, distributors, designers and/or promoters of thimerosal itself, not a vaccine. 42 U.S.C. § 300aa-11(a)(2)(A).

The plaintiffs are unable to provide the Court any legal authority for their interpretation of the Vaccine Act as applied to thimerosal. On the contrary, it appears every federal court to have ruled on the issue, including this one, has held injuries resulting from thimerosal contained in vaccines are vaccine-related under the meaning of the Vaccine Act. *E.g., Strauss v. American Home Prod. Corp., et al,* Cause No. G-02-226 (S.D. Tex. June 11, 2002) (finding injuries from thimerosal are "vaccine-related" under the Vaccine Act); *Blackmon, et al v. American Home Prod. Corp.,* Cause No. G-02-179 (S.D. Tex. May 8, 2002) (same); *Owens v. American Home Prod. Corp.,* 203 F.Supp.2d 748 (S.D. Tex. 2002) (same). Additionally, the Department of Health and Human Services ("HHS") has taken the position that thimerosal is not an adulterant or contaminant of

-4-

)

)

holds thimerosal is not an adulterant or contaminant under the Vaccine Act and, thus, Joey Swafford's alleged injuries are vaccine-related. Accordingly, the Vaccine Act requires the Court to dismiss the parents' claims brought on behalf of Joey Swafford without prejudice to refiling after they have exhausted the requirements of the Vaccine Act.[3]

## II.    Daron Swafford and Tina Swafford's Individual Claims

Daron and Tina Swafford bring claims individually and as next friend of their son, Joey Swafford. Individually, they seek recovery for all past and future costs associated with their son's injuries, lost wages and income, emotional distress, loss of consortium and loss of services. *See* Petition, at 16. Under the Vaccine Act, "any person who has sustained a vaccine-related injury" or "the legal representative of such person if such person is a minor or is disabled" may file a petition for compensation in the Court of Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An individual may only file a petition on his own behalf if he received a vaccine and alleges a resulting injury. 42 U.S.C. §§ 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A). Thus, Daron and Tina Swafford can only bring their claims as next friend of Joey, not their individual claims, in the Court of Federal Claims.

The defendants move to dismiss Daron and Tina Swafford's individual claims for damages because they are derivative of Joey's claims, are duplicative of damages available under the Vaccine Act, or are not cognizable under Texas law. However, if the Court dismissed the parents' claims, their statutes of limitations could expire while they are representing their son's claims in the Court

---

[3] To the extent the plaintiffs sued defendants that allegedly did not manufacture the thimerosal at issue in this case, the Court dismisses their claims on behalf of Joey Swafford against those defendants as well in the interest of judicial economy.

holds thimerosal is not an adulterant or contaminant under the Vaccine Act and, thus, Joey Swafford's alleged injuries are vaccine-related. Accordingly, the Vaccine Act requires the Court to dismiss the parents' claims brought on behalf of Joey Swafford without prejudice to refiling after they have exhausted the requirements of the Vaccine Act.[3]

## II.    Daron Swafford and Tina Swafford's Individual Claims

Daron and Tina Swafford bring claims individually and as next friend of their son, Joey Swafford. Individually, they seek recovery for all past and future costs associated with their son's injuries, lost wages and income, emotional distress, loss of consortium and loss of services. *See* Petition, at 16. Under the Vaccine Act, "any person who has sustained a vaccine-related injury" or "the legal representative of such person if such person is a minor or is disabled" may file a petition for compensation in the Court of Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An individual may only file a petition on his own behalf if he received a vaccine and alleges a resulting injury. 42 U.S.C. §§ 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A). Thus, Daron and Tina Swafford can only bring their claims as next friend of Joey, not their individual claims, in the Court of Federal Claims.

The defendants move to dismiss Daron and Tina Swafford's individual claims for damages because they are derivative of Joey's claims, are duplicative of damages available under the Vaccine Act, or are not cognizable under Texas law. However, if the Court dismissed the parents' claims, their statutes of limitations could expire while they are representing their son's claims in the Court

---

[3] To the extent the plaintiffs sued defendants that allegedly did not manufacture the thimerosal at issue in this case, the Court dismisses their claims on behalf of Joey Swafford against those defendants as well in the interest of judicial economy.

-6-

vaccines.[1] Indeed, the HHS's determination that thimerosal is a component of vaccines,[2] not an adulterant, comports with common sense, since at the time Joey Swafford received the vaccines it was impossible to get the vaccines without thimerosal.

Moreover, the special masters in the Court of Federal Claims are experienced in Vaccine Act claims and are better equipped to handle thimerosal cases. The Court of Federal Claims has been inundated with cases alleging the thimerosal contained in vaccines caused neurodevelopmental disorders such as autism. *See* Vaccine Manufacturers' Motion to Dismiss, Ex. 3 ("Autism General Order #1"), at 1-2; Ex. 1 ("Ruling on Jurisdiction"). The plaintiffs' claims are identical to hundreds of those already before the Court of Federal Claims. The Office of Special Masters within that court recently established procedures to accommodate the thousands of thimerosal cases it expects to receive. *See* Autism General Order #1. While the Court of Federal Claims' acceptance of jurisdiction and creation of procedures is not binding on this Court, it indicates the entity with the most experience applying the Vaccine Act finds thimerosal cases within the statute's definition of a "vaccine-related injury" and is prepared and willing to handle such cases. *See also Collins vs. American Home Prod. Corp.*, Cause No. 3:01-CV-979LN (S.D. Miss. Aug. 1, 2002) (dismissing thimerosal claims because Autism Order #1 "foreclose[d] any reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants."). The Court

---

[1] While the HHS's position is official, in that it is posted on the HHS web site and HHS has taken the position in court papers, it is not a regulation or other agency action entitled to judicial deference under the *Chevron* doctrine. *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984). However, the HHS's official position holds persuasive authority.

[2] The HHS regulation for general biological products standards includes "preservatives" in the category of "constituent materials," indicating the agency's view that preservatives are components of vaccines, not adulterants. 21 C.F.R. § 610.15.

of Federal Claims.[4] TEX. CIV. PRAC. & REM. CODE § 16.003 (two-year statute of limitations in personal injury cases). The Court has discretion to stay proceedings. *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 649 (5th Cir. 2000). Courts often stay proceedings to avoid interference with related proceedings in another forum and to avoid the waste of duplication. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) ("The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."). The parents' claims brought on behalf of their minor son must first be heard in the Court of Federal Claims. Dismissing the parents' individual claims during the pendency of that court's jurisdiction might preclude the parents from bringing their claims in any forum. Accordingly, the Court will stay all proceedings in Daron and Tina Swafford's individual causes of action against all defendants until their son's claims have been administered in the Court of Federal Claims under the Vaccine Act.

In accordance with the foregoing:

IT IS ORDERED that the Vaccine Manufacturers' Motion to Dismiss [#6] is GRANTED IN PART as to the claims of Joey Swafford to be presented in the Court of Federal Claims, and their Alternative Motion to Stay [#6] is GRANTED IN PART as to Daron and Tina Swafford's individual causes of action;

---

[4] The Vaccine Act does not toll the statute of limitations for the parents' claims while they are representing their child in the Court of Federal Claims. The Vaccine Act does, however, toll the statute of limitations for the minor's state law claims while his petition is pending before the court. 42 U.S.C. § 300aa-16(c). For the child's claims against the defendants who do not manufacture vaccines, the statute of limitations will not begin to run until he reaches the age of majority. *See* TEX. CIV. PRAC. & REM. CODE § 16.001.

IT IS FURTHER ORDERED that Sigma-Aldrich Corporation and Sigma Aldrich, Inc.'s Motion to Dismiss [#4] is GRANTED IN PART as to the claims of Joey Swafford to be presented in the Court of Federal Claims, and their Alternative Motion to Stay Proceedings [#5] is GRANTED IN PART as to Daron and Tina Swafford's individual causes of action;

IT IS FURTHER ORDERED that Eli Lilly and Company's Motion to Dismiss [#23] is GRANTED IN PART as to the claims of Joey Swafford to be presented in the Court of Federal Claims, and its Alternative Motion to Stay [#23] is GRANTED IN PART as to Daron and Tina Swafford's individual causes of action;

IT IS FURTHER ORDERED that Spectrum Laboratory Products, Inc.'s Motion to Dismiss [#7] is GRANTED IN PART as to the claims of Joey Swafford to be presented in the Court of Federal Claims, and DENIED IN PART as to Daron and Tina Swafford's individual causes of action;

IT IS FURTHER ORDERED that plaintiffs' claims brought as next friend of Joey Swafford against all defendants are DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that plaintiffs' claims brought in their individual capacities are STAYED pending further order of this Court;

IT IS FINALLY ORDERED that the plaintiffs SHALL FILE a status report with this Court on November 7, 2003 informing the Court of the status of their petition, if any, filed on behalf of Joey Swafford in the Court of Federal Claims.

SIGNED this the _7th_ day of March 2003.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

E&D
1-15-03

**IN THE UNITED STATES DISTRICT COURT**

FILED - CLERK
U.S. DISTRICT COURT

2003 JAN 15 AM 8:04

**FOR THE EASTERN DISTRICT OF TEXAS**

TX EASTERN - LUFKIN

**LUFKIN DIVISION**          BY_____ DH

KIRK BOTTER and DARLA BOTTER §
Individually and as Next Friend of
CODY WYATT BOTTER          §

VS.                        § CIVIL ACTION NO. 9:02 CV 181

AVENTIS PASTEUR, INC.,     §
Individually and as Successor-in-Interest
to CONNAUGHT LABORATORIES, §
INC., et. al.

### ORDER

　　　Plaintiffs Kirk Botter and Darla Botter bring this suit, individually and as legal

representative of their minor child, Cody Wyatt Botter, pursuant to Texas state law,

against Defendants Aventis Pasteur, Inc. ("Aventis") f/k/a Connaught Laboratories

f/d/b/a Pasteur Merieux Connaught; Sigma Aldrich, Inc. and Sigma Aldrich

Corporation ("Sigma Inc."); the Dow Chemical Company ("Dow"); Eli Lilly and

Company ("Eli Lilly"); GDL International, Inc. ("GDL"); GlaxoSmithKline,

Individually and as Successor-in-Interest to  Smith Kline Beecham Corporation

("Smith Kline"); Merck and Company, Inc. ("Merck"); EM Industries, Inc. ("EM");[1]

Taylor Medical;  and Wyeth ("Wyeth") d/b/a Wyeth, Inc., Wyeth Laboratories,

---

[1]Plaintiffs have dismissed their claims against EM Industries, Inc.

1

Wyeth-Ayerst, Wyeth-Ayerst Laboratories, Wyeth Lederle, Wyeth Lederle Vaccines, and Lederle Laboratories, and f/k/a American Home Products, Corp.   Plaintiffs' complaint alleges the following causes of action: strict liability, negligence, gross negligence, fraud & conspiracy, and negligence in marketing.   In their prayer for relief, the parents seek damages for loss of consortium of their child, Cody Wyatt.

Before the Court are the Vaccine Manufacturer Defendants' Rule 12(b) and 12(c) Motion to Dismiss (doc. # 12) brought by Aventis Pasteur, Merck, Wyeth, and Smith Kline; Eli Lilly and Co.'s Motion to Dismiss or Stay Proceedings (doc. # 4) and its Amended Motion to Dismiss (doc. # 31); Sigma-Aldrich Inc.'s Motion to Dismiss (doc. # 6), its Alternative Motion to Stay Proceedings (doc. #33), its Supplemental Motion to Dismiss (doc. # 34), and its second Supplemental Motion to Dismiss (doc. # 60); Aventis Pasteur Inc.'s Motion to Dismiss (doc. # 12); and Dow Chemical's Motion to Dismiss or Stay Proceedings and for Summary Judgment (docs. # 38 and # 39).   After due consideration of the briefing and oral arguments of the parties and the relevant law, the Court finds  that the motions are well taken in part and should be GRANTED IN PART.

## BACKGROUND

Plaintiffs claim their son, Cody Wyatt, was exposed to harmful levels of mercury received through injections of routine childhood vaccinations administered

to him by his pediatrician during the first eighteen months of his life, from April 16, 1998 through December 10, 1999. Plaintiffs allege that Cody now suffers, and in the future will continue to suffer, the toxic neurological effects of mercury poisoning as a result of certain Defendants'[2] negligent use of thimerosal preservative, containing mercury, in their vaccines. The Complaint, filed originally in the District Court of Angelina County, Texas, states that in the 1980's, the FDA proposed a regulation requiring the removal of thimerosal from all over-the-counter products and that in July of 1999 the American Academy of Pediatrics advised its members to use thimerosal-free vaccines due to concern regarding mercury poisoning.

Defendants removed the case from Angelina County claiming this Court has diversity and federal question jurisdiction under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-1, *et seq*.

Defendants assert the affirmative defense that the National Childhood Vaccine Injury Act ("The Act") prohibits a civil suit against a vaccine manufacturer or administrator for damages greater than $1,000 if the damages arise from a vaccine related injury or death and urge the Court to dismiss the case because Plaintiffs have not filed first with the U.S. Court of Federal Claims ("Vaccine Court") as required by the Act. In the alternative, Defendants request that we stay proceedings pending the

---

[2] The Complaint does not specify which of the Defendants to which it refers.

3

10:25 JAN 15, 2003                TEL NO: 5901015              #10565 PAGE: 5/19

outcome of the suit before the Vaccine Court.[3]

## DISCUSSION

### Claims Against Vaccine Manufacturers:

The National Childhood Vaccine Injury Act of 1986 sets forth a scheme for compensation for vaccine-related injuries or death. 42 U.S.C. § 300aa-11 (1988 ed., as amended 2002) . Congress recognized that the "[v]accination of children against deadly, disabling, but preventable infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken. Use of vaccines has prevented thousands of children's deaths each year and has substantially reduced the effects resulting from disease." H.R. Rep. No. 99-908, at 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6345. However, while most children enjoy measurable benefit from immunization programs, "a small but significant number of have been gravely injured." *Knudsen v. Secretary of HHS*, 35 F.3d 543, 549 (Fed. Cir. 1994) (quoting H.R.Rep. No. 99-908, at 3, *reprinted in* 1986 U.S.C.C.A.N. 6344).

Congress, therefore, enacted the Act to streamline the process of seeking compensation for vaccine-related injuries and to avoid the inconsistency, expense, and unpredictability of the tort system. *Shalala v. Whitecotton*, 514 U.S. 268, 269,

---

[3]While some Defendants state additional grounds for their motions to dismiss, pending motions use the Vaccine Act provisions as a main basis for their motions to dismiss or to stay.

4

115 S.Ct. 1477, 1478, 131 L.Ed.2d 374 (1995). The program established by the

Act is designed to "ensure that all children who are injured by vaccines have access

to sufficient compensation for their injuries," H.R. Rep. No. 99-908 at 6345- 6346,

and "free[s] manufacturers from the specter of large, uncertain tort liability, and

thereby ... keep[s] manufacturers in the market." *Schafer v. Am. Cyanamid Co.*, 20

F.3d 1, 4 (1st Cir. 1994).

The Program, set forth in the Vaccine Act, requires vaccine-related claims

to be initially heard by special masters in the United States Court of Federal Claims

("Vaccine Court"), adjudicated informally and then accorded expeditious review.

*See Whitecotton*, 514 U.S. at 270, 115 S.Ct. at 1478. This system streamlines the

claims process by establishing standards of proof, under which individuals who

suffer injuries within specified intervals after being administered a vaccine, benefit

from a presumption that a vaccine caused those injuries. *See* 42 U.S.C. §§

300aa-11(c)(1)(C)(i), 300aa-13(a)(1), 300aa-14; *Haggerty v. Wyeth Ayerst Pharm.*,

79 F.Supp.2d 182, 184 (E.D.N.Y. 2000). A Program claimant may not file a civil

action against a vaccine manufacturer or administrator unless the claimant initially

files a timely petition in accordance with the Program's guidelines.[4] *See* 42 U.S.C.

---

[4] A proper claimant, or "petitioner," under the Vaccine Act is "any person who has sustained a vaccine-related injury," or the legal representative of such person. 42 U.S.C. § 300aa-11(b)(1)(A).

5

§ 300aa-11(2)(A); *Whitecotton,* 514 U.S. at 270, 115 S.Ct. at 1478 (explaining that a claimant alleging an injury after the Vaccine Act's effective date "must exhaust the Act's procedures ...before filing any de novo civil action in state or federal court."). If a claimant seeks compensation in a state or federal court for vaccine-related injuries prior to exhausting his or her remedies under the Vaccine Act, the Court must dismiss the action. *See* 42 U.S.C. § 300aa-11(a)(2)(B). Simply put, individuals who qualify as Program claimants must file petitions in the Vaccine Court in order to pursue any vaccine-related claims at all.[5] If an individual who prevails in the Vaccine Court is ultimately dissatisfied with his or her Program award, that individual may reject the award and pursue a traditional tort action in any forum[6]. *See* 42 U.S.C. § 300aa-21(a).

---

[5] De minimis claims for less than $1,000, however, may be brought in state or federal courts without prior filing under the Vaccine Program. See 42 U.S.C. § 300aa-11(a)(2)(A). The Vaccine Act requires that any vaccine-related action seeking an unspecified amount of damages be filed under the Program. *Id.*

[6] Under the Program, the compensation awarded to a petitioner for a vaccine-related injury may include actual and un-reimbursable expenses and projected expenses for medical or other remedial care determined to be reasonably necessary; actual and anticipated lost earnings; and actual and projected pain and suffering subject to a statutory cap of $250,000. See 42 U.S.C. § 300aa-15(a). Punitive and exemplary damages are prohibited. See 42 U.S.C. § 300aa-15(d). Reasonable attorneys' fees and costs are awarded even if the petition is denied, so long as the special master determines that the petition was brought in good faith and that a reasonable basis for asserting the claim existed. See 42 U.S.C. § 300aa-15(c). In the event that a petitioner chooses to reject a Program award, the Vaccine Act limits the tort remedies that become available. For instance, the Vaccine Act establishes compliance with Food and Drug Administration ("FDA") requirements as a partial defense for manufacturers, see 42 U.S.C. § 300aa-22(b)(2), and requires tort suits to be tried in three phases (liability, general damages and punitive damages). See 42 U.S.C. § 300aa-23(a). Moreover, a manufacturer's compliance with FDA guidelines generally precludes an award of punitive damages. See 42 U.S.C. § 300aa-23(d).

At the time of institution of this lawsuit the Plaintiffs had not filed a petition in the Court of Federal Claims. Plaintiffs' initial position was that they were not required to file originally in the Vaccine Court because the Vaccine Act does not require such a filing when the injury involved is not "vaccine-related." Plaintiffs have since informed the Court that they have filed a claim before the Vaccine Court in mid-December, 2002.

The term vaccine-related injury "does not include an illness, injury, condition or death associated with an adulterant or contaminant intentionally added to a vaccine." 42 U.S.C. § 300aa-33(5). Plaintiffs asserted that Cody's injuries were cause by thimerosal, which they claim is an "adulterant or contaminant" intentionally added to a vaccine and that, therefore, this lawsuit does not involve a "vaccine- related" injury as defined by the Vaccine Act. The Defendants, however, contend that thimerosal is not an "adulterant or contaminant," but rather, a "constituent material" of vaccines. In the face of overwhelming authority holding that thimerosal is a constituent material of the vaccines in question and is not an

7

adulterant or contaminant, Plaintiffs have all but abandoned their position.[7] The

following cases have found   injuries from thimerosal are "vaccine-related" under

the Vaccine Act: *Liu v. Aventis Pasteur*, 219 F.Supp.2d 762 (W.D.Tex. 2002);

*Owens v. Am. Home Prods. Corp.*, 203 F.Supp.2d 748 (S.D.Tex. 2002); *McDonald*

*v. Abbott Labs*, 02-77 (S.D.Miss. Aug. 1, 2002); *Collins v. Am. Home Prods.*

*Corp.*, 01-979 (S.D.Miss. Aug. 1, 2002); *Stewart v. Am. Home Prods. Corp.*,

02-427 (S.D.Miss. Aug. 1, 2002); *Strauss v. American Home Prod. Corp.*, 208

F.Supp.2d 711 (S.D.Tex. 2002); *Blackmon v. American Home Prod. Corp.*, Cause

No. G-02-179 (S.D.Tex. May 8, 2002); *O'Connell v. American Home Products*

*Corp.*, 2002 WL 31455729 (S.D. Tex. May 7, 2002); *Wax v. Aventis Pasteur Inc.*,

__ F. Supp.2d. __, 2002 WL 31444878 (E.D.N.Y. Oct. 30, 2002); *Bertrand v.*

*Aventis Pasteur Laboratories, Inc.*, 226 F.Supp.2d 1206 (D. Ariz. 2002); *Leroy v.*

*Secretary of Dept. of Health and Human Services*, 2002 WL 31730680 (Fed. Cl.

Oct. 11, 2002).

Additionally, the Department of Health and Human Services has taken the

position that thimerosal is not an adulterant or contaminant of vaccines.  See

"Statement of Interest" in *King ex rel King v. Aventis Pasteur, Inc.*, 210 F. Supp.2d

1201 (D. Or. 2002).

---

[7]See statement of Plaintiffs' counsel at the October 28, 2002 hearing held on motions, transcript of hearing at page 24.

8

Since the institution of this lawsuit and the filing of the motions under consideration here, Congress passed the Homeland Security Act of 2002 ("HSA"), which was enacted on November 25, 2002. The Homeland Security Act contains certain clarifying amendments to the Vaccine Act. According to § 1717 of the its provisions, the clarifying provisions became effective on the date of enactment and govern this case.[8]

The first amendment which directly affects this case is the clarification of the term "vaccine." This term is amended to include "all components and ingredients listed in the vaccine's product license application and product label." 42 U.S.C. §300aa-33(7) as clarified by § 1716 of the HSA.[9] It is clear that this definition would include thimerosal, if it was a component or ingredient listed in the vaccine's product application and product label. While the Court has no

---

[8] "The amendments made by sections 1714, 1715, and 1716 shall apply to all actions or proceedings pending on or after the date of enactment of this Act, unless a court of competent jurisdiction has entered judgment (regardless of whether the time for appeal has expired) in such action or proceeding disposing of the entire action or proceeding."

[9] § 1716. CLARIFICATION OF DEFINITION OF VACCINE.

Section 2133 of the Public Health Service Act (42 U.S.C.§ 300aa-33) is amended by adding at the end the following:
"(7) The term 'vaccine' means any preparation or suspension, including but not limited to a preparation or suspension containing an attenuated or inactive microorganism or subunit thereof or toxin, developed or administered to produce or enhance the body's immune response to a disease or diseases and includes all components and ingredients listed in the vaccines's product license application and product label."

9

evidence of what was listed on the product application or label, given the fact that the FDA had apparently widely approved the use of thimerosal as a vaccine preservative since the 1930's, and required that preservatives be added to vaccines distributed in multi-use vials,[10] it seems logical to assume that thimerosal was listed on either the product application or label of the vaccines used in this case.

Even if this is not the case, in light of the overwhelming case law and the HHS's interpretation holding that thimerosal is not an "adulterant or contaminant," but rather, a "constituent material" of vaccines, the Court finds that the claims of Cody Wyatt Botter against the Vaccine Manufacturers[11] concern a "vaccine related injury" and are covered by the provisions of the Vaccine Act.

Claims Against Non-Manufacturers:

Because of the recent enactment of the Homeland Security Act of 2002, Defendants Sigma-Aldrich and Eli Lilly join in the motion of the Vaccine Manufacturers. They do so based upon the second amendment to the Vaccine Act

---

[10] See C.F.R. § 610.15(a) and C.F.R. § 610.15.

[11] While Plaintiffs' Complaint does not specify which of the Defendants are "Vaccine Manufacturers," the following Defendants have identified themselves as such by their motion "Vaccine Manufacturer Defendants' Rule 12(b) and 12(c) Motion to Dismiss (doc. 12)":Merck and Company, Inc. ("Merck"); Wyeth ("Wyeth") f/k/a American Home Products, Corp.;Aventis Pasteur, Inc. ("Aventis"); Smith Kline Beecham Corporation ("Smith Kline").

which clarifies the term "manufacturer."[12] This amendment shows that it is

Congress' intention that the protections of the Vaccine Act cover distributors of

components of vaccines. Section 1714 amends 42 U.S.C. §300aa-33(3) to define

"manufacturer" to include any corporation, organization, or institution which

manufactures, imports, processes, or distributes any vaccine set forth in the

Vaccine Injury table, including any component or ingredient of any such vaccine....

The term "manufacture" means to manufacture, import, process or distribute a

vaccine, including any component or ingredient of any such vaccine.

In addition Eli Lilly and Dow move to dismiss the Plaintiffs' claims against

them, or in the alternative, for stay of the proceedings until the termination of the

action before the Vaccine Court.[13] Dow also moves for summary Judgment. Both

Lilly and Dow claim they did not manufacture or distribute the thimerosal or

vaccines that allegedly caused Cody Botter's injuries. Eli Lilly contends it stopped

distributing childhood vaccines prior to 1980, and all vaccines in 1985, and

---

[12]SEC. 1714. CLARIFICATION OF DEFINITION OF MANUFACTURER.
Section 2133(3) of the Public Health Service Act (42 U.S.C. 300aa-33(3)) is amended--
(1) in the first sentence, by striking "under its label any vaccine set forth in the Vaccine Injury Table" and inserting "any vaccine set forth in the Vaccine Injury table, including any component or ingredient of any such vaccine"; and
(2) in the second sentence, by inserting "including any component or ingredient of any such vaccine" before the period.

[13]While Lilly's motion is titled a Motion to Dismiss, it is converted to a motion for summary judgment under Rule 56 by the addition of evidence beyond the pleadings. Fed. R. Civ. P. 12(c).

stopped distributing thimerosal by 1992. *See* Affidavit of Scott Fishman, Exhibit "A" to Lilly's motion. Dow states it has not manufactured vaccines or been licensed to do so since 1978. See Dow's Motion to Dismiss, at page 3.

Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. also move to dismiss or, in the alternative, to stay, claiming they did not manufacture the vaccines or thimerosal at issue in this case.

These Defendants ask this Court to enter a no-liability judgment in their favor despite the Court's need to dismiss or stay the Plaintiffs' claims against the vaccine manufacturers until the Plaintiffs follow the exhaustion requirements of the Vaccine Act. In the alternative, these Defendants seek a dismissal of the claims against them or a stay of proceedings under the same posture as the vaccine manufacturers. Plaintiffs raise many of the same claims against these Defendants as against the vaccine manufacturer Defendants, including strict liability, negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products, gross negligence, and fraud and conspiracy, and loss of consortium. To rule on the merits of some Defendants' substantive defenses would require a period of discovery allowing the Plaintiffs to investigate the Defendants' contentions. To allow the Plaintiffs to conduct discovery on some Defendants during the pendency of the minor's claims under the Vaccine Act against other

12

Defendants is inconsistent with Congress's goal of minimizing litigation costs.

Therefore, the Court will stay any discovery until the termination of Plaintiffs'

action before the Vaccine Court rather than allow discovery on some Defendants.

<u>Kirk and Darla Botters' Individual Claims:</u>

     Kirk and Darla Botter bring claims individually and as next friend of their

son. Individually, they seek recovery for all past and future costs associated with

Cody's injuries, lost wages and income, emotional distress, loss of consortium and

loss of services. *See* First Amended Petition, at 17. Under the Vaccine Act, "any

person who has sustained a vaccine-related injury" or "the legal representative of

such person if such person is a minor or is disabled," may file a petition for

compensation in the Court of Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An

individual may only file a petition on his own behalf if he received a vaccine and

alleges a resulting injury. 42 U.S.C. §§ 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A).

Thus, Kirk and Darla Botter can only bring their claims as next friend of Cody, not

their individual claims, in the Court of Federal Claims.

     The Defendants move to dismiss the Botter's individual claims for damages

because they are derivative of Cody's claims, are duplicative of damages available

under the Vaccine Act, or are not cognizable under Texas law. However, if the

Court dismissed the parents' claims, their statutes of limitations could expire while

13

the parents are representing Cody's' claims in the Court of Federal Claims.[14]

The Plaintiffs seek to proceed upon their individual claims during the pendency of their case before the Vaccine Court. It is clear that all of the individual claims of Kirk and Darla Botter, including the loss of consortium claim, are derivative of the claim of Cody Wyatt Botter. *Reagan v. Vaughn*, 804 S.W.2d 463, 466 (Tex. 1990); *Whittlesey v. Miller*, 572 S.W.2d 665, 667 (Tex. 1978); *Harris County v. White*, 823 S.W.2d 385, 388 (Tex.App.--Texarkana 1992, *no writ*); *Nash v. Selinko*, 14 S.W.3d 315, 317 (Tex.App.--Houston [14th Dist.] 1999, *pet. denied*). Since the underlying claim must proceed first in the Vaccine Court, judicial economy and concern for consistent results suggests the prudent course of action would be to allow the underlying cause before the Vaccine Court to terminate before proceeding with these individual claims.

The Court has discretion to stay proceedings. *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 649 (5th Cir. 2000). Courts often stay proceedings to avoid interference with related proceedings in another forum and to avoid the waste of duplication. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751

---

[14]Tex. Civ. Prac. & Rem. Code § 16.003 (two-year statute of limitations in personal injury cases). The Vaccine Act does not toll the statute of limitations for the parents' claims while they are representing their child in the Court of Federal Claims. The Vaccine Act does, however, toll the statute of limitations for the minor's state law claims while his petition is pending before the court. 42 U.S.C. § 300aa-16(c). For the child's claims against the Defendants who do not manufacture vaccines, the statute of limitations will not begin to run until he reaches the age of majority. Tex. Civ. Prac. & Rem. Code § 16.001.

14

F.2d 721, 728-29 (5th Cir. 1985) ("The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."). The parents' claims brought on behalf of their minor son must first be heard in the Court of Federal Claims. Dismissing the parents' individual claims during the pendency of that court's jurisdiction might preclude the parents from bringing their claims in any forum. Accordingly, the Court will stay all proceedings in Kirk and Darla Botters' individual causes of action against all Defendants until Cody Wyatt Botter's claims have been administered in the Court of Federal Claims under the Vaccine Act.

CONCLUSION

For the foregoing reasons, IT IS ORDERED that

the Vaccine Manufacturer Defendants' Rule 12(b) and 12(c) Motion to Dismiss (doc. # 12) brought by Aventis Pasteur, Merck, Wyeth, and Smith Kline is GRANTED IN PART as to the claims of Cody Wyatt Botter to be presented in the Court of Federal Claims, and their Alternative Motion to Stay is GRANTED IN PART as to Kirk and Darla Botter's individual causes of action;

Eli Lilly and Co.'s Motion to Dismiss (doc. # 4) and its Amended Motion to Dismiss (doc. # 31) are GRANTED IN PART as to the claims of Cody Wyatt

15

Botter to be presented in the Court of Federal Claims, and their Alternative Motion to Stay Proceedings is GRANTED IN PART as to Kirk and Darla Botter's individual causes of action;

Sigma-Aldrich Inc.'s Motion to Dismiss (doc. # 6), its Supplemental Motion to Dismiss (doc. # 34), and its second Supplemental Motion to Dismiss (doc. # 60) are GRANTED IN PART as to the claims of Cody Wyatt Botter to be presented in the Court of Federal Claims, and its Alternative Motion to Stay Proceedings (doc. #33) is GRANTED IN PART as to Kirk and Darla Botter's individual causes of action;

Dow Chemical's Motion to Dismiss or Stay Proceedings (docs. # 38) is GRANTED IN PART as to the claims of Cody Wyatt Botter to be presented in the Court of Federal Claims, and their Alternative Motion to Stay is GRANTED IN PART as to Kirk and Darla Botter's individual causes of action. Dow's Motion for Summary Judgment (doc. # 39) is DENIED without prejudice to refiling upon a change of status of the case.

IT IS FURTHER ORDERED that Cody Wyatt Botter's claims against all Defendants are DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that Plaintiffs' claims brought in their individual capacities are STAYED pending further order of this Court;

16

IT IS FURTHER ORDERED that the Plaintiffs shall file a status report with this Court every six months from the date of this Order, informing the Court of the status of their petition filed on behalf of Cody Wyatt Botter in the Court of Federal Claims.

IT IS FURTHER ORDERED that this case be administratively closed pending the outcome of the Vaccine Court proceedings.

IT IS FINALLY ORDERED that any party may move for a lifting of the stay or other relief upon a change of circumstances.

SIGNED this ___13th___ day of January, 2003.

JOHN HANNAH, JR.
UNITED STATES DISTRICT JUDGE

17

LEXSEE 2002 US DIST LEXIS 22046

MICHAEL O'CONNELL and EILEEN O'CONNELL, individually and as next friends to MICHAEL JOSEPH O'CONNELL, Plaintiffs, v. AMERICAN HOME PRODUCTS CORPORATION, et al., Defendants.

CIVIL ACTION NO. G-02-184

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, GALVESTON DIVISION

*2002 U.S. Dist. LEXIS 22046*

May 7, 2002, Decided
May 7, 2002, Entered

**DISPOSITION:** [*1] Defendants Wyeth, Aventis, Merck And Smith Kline's Motion To Dismiss granted in part and denied in part. Defendants Sigma And EM's Motion To Dismiss, Ordering Plaintiffs To Conduct Jurisdictional Discovery Of GDL denied and Defendants' Request For Oral Argument denied as moot.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff parents brought a products liability action against defendants, vaccine manufacturers, and thimerosal manufacturers, seeking damages for loss of consortium, loss of services, and emotional distress. The vaccine manufacturers and thimerosal manufacturers moved to dismiss pursuant to Fed. R. Civ. P. 12(b) and the National Childhood Vaccine Injury Act, *42 U.S.C.S. § 300aa-1*–300aa-34.

**OVERVIEW:** The vaccine manufacturers claimed that the parents as proper National Childhood Vaccine Injury Act (Vaccine Act), *42 U.S.C.S. § 300aa-1*–300aa-34, claimants under *42 U.S.C.S. § 300aa-11*(b)(1)(A) failed to file a petition in the Vaccine Court as a prerequisite to bringing their tort action. The parents claimed that their child's injuries were not vaccine related under *42 U.S.C.S. § 300aa-33*(5) because thimerosal was an adulterant or contaminant added to vaccines. The court initially held that thimerosal was a constituent material of vaccines, and, thus, the parent's child's injuries were vaccine related. The court further held that the parents were required to file a petition in the Vaccine Court prior to bringing their tort action against the vaccine manufacturers. The court then held that the parents stated claims for loss of consortium, but failed to state claims for loss of services or emotional distress. The court finally held that, although the parents' claims against the thimerosal manufacturers were not subject to the Vaccine Act's tort suit bar, only their loss of consortium claims were properly stated.

**OUTCOME:** The vaccine manufacturers' motion to dismiss was granted in part regarding the parents' representative claims and their claims for loss of services and emotional distress. The vaccine manufacturers' motion to dismiss was denied in part regarding the parents' loss of consortium claims. The thimerosal manufacturers' motion to dismiss was granted in part regarding the parents' derivative claims for loss of services and emotional distress.

**LexisNexis (TM) HEADNOTES- Core Concepts:**

**COUNSEL:** For MICHAEL O'CONNELL, EILEEN O'CONNELL, MICHAEL JOSEPH O'CONNELL, plaintiffs: C Andrew Waters, Walter & Kraus, Peter Andersen Moir, Quilling Selander et al, Tanja Karin Martini, Waters & Kraus LLP, Dallas, TX.

For AMERICAN HOME PRODUCTS CORPORATION, defendant: Michael R Klatt, Clark Thomas and Winters, Austin, TX.

For AMERICAN HOME PRODUCTS CORPORATION, SIGMA–ALDRICH INC, defendants: Susan E Burnett, Clark Thomas & Winters, Austin, TX.

For WYETH-AYERST, WYETH-AYERST LABORATORIES, WYETH LEDERLE, WYETH LEDERLE VACCINES, defendants: Stephen Robert Lewis, Jr, Lewis & Williams, Galveston, TX.

For WYETH-AYERST, defendant: Andrew S Hanen, Hanen Alexander Johnson & Spalding, Houston, TX USA.

2002 U.S. Dist. LEXIS 22046, *1

For AVENTIS PASTEUR INC, PASTEUR MERIEUX, PASTEUR MERIEUX CONNAUGHT, defendants: R Jo Reser, Ray Valdez et al, San Antonio, TX.

For AVENTIS PASTEUR INC, PASTEUR MERIEUX, PASTEUR MERIEUX CONNAUGHT, defendants: Marsha Marie [*2] Piccone, Faegre & Benson, LLP, Denver, CO.

For AVENTIS PASTEUR INC, defendant: Russell O Stewart, Faegre & Benson LLP, Denver, CO.

For DOW CHEMICAL COMPANY, defendant: John R Gilbert, Gilbert & Moore PLLC, Angleton, TX.

For ELI LILLY & CO, defendant: Sandra Lynn Phillips, Diana L Panian, Shook Hardy et al, Houston, TX.

For ELI LILLY & CO, defendant: Douglas W Poole, McLeod Alexander et al, Galveston, TX.

For ELI LILLY & CO, defendant: Jeffery A Kruse, Deborah A Moeller, Shook Hardy et al, Kansas City, MO.

For EM INDUSTRIES INC, defendant: Marc A Sheiness, Sheiness Scott et al, Houston, TX.

For GDL INTERNATIONAL, INC., defendant: John Martin Ribarits, Abbott Simses et al, Houston, TX.

For GLAXOSMITHKLINE, defendant: Barclay A Manley, Fulbright & Jaworski, Houston, TX.

For MERCK & CO INC, defendant: Richard L Josephson, Baker & Botts, Houston, TX.

For SIGMA-ALDRICH CORPORATION, defendant: David Michael Macdonald, McCauley Macdonald & Devin, Dallas, TX.

For SIGMA-ALDRICH CORPORATION, SIGMA-ALDRICH INC, defendants: Raymond G Kolts, Dean & Kolts, Coeur d'Alene, ID.

For SIGMA-ALDRICH CORPORATION, defendant: Kathlene Landgraf Kolts, [*3] Dean & Kolts, Coeur d'Alene, ID.

For SPECTRUM CHEMICAL MANUFACTURING, defendant: John A Scully, Cooper & Scully, Dallas, TX.

**JUDGES:** SAMUEL B. KENT, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** SAMUEL B. KENT

**OPINION:**

ORDER GRANTING IN PART AND DENYING IN PART WYETH, AVENTIS, MERCK AND SMITH KLINE'S MOTION TO DISMISS, DENYING SIGMA AND EM'S MOTION TO DISMISS, ORDERING PLAINTIFFS TO CONDUCT JURISDICTIONAL DISCOVERY OF GDL AND DENYING DEFENDANTS' REQUEST FOR ORAL ARGUMENT AS MOOT

Plaintiffs Michael O'Connell and Eileen O'Connell, individually and as legal representatives of their minor child Michael Joseph O'Connell ("Michael"), bring this products liability lawsuit against Defendants Sigma Aldrich Corporation ("Sigma Corp."); Sigma Aldrich, Inc. ("Sigma Inc."); Eli Lilly and Company ("Eli Lilly"); The Dow Chemical Company ("Dow"); EM Industries, Inc. ("EM"); Wyeth ("Wyeth") f/ k/ a American Home Products, Corp.; Aventis Pasteur, Inc. ("Aventis") f/ k/ a Connaught Laboratories f/ d/ b/ a Pasteur Merieux Connaught; Merck and Company, Inc. ("Merck"); Smith Kline Beecham Corporation ("Smith Kline") d/ b/ a GlaxoSmithKline; Spectrum Laboratory Products, Inc. ("Spectrum"); and GDL International, [*4] Inc. ("GDL") pursuant to the state laws of Texas. Now before the Court are three Motions to Dismiss filed by various Defendants: (1) a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b) and the National Childhood Vaccine Injury Act ("Vaccine Act"), *42 U.S.C. §§ 300aa-1–300aa-34*, filed by Wyeth, Aventis, Merck and Smith Kline; (2) a Motion to Dismiss pursuant to the Vaccine Act and Fed. R. Civ. P. 19 filed by Sigma Corp. and Sigma Inc. (collectively, "Sigma") and subsequently joined by EM; and (3) a Motion to Dismiss for Lack of Personal Jurisdiction filed by GDL. For the reasons articulated below, Wyeth, Aventis, Merck and Smith Kline's Motion to Dismiss pursuant to the Vaccine Act is **GRANTED IN PART** and **DENIED IN PART**, Sigma and EM's Motion to Dismiss pursuant to the Vaccine Act is **DENIED** and Plaintiffs are hereby **ORDERED** to conduct jurisdictional discovery before responding to the Motion to Dismiss filed by GDL.

**I. Background**

During the first eighteen months of his life, Michael was allegedly exposed to harmful levels of mercury via routine childhood vaccinations administered to him by his pediatrician. All or some of the [*5] vaccines contained thimerosal, a mercury laden preservative. At that time, vaccine manufacturers routinely added thimerosal to multiple-use vials of vaccines to extend each vial's shelf life. The thimerosal (and thus, mercury) introduced into Michael's body by way of vaccination allegedly af-

flicted him with serious and lasting neurological injuries. Plaintiffs filed this action in a Texas state court seeking damages for Michael's personal injuries both individually and on Michael's behalf (as his legal representatives). In their Original Petition, Plaintiffs assert four causes of action (strict liability, negligence, gross negligence and conspiracy) against two distinct categories of Defendants: (1) the manufacturers of thimerosal containing vaccines—Wyeth, Aventis, Merck and Smith Kline ("Vaccine Manufacturers"); and (2) the manufacturers of thimerosal itself—Eli Lilly, EM, Sigma, Dow, Spectrum and GDL ("Chemical Manufacturers"). n1 Defendants subsequently removed the action pursuant to this Court's diversity jurisdiction.

> n1 In their Original Petition Plaintiffs do not distinguish between the Vaccine Manufacturers and the Thimerosal Manufacturers. The Court finds, however, that making such a distinction is essential.

**[\*6]**

## II. The Vaccine Act

The "vaccination of children against deadly, disabling, but preventable infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken. Use of vaccines has prevented thousands of children's deaths each year and has substantially reduced the effects resulting from disease." H.R. Rep. No. 99-908, at 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6345. However, while most children enjoy measurable benefit from immunization programs, "a small but significant number of have been gravely injured." Id. Two significant concerns are accompany these vaccine-related injuries: the inconsistency, expense, delay and unpredictability of the tort system in compensating claims of vaccine-injured children; and the instability and uncertainty of the childhood vaccine market inevitably caused by the risks of tort litigation. See id. at 7, 1986 U.S.C.C.A.N. at 6348. Fortunately, the National Vaccine Injury Compensation Program ("Program") ameliorates these concerns. The Program provides an avenue of recovery for injuries and deaths traceable to vaccinations that works with greater ease and on a faster **[\*7]** timetable than the civil tort system. n2 See *Shalala v. Whitecotton, 514 U.S. 268, 269, 115 S. Ct. 1477, 1478, 131 L. Ed. 2d 374 (1995).* In effect, it "ensure[s] that all children who are injured by vaccines have access to sufficient compensation for their injuries," H.R. Rep. No. 99-908 at 6345-6346, and "free[s] manufacturers from the specter of large, uncertain tort liability, and thereby ... keep[s] manufacturers in the market." *Schafer v. Am. Cyanamid Co., 20 F.3d 1, 4 (1st Cir. 1994).*

> n2 The Program became effective on October 1, 1988.

The Program, set forth in the Vaccine Act, requires that vaccine-related claims are initially heard by special masters in the United States Court of Federal Claims ("Vaccine Court"), adjudicated informally and then accorded expeditious review. See *Whitecotton, 514 U.S. at 270, 115 S. Ct. at 1478.* This system streamlines the claims process by establishing standards of proof, under which individuals who suffer injuries **[\*8]** within specified intervals after being administered a vaccine, benefit from a presumption that a vaccine caused those injuries. See *42 U.S.C. §§ 300aa-11(c)(1)(C)(i), 300aa-13(a)(1), 300aa-14; Haggerty by Haggerty v. Wyeth Ayerst Pharms., 79 F. Supp. 2d 182, 184 (E.D.N.Y. 2000).* A Program claimant may not file a civil action against a vaccine manufacturer or administrator unless the claimant initially files a timely petition in accordance with the Program's guidelines. n3 See *42 U.S.C. § 300aa-11(a)(2)(A); Whitecotton, 514 U.S. at 270, 115 S. Ct. at 1478* (explaining that a claimant alleging an injury after the Vaccine Act's effective date "must exhaust the Act's procedures ... before filing any *de novo* civil action in state or federal court"). If a claimant seeks compensation in a state or federal court for vaccine-related injuries prior to exhausting his or her remedies under the Vaccine Act, the Court must dismiss the action. See *42 U.S.C. § 300aa-11(a)(2)(B).* Simply put, individuals who qualify as Program claimants must file petitions in the Vaccine Court in order **[\*9]** to pursue any vaccine-related claims at all. n4 If an individual who prevails in the Vaccine Court is ultimately dissatisfied with his or her Program award, that individual may reject the award and pursue a traditional tort action in any forum. n5 See *42 U.S.C. § 300aa-21(a).*

> n3 A proper claimant, or "petitioner," under the Vaccine Act is "any person who has sustained a vaccine-related injury," or the legal representative of such person. *42 U.S.C. § 300aa-11(b)(1)(A).*

> n4 There are a few exceptions. *De minimis* claims for less than $1,000 may be brought in state or federal courts without prior filing under the Vaccine Program. See *42 U.S.C. § 300aa-11(a)(2)(A).* However, the Vaccine Act requires that any vaccine-related action seeking an unspecified amount of damages (such as the instant lawsuit) be filed under the Program. See id.

> n5 Under the Program, the compensation awarded to a petitioner for a vaccine-related injury may include actual and un-reimbursable expenses and projected expenses for medical or other reme-

2002 U.S. Dist. LEXIS 22046, *9

dial care determined to be reasonably necessary; actual and anticipated lost earnings; and actual and projected pain and suffering subject to a statutory cap of $250,000. See 42 U.S.C. § 300aa-15(a). Punitive and exemplary damages are prohibited. See 42 U.S.C. § 300aa-15(d). Reasonable attorneys' fees and costs are awarded even if the petition is denied, so long as the special master determines that the petition was brought in good faith and that a reasonable basis for asserting the claim existed. See 42 U.S.C. § 300aa-15(c). In the event that a petitioner chooses to reject a Program award, the Vaccine Act limits the tort remedies that become available. For instance, the Vaccine Act establishes compliance with Food and Drug Administration ("FDA") requirements as a partial defense for manufacturers, see 42 U.S.C. § 300aa-22(b)(2), and requires tort suits to be tried in three phases (liability, general damages and punitive damages). See 42 U.S.C. § 300aa-23(a). Moreover, a manufacturer's compliance with FDA guidelines generally precludes an award of punitive damages. See 42 U.S.C. § 300aa-23(d).

[*10]

### III. Vaccine Manufacturers' Motion to Dismiss

In this case, it is undisputed that Plaintiffs have not filed a petition in the Vaccine Court in accordance with the Program. In their Motion to Dismiss, filed March 28, 2002, the Vaccine Manufacturers highlight this fact and argue that Plaintiffs' failure to file a Program petition requires the Court to dismiss all claims filed against them pursuant to Fed. R. Civ. P. 12(b). n6 In response, Plaintiffs contend that they are not required to file a petition in the Vaccine Court because Michael's injuries fall outside the scope of the Vaccine Act. Thus, the Court must initially determine whether Plaintiffs are required to file a Program petition for: (1) the claims they have filed on Michael's behalf ("Representative Claims"); or (2) their individual claims that are derivative of Michael's injuries ("Individual Claims").

n6 Although the Vaccine Manufacturers do not specify which provision of Rule 12(b) they are moving for dismissal under, the Court assumes that they are seeking a dismissal under Rule 12(b)(3) for improper venue, or in the alternative, under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(3); Fed. R. Civ. P. 12(b)(3).

[*11]

### Representative Claims Filed Against the Vaccine Manufacturers

A proper claimant under the Vaccine Act is "any person who has sustained a vaccine-related injury" or the legal representative of that person. 42 U.S.C. § 300aa-11(b)(1)(A). Therefore, if Michael sustained a "vaccine-related injury," Plaintiffs are proper claimants under the Vaccine Act with respect to the Representative Claims. The Vaccine Act defines "vaccine-related injury" as "an illness, injury, condition or death associated with one or more of the vaccines set forth in the Vaccine Injury Table [ 42 C.F.R. § 100.3], except that term does not include an illness, injury, condition, or death associated with an adulterant or a contaminant intentionally added to such a vaccine." n7 42 U.S.C. § 300aa-33(5). Plaintiffs maintain that because thimerosal is an "adulterant or contaminant intentionally added to ... a vaccine," this lawsuit does not involve a "vaccine-related" injury as defined by the Vaccine Act. n8 Conversely, the Vaccine Manufacturers contend that thimerosal is not an "adulterant or contaminant," but rather, a "constituent [*12] material" of vaccines. The Court agrees with the Vaccine Manufacturers.

n7 The vaccines currently listed in the Vaccine Injury Table are diptheria, tetanus, pertussis, measles, mumps, rubella, poliovirus, hepatitus B, haemophilil influenzae type b, varicella zoster virus, rotavirus and streptococcus pneumoniae. See 42 C.F.R. § 100.3 (Vaccine Injury Table). In addition to listing eligible vaccines, the Vaccine Injury Table also lists types of injuries associated with each vaccine. See id. Individuals who suffer a listed injury after being dosed with the corresponding vaccine make out a prima facie case for compensation that may be rebutted only by proof that such injury was caused by factors unrelated to the vaccine. See 42 U.S.C. §§ 300aa-11(c)(1)(C)(i), 300aa-13(a)(1)(B). Individuals who suffer injuries not listed in the Vaccine Injury Table may still obtain compensation, but they must prove by a preponderance of the evidence that the injury was in fact caused by a listed vaccine. See id.

n8 The Court notes that Plaintiffs' Original Petition does not specify which thimerosal containing vaccines were administered to Michael. Rather, the Petition generally refers to vaccines that are "routinely administered to children" according to the "typical immunization schedule during the first 18 months of life." The Recommended Childhood Immunization Schedule published by the Centers for Disease Control and Prevention ("CDC") specifies that the routine vaccinations for American children within their first eighteen months are (1) hep-

atitis B vaccine; (2) diphtheria, tetanus and pertussis vaccine; (3) haemophilus influenzae type b vaccine; (4) poliovirus vaccine; (5) measles–mumps–rubella vaccine; and (6) varicella zoster virus vaccine. See Morbidity and Mortality Weekly Report (Centers for Disease Control and Prevention) Vol. 44 Nos. 52 & 52, January 5, 1996, at 942 (Figure 1). Thus, the Court presumes that the reference to vaccines "routinely administered to children" in Plaintiffs' Original Petition refers to the six CDC–recommended vaccines. And because all six of these vaccines are covered by the Vaccine Injury Table, see 42 C.F.R. § 100.3, the Court further assumes that Michael's injuries are "table injuries" within the scope of the Vaccine Act. This assumption is supported by the fact that Plaintiffs do not assert that Michael was injured by an unlisted vaccine in response to the Vaccine Manufacturers' Motion to Dismiss.

[*13]

When attempting to discern a statute's meaning, a court must initially look to the plain meaning of the statute's language. See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54, 117 L. Ed. 2d 391, 112 S. Ct. 1146 (1992). Here, because "adulterant" and "contaminant" are not specifically defined by the Vaccine Act, dictionary definitions provided the Court with guidance as to the plain meaning of these terms. The definition of an "adulterant" is "a substance which makes an item impure, spurious, or inferior by adding extraneous or improper ingredients." The American Heritage Dictionary 58 (2d ed. 1992). A medical dictionary similarly defines adulterant as "an impurity; an additive that is considered to have an undesirable effect or to dilute the active material so as to reduce its therapeutic or monetary value." Stedman's Medical Dictionary 30 (27th ed. 2000). And a contaminant is "something that makes impure or corrupt by contact or mixture." Webster's 9th New Collegiate Dictionary 283 (9th ed. 1991).

Thimerosal, when used in vaccines, fails to correspond with any of these definitions. Vaccine manufacturers intentionally add thimerosal to vaccine formulas [*14] because it deters microbial and fungal growth, thereby maintaining the safety, purity and potency of vaccines. In fact, Thimerosal has been widely used as a vaccine preservative since the 1930s, see Statement by William Egan, Ph.D., FDA, before the Committee on Government Reform, U.S. House of Representatives, July 18, 2000, and its use satisfies the FDA's requirement that preservatives be added to vaccines distributed in multi-use vials. See 21 C.F.R. § 610.15(a) ("Products in multiple-dose containers shall contain a preservative"). As

such, thimerosal cannot be said to "make impure or corrupt" a vaccine or to reduce a vaccine's therapeutic value. Furthermore, thimerosal cannot be characterized as having an undesirable effect or diluting the active material found within a vaccine In fact, the precise opposite is true. As a preservative, thimerosal prevents a vaccine's corruption. Hence, neither the plain meaning of "adulterant" nor "contaminant" applies to thimerosal when, as here, it is purposefully used as an ingredient in the approved formulation of a vaccine.

The remainder of the language used by Congress to define "vaccine–related injury" [*15] (i.e. "associated with one or more ... vaccines") likewise requires a finding that the Representative Claims are covered by the Program. A "vaccine" is defined as a "suspension of attenuated or killed microorganisms," Dorland's Medical Dictionary 1799 (27th ed. 1988), and "a preparation of killed microorganisms, living attenuated organisms, or living fully virulent organisms." Webster's 9th New Collegiate Dictionary 1301 (9th ed. 1991). Neither of these definitions indicate that a vaccine is comprised of microorganisms alone. On the contrary, they indicate that a vaccine is a "suspension" or "preparation" composed of both microorganisms and additional ingredients. n9 And, as explained above, manufacturers of vaccines add thimerosal to the "preparation" or "suspension" of vaccines. n10

n9 A suspension is "a class of pharmacopeial preparations of finely divided undissolved drugs [or in this case, microorganisms] ... dispersed in liquid vehicles for oral or parenteral use." Stedman's Medical Dictionary 1713 (26th ed. 1995). A preparation is "a medicinal substance made ready for use." Webster's 9th New Collegiate Dictionary 929 (9th ed. 1991).

[*16]

n10 The FDA has long recognized that preservatives (i.e. thimerosal) are "constituent materials" of vaccines. See 21 C.F.R. § 610.15 (indicating that constituents of biological materials include ingredients, preservatives, diluents and adjuvants).

Therefore, because Michael's injuries are allegedly linked to a vaccine ingredient, his injuries are definitely "vaccine-related." See, e.g., Brausewetter v. Sec'y of Health and Human Servs., 1999 U.S. Claims LEXIS 180, No. 99–278V, 1999 WL 562700, at *3 (Fed. Cl. July 16, 1999) (stating that claims fall under the Vaccine Act when a claimant is exposed to the "chemical/biological components of the tetanus vaccine"); Pannell v. Sec'y of Health

and Human Servs., 1995 U.S. Claims LEXIS 143, No. 94-658V, 1995 WL 432643, at *2 (Fed. Cl. July 7, 1995) (referring to "vaccine-related injury" as one "caused by the vaccine or by something contained therein"); see also Grant v. Secretary of HHS 956 F.2d 1144, 1149-50 (Fed. Cir. 1992) (affirming award where vaccine's preservative was an alleged cause of claimant's injury). [*17] Clearly, the plain language of the Vaccine Act indicates that Michael's injuries cannot be "thimerosal-related" without being "vaccine-related" as well. n11 Therefore, Plaintiffs are required to file a Program petition as a pre-requisite to filing any civil action seeking damages from the Vaccine Manufacturers for Michael's injuries. Accordingly, the Vaccine Manufacturers' Motion to Dismiss is **GRANTED** with respect to the Representative Claims asserted against them. These claims are hereby **DISMISSED WITHOUT PREJUDICE** and Plaintiffs are urged to re-file such claims in the Vaccine Court if they so desire.

n11 In this case, because the language of the Vaccine Act unambiguously and specifically indicates that injuries caused by vaccine preservatives (i.e. thimerosal) are within its scope, it is clear that Congress has spoken to the precise question at issue. And the Court has given effect to such Congressional intent. However, the Court's decision would remain the same even if Congressional intent was not clearly expressed. In that event, the Court would have adopted the position taken by the Secretary of the Department of Health and Human Services ("Secretary"). See Chevron U.S.A. v. Nat'l Resources Def. Council, Inc., 467 U.S. 837, 843-44, 104 S. Ct. 2778, 2781-82, 81 L. Ed. 2d 694 (1984) (explaining that when Congress has not directly spoken to an issue, courts must adopt the interpretation of the administrative agency charged with the duty of enacting the regulation in question "unless they are arbitrary, capricious, or manifestly contrary to the statute"). The Secretary, who is charged with the responsibility of administering the Program, see 42 U.S.C. §§ 300aa-10-300aa34, maintains that any injury claims allegedly caused by thimerosal in covered vaccines are "vaccine related" and therefore, thimerosal-related claims against vaccine manufacturers require adjudication by the Vaccine Court. See, e.g., The National Vaccine Injury Compensation Program web-page, available at <http://www.hrsa.gov/osp/vicp/quanda.htm> ("Because thimerosal is not an adulterant or contaminant, individuals who have claims relating to thimerosal in vaccines covered under the [Vaccine Act] ... must first file the claim with

the [Program] before pursuing any other civil litigation").

[*18]

Individual Claims Against the Vaccine Manufacturers

Having dismissed the Representative Claims against the Vaccine Manufacturers, the Court now turns to Plaintiffs' Individual Claims for loss of consortium, emotional distress and loss of services. In their Motion to Dismiss, the Vaccine Manufacturers argue that Plaintiffs are also required to file a Program petition as a pre-requisite to asserting the Individual Claims. Moreover, the Vaccine Manufacturers assert that even if the Individual Claims are not barred by the Vaccine Act, Plaintiffs' causes of action for loss of consortium, loss of services and emotional distress cannot be maintained in accordance with Texas law. The Court will address each of these contentions in turn.

Vaccine Act Petition

By its own terms, the Vaccine Act's proscription against bringing a civil action for damages prior to the filing of a Program petition "applies only to a person who has sustained a vaccine-related injury or death and who is qualified to file a petition for compensation under the Program." 42 U.S.C. § 300aa-11(a)(9). As such, Plaintiffs are not barred from bringing their Individual Claims against the [*19] Vaccine Manufacturers unless they are "qualified to file a petition." An individual becomes eligible to file a petition if he or she suffers a specified injury after he or she receiving a vaccine. See 42 U.S.C. §§ 300aa-11(b)(1)(A), 300aa-11(c)(1)(A). Thus, unless an individual received a vaccine (or is the legal representative of such an individual), that individual cannot file a petition in the Vaccine Court. See Schafer, 20 F.3d at 7; Head v. Sec'y of Health and Human Servs., 26 Cl. Ct. 546, 547 n.1 (1992), aff'd, 996 F.2d 318 (Fed. Cir. 1993). In this case, neither Plaintiff alleges to have "suffered a relevant injury ... after he or she received a vaccine." Accordingly, Plaintiffs need not (and cannot, for that matter) file a Program petition with respect to their Individual Claims, and are consequently permitted to file such claims in this forum. See Schafer, 20 F.3d at 5 (explaining that the Vaccine Act's tort suit ban does not apply to individuals who cannot file petition in the Vaccine Court except in a representative capacity), Head, 26 Cl. Ct. at 550 (holding that [*20] an award to a mother in her individual capacity in an action arising from vaccine-related injuries received by her daughter did not bar the daughter's subsequent action under the Vaccine Act); McDonald v. Lederle Labs., 341 N.J. Super. 369, 775 A.2d 528, 535 (N.J. 2001) ("The [Vaccine] Act does not preclude parents from filing an individual civil ac-

tion for losses incurred by them."). Having determined that Plaintiffs' Individual Claims are not barred by the Vaccine Act, the Court now considers the merits of these claims under Texas law.

### Loss of Consortium

In *Sanchez v. Schindler, 651 S.W.2d 249, 26 Tex. Sup. Ct. J. 353 (Tex. 1983)*, the Texas Supreme Court recognized that injuries to the familial relationship are significant injuries worthy of compensation. See *id. at 251*. Accordingly, parents may recover for loss of companionship for the wrongful death of a child. See id. At least two Texas courts have extended the Sanchez holding to cover situations involving a non-fatally injured child. See *Roberts v. Williamson, 52 S.W.3d 343, 352 (Tex. App.—Texarkana 2001)* ("To hold that a parent cannot recover [for the loss of consortium [*21] of a non-fatally injured child] would ignore the basic idea behind recovery for loss of consortium: to attempt to compensate for the loss of love and companionship"), *petition for review filed* (August 20, 2001); *Enochs v. Brown, 872 S.W.2d 312, 322 (Tex. App.—Austin 1994, no writ)* ("Within the [Texas] Supreme Court's express recognition of a common law cause of action for a serious injury to a spouse or parent lies the implicit recognition of a parent's claims for loss of companionship for a similar injury to a child"); Cf. *Reagan v. Vaughn, 804 S.W.2d 463, 466, 34 Tex. Sup. Ct. J. 189 (Tex. 1990)* ("The two relationships likely to be most severely affected by a negligent injury to a person are the husband and wife relationship and that of parent and child[.]") Therefore, in light of these decisions, the Court concludes that Plaintiffs have stated a viable claim for loss of consortium under Texas law.

### Loss of Services

On the other hand, the Texas Supreme Court rejected the "antiquated concept of the child as an economic asset," when it explained that "the real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but [*22] is the loss of love, advice, comfort, companionship and society." *Sanchez, 651 S.W.2d 249, 251.* Therefore, the Court concludes that, as a matter of Texas law, Plaintiffs cannot maintain a cause of action for loss of services based upon Michael's alleged injuries.

### Emotional Distress

Similarly, Plaintiffs cannot recover on their derivative claims of emotional distress. In Texas, emotional distress damages are recoverable in a very limited set of circumstances: (1) as the foreseeable result of a breach of a duty arising out of certain special relationships; (2) for common law torts involving intentional or malicious conduct; (3) for wrongful death; (4) in personal injury cases where the defendant's conduct causes the plaintiff serious bodily injury; and (5) in bystander actions. See *Verinakis v. Med Profiles, Inc., 987 S.W.2d 90, 95 (Tex. App.—Houston [14th Dist.] 1998, pet. denied)*. In this case, Plaintiffs have not alleged any facts signaling a special relationship, intentional or malicious conduct or wrongful death. And the only personal injuries alleged were incurred by Michael–not by Plaintiffs. Thus, the only possible avenue by which Plaintiffs [*23] may attempt to recover emotional distress damages is the bystander action. However, this method proves similarly inapplicable.

In Texas, bystanders may recover damages for mental anguish suffered as a result of witnessing a serious or fatal accident involving a close family member. See *City of Tyler v. Likes, 962 S.W.2d 489, 496, 41 Tex. Sup. Ct. J. 174 (Tex. 1997)*. In order to successfully recover emotional distress damages, a bystander plaintiff must establish that: (1) the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it; (2) the plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observation of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) the plaintiff and victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. See *United Servs. Auto Ass'n v. Keith, 970 S.W.2d 540, 541–42, 41 Tex. Sup. Ct. J. 928 (Tex. 1998)* (per curiam). Texas law requires the bystanders's presence when the accident occurred and the contemporaneous perception of the accident. [*24] See *id. at 542.*

Here, Plaintiffs clearly did not witness and perceive the type of shocking accident contemplated by the bystander theory of recovery. Rather, Plaintiffs witnessed Michael's routine vaccination and his subsequent physical deterioration that is allegedly linked to thimerosal. Moreover, Plaintiffs did not learn of Michael's alleged mercury poisoning until Michael's neurological problems were diagnosed by a physician, well after his vaccinations were administered. However anguishing these belated circumstances may have been, the bystander theory is inapplicable to the facts of this case, as a matter of Texas law.

As stated above, although none of the Individual Claims are barred by the Vaccine Act, Plaintiffs' derivative claims for loss of services and emotional distress cannot be maintained in conformity with Texas law. However, Plaintiffs' cause of action for loss consortium remains viable. As such, the Vaccine Manufacturers' Motion to Dismiss is hereby **GRANTED IN PART** with respect to Plaintiffs' Individual Claims for loss of services and emotional distress; and hereby **DENIED IN PART** with respect to Plaintiffs' Individual Claims for loss [*25] of con-

sortium. Plaintiffs' Individual Claims for loss of services and emotional distress against the Vaccine Manufacturers are hereby **DISMISSED WITH PREJUDICE.**

### IV. Sigma and EM's Motion to Dismiss

The Court now turns to the Motion to Dismiss filed by Sigma on March 22, 2002 and joined by EM on March 27, 2002 (both Sigma and EM are Chemical Manufacturer Defendants). n12 Sigma and EM contend that the Vaccine Act requires dismissal of the Representative Claims and Individual Claims brought against them. This argument contains a fatal flaw, however, because the Vaccine Act only prohibits the filing of any civil action against a "vaccine *manufacturer or administrator*" prior to the filing of a Program petition. *42 U.S.C. § 300aa-11*(a)(2)(A) (emphasis added). Because Sigma and EM allegedly supply thimerosal (a raw material) to the Vaccine Manufacturers, but do not manufacture or administer vaccines themselves, Plaintiffs' claims against Sigma and EM are not subject to the Vaccine Act's tort suit bar. Nevertheless, for the reasons discussed previously in conjunction with the Individual Claims against the Vaccine Manufacturers, Sigma and EM's Motion to Dismiss is hereby **GRANTED IN PART** with respect to Plaintiffs' derivative claims for loss of services and emotional distress. Regarding all other claims asserted by Plaintiffs against Sigma and EM, their Motion to Dismiss is hereby **DENIED.** n13

> n12 On May 1, 2002, Sigma filed a second Motion to Dismiss and alternatively, a Motion to Stay. The Court is not making any ruling on Sigma's second Motion to Dismiss at this time. The Court will address that Motion, along with Sigma's request for a stay, after Plaintiffs have responded thereto.

> n13 Sigma and EM's Motion to Dismiss also argues for a dismissal pursuant to Fed. R. Civ. P. 19 in the event that the Court dismisses "any other Defendant or other Defendants." Because the

Court has not dismissed any Defendants (only certain claims), the Court does not need to address Sigma and EM's Rule 19 request.

### V. GDL's Motion to Dismiss

The Court recently issued an Order denying Plaintiffs leave to conduct jurisdictional discovery of GDL pending further Order [*27] of the Court. Having determined that Plaintiffs' claims against the Chemical Manufacturers are not barred by the Vaccine Act, the Court finds that such discovery is indeed warranted. As such, the Court hereby **ORDERS** that Plaintiffs have sixty (60) days from the date of this Order to conduct discovery pertaining solely to whether this Court may validly exercise personal jurisdiction over GDL. At the end of that time period, Plaintiffs are **ORDERED** to file their Response to GDL's Motion to Dismiss for Lack of Personal Jurisdiction. The Court will rule on that Motion as soon as it can be reached.

In conclusion, the Court reiterates that all Representative Claims asserted against the Vaccine Manufacturers fall squarely within the jurisdiction of the Vaccine Court and are hereby **DISMISSED WITHOUT PREJUDICE.** The only claims against the Vaccine Manufacturers that Plaintiffs may properly assert in this forum are those seeking compensation for loss of consortium. On the other hand, Plaintiffs' Representative Claims and Individual Claims against the Chemical Manufacturers are subject to adjudication in this forum. GDL's Motion to Dismiss remains pending. Finally, this Order [*28] renders the Vaccine Manufacturers' Request for Oral Argument on their Motion to Dismiss **MOOT.** The Court will address all other pending concerns as soon as they are ripe for consideration.

**IT IS SO ORDERED.**

**DONE** this 7th day of May, 2002, at Galveston, Texas.

SAMUEL B. KENT

UNITED STATES DISTRICT JUDGE

In the United States Court of Federal Claims

OFFICE OF SPECIAL MASTERS

(Filed: July 3, 2002)

```
* * * * * * * * * * * * * * * * * * * * * * * * *
IN RE: CLAIMS FOR VACCINE INJURIES   *
RESULTING IN AUTISM SPECTRUM         *
DISORDER OR A SIMILAR                 *
NEURODEVELOPMENTAL DISORDER           *          AUTISM MASTER FILE
                                      *          To be published
VARIOUS PETITIONERS,                  *
                                      *
         v.                           *
                                      *
SECRETARY OF HEALTH AND               *
HUMAN SERVICES,                       *
                                      *
         Respondent.                  *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

## AUTISM GENERAL ORDER #1

### A. Background

This Autism General Order #1 is being issued by the Office of Special Masters ("OSM"), to address an unusual situation facing the National Vaccine Injury Compensation Program ("Program.")[1] This situation arises out of concern in recent years that certain childhood vaccinations might be causing or contributing to an apparent increase in the diagnosis of a type of serious neurodevelopmental disorder known as "autism spectrum disorder," or "autism" for short.[2]

---

[1] The applicable statutory provisions defining the Program are found at 42 U.S.C. § 300aa-10 *et seq.* (2000). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. § 300aa (2000).

[2] An autism spectrum disorder is a brain disorder affecting a person's ability to communicate, form relationships, and/or respond appropriately to the environment. Such disorders sometimes result in death. The "spectrum" of such disorders includes relatively high-functioning persons with speech and language intact, as well as persons who are mentally retarded, mute, or with serious language delays. Symptoms may include, but are not limited to, avoidance of eye contact, seeming "deafness," abrupt loss of language, unawareness of environment, physical abusiveness,

Specifically, it has been alleged that cases of autism, or neurodevelopmental disorders similar to autism, may be caused by Measles-Mumps-Rubella ("MMR") vaccinations; by the "thimerosal" ingredient contained in certain Diphtheria-Tetanus-Pertussis ("DTP"), Diphtheria-Tetanus-acellar Pertussis ("DTaP"), Hepatitis B, and Hemophilus Influenza Type B ("HIB") vaccinations; or by some combination of the two.

To date, over 400 cases alleging a causal relationship between such vaccinations and autism disorders have been filed in this court; more than 300 of those cases have been filed in the past six months. Moreover, numerous civil lawsuits against vaccine manufacturers, alleging that the thimerosal ingredient caused autism, have been filed in courts around the country. One recent ruling in such a suit determined as a matter of law that such claims of vaccinees against vaccine manufacturers must be dismissed and brought to this court as Program claims. See *Owens v. American Home Products Corp.*, 2002 WL 992094 (S.D. Tex. May 7, 2002).

As a result of the influx of Program claims and the potential for many more such claims, the OSM has held a series of meetings with an informal advisory committee to address the task of dealing with these claims. This committee consisted of petitioners' counsel who represent many such current and potential Program claimants, along with legal and medical representatives of the Secretary of Health and Human Services. (See Ex. C for a list of the participants in that advisory committee.) The participating petitioners' counsel, who are in contact with many other petitioners' counsel, have estimated that due to the *Owens* decision, approximately 3,000 to 5,000 such Program petitions (or possibly even more) are likely to be filed with this court during the next several months.

Processing such a large number of cases will stretch thinly the resources of both the court and the bar. It is in the interests of all that the court aggressively, but fairly, manage this docket to ensure a timely presentation and resolution of the difficult medical and legal issues raised in these cases. This Autism General Order #1 and the procedure detailed herein resulted from extensive discussions with the parties' representatives, and from the special masters' experience in handling other groups of cases presenting common issues. The court is confident that this procedure, coupled with the cooperative efforts and quality advocacy of counsel, will provide the necessary information for resolving these cases, within a reasonable time frame.

During the advisory committee meetings, petitioners' representatives proposed a timetable for resolving the general causation issues involved in these cases which extended well over two years. In response, the OSM established one overriding principle governing all suggestions, proposals, and requests--the OSM's decision on the causation issues shall be rendered within two years after the filing of this General Order. The OSM's subsequently adopted procedure and schedule contained herein are designed to meet that two-year time frame.

---

inaccessibility, fixation, bizarre behavior, "flapping," repetitive and/or obsessive behavior, insensitivity to pain, social withdrawal, and extreme sensitivity to sounds, textures, tastes, smells, and light. National Institute of Mental Health, Publication 97-4023.

### B. Proposal of petitioners' representatives

Autism cases are not new to the court; a number have been pending for several years. However, in those pending cases, petitioners' counsel continue to request more time for the science to crystalize, to obtain experts, and in general to prepare their proof concerning the difficult medical and legal causation issues. Similarly, in the advisory committee discussions described above, petitioners' representatives have stated that they are not prepared to present their causation case at this time. Rather, petitioners request extensive discovery--documents, studies, and raw data from government agencies and possibly vaccine manufacturers--information relevant to the general causation issues, through this court's discovery process.

Accordingly, petitioners' representatives in the advisory committee meetings have proposed a general procedure by which the OSM could process the claims described above, both those already filed and those about to be filed. They propose that the OSM utilize a two-step procedure: first, conduct an inquiry into the *general causation issues* involved in these cases-- *i.e.*, whether the vaccinations in question can cause autism and/or similar disorders, and if so in what circumstances; and then, second, apply the conclusions reached in that general inquiry to the individual cases. They propose that the OSM establish an "Autism Master File" with respect to the general causation issues, which would be open to inspection by any interested persons, and which would constitute an evidentiary record with respect to the general causation issues. They propose that a team of petitioners' lawyers be selected to represent the interests of all petitioners in these autism cases during the course of this general causation inquiry. They propose that the proceeding begin with a lengthy period of discovery concerning the general causation issues, followed by a designation of experts for each side, an evidentiary hearing, and a ruling on the general causation issues. Finally, the special master's determination on the general causation issues would be applied to the individual cases.

During the meetings of the informal advisory group, respondent's representatives did not oppose petitioners' general plan, as set forth above, that the OSM conduct a general inquiry into the causation question, then apply the conclusions reached in that inquiry to the individual cases.

### C. Procedure adopted by the OSM

After considering carefully the practical and thoughtful advice from petitioners' and respondent's representatives presented during the meetings of the advisory committee, the OSM responds to the challenge presented by this influx of cases with the following procedures.

First, the OSM adopts the general approach to these cases suggested by the participants in the informal advisory committee. That is, the OSM will utilize a two-step procedure: First, the OSM will inquire into the *general causation issues* involved in these cases--*i.e.*, whether the vaccinations in question can cause autism and/or similar disorders, and if so in what circumstances; and then, second, the conclusions reached in that general inquiry will be applied to the individual cases. As proposed, the OSM will authorize a team of attorneys to represent the interests of all

3

petitioners in these autism cases during the course of this general causation inquiry, which is officially entitled the "Omnibus Autism Proceeding." The inquiry will proceed as generally proposed by petitioners' attorneys—*i.e.*, a period for any court-approved discovery concerning the general causation issues, followed by a designation of experts for each side, an evidentiary hearing, and finally a special master's ruling on the general causation issues. Subsequently, the general causation conclusions will be applied to the individual cases.

The court will, as proposed, establish an "Autism Master File" with respect to the general causation issues involved in these cases. That file will be open to inspection by any interested persons, and will constitute an evidentiary record with respect to the general causation issues. All evidence relevant to the general causation issues, including transcripts of any evidentiary hearings, will be placed into that file. The first documents placed into that master file will be this Autism General Order #1 and the attachments hereto.

In accordance with § 300aa-12(d)(1), the Chief Special Master hereby designates Special Master George Hastings to preside over the Omnibus Autism Proceeding, and to make any necessary rulings on the general causation issues.

Representing the interests of petitioners in the Omnibus Autism Proceeding will be a Petitioners' Steering Committee. This committee will be comprised of counsel who are representing Program petitioners in autism cases. Currently, the vast majority of pending Program autism cases have been filed by a small number of law firms. The OSM invited attorneys from those firms to participate in the informal advisory committee described above. Those counsel have organized the initial Petitioners' Steering Committee, whose members are set forth at Ex. D to this Order. Other counsel who are interested in serving on the Steering Committee may contact the members of that committee to express their interest. The OSM believes that membership on the Steering Committee should be determined by petitioners' counsel, interacting among themselves. The Committee shall keep the presiding special master apprised, however, of changes in its membership. The Committee shall designate two attorneys as "lead counsel," authorized to sign and file documents on behalf of the Committee into the Autism Master File, and to represent the Committee at status conferences. In the unlikely event that disputes arise as to the Committee membership, the presiding special master shall be informed immediately and will resolve any issues.

Similarly, respondent shall designate two "lead counsel" for respondent in the Omnibus Autism Proceeding, who will be authorized to file documents on behalf of respondent into the Autism Master File, and to represent respondent at status conferences.

When either "party" to the Omnibus Autism Proceeding—*i.e.*, the Petitioners' Steering Committee or respondent—files documents into the Autism Master File, if the document is less than 20 pages, the party shall file an original and two copies. For documents of 20 or more pages, an original and one copy will suffice. By rule, the Clerk of the Court will file the original in the Autism Master File and send the copy or copies to the presiding special master. Unless requested, separate mailings to the presiding special master are unnecessary. The Steering Committee will serve a copy

4

of each filed document on each of the two designated lead counsel for respondent. The respondent will serve a copy of each filed document on each member of the Steering Committee.

Attached to this General Order as Exhibit A is the "Master Autism Petition for Vaccine Compensation" ("Master Petition"). This document was drafted and presented to the OSM by the Petitioners' Steering Committee. It sets forth the general allegation that a vaccinee's autistic disorder or similar disorder was caused by one or more of the MMR and thimerosal-containing vaccinations. It provides that any Program petitioner filing a "Short-Form Autism Petition for Vaccine Compensation," in a form similar to that set forth as Exhibit B to this General Order, represents that such petitioner's claim meets the criteria set forth in the Master Petition. As will be detailed below, by filing such a short-form petition, a petitioner will elect into the Omnibus Autism Proceeding, and simultaneously opt to stay case-specific proceedings on his own petition until the conclusion of the Omnibus Autism Proceeding.

## D. The Autism Master Schedule

To meet the court's self-imposed two-year timetable for decision, the Omnibus Autism Proceeding will be conducted according to an Autism Master Schedule, appended to this General Order as Exhibit E. This schedule has been determined through cooperative discussions at the advisory committee meetings. Petitioners' representatives proposed the first draft of the schedule. They proposed a schedule covering two years, from issuance of an initial General Order (i.e., this Order) until the date of an evidentiary hearing on the general causation issues, with an additional unspecified period of time obviously needed for the presiding special master to analyze the evidence introduced at the hearing and produce a written opinion. In that proposed schedule, essentially 470 of the 730 days in the two-year period were devoted to the discovery process. The first proposal extended beyond two years and thus was rejected by the OSM. After discussion, petitioners submitted a revised schedule which shortened the discovery period to 410 days, moved the hearing date up, and built in sufficient time to decide the causation issues within the two-year period. This second proposal is adopted, with slight modifications and three observations.

First, and foremost, the OSM expects that the parties will act promptly and vigorously to *adhere to this schedule, if not move more quickly*. Because the interests of thousands of petitioners are affected, the presiding special master will be disinclined to allow the Omnibus Autism Proceeding to slip behind schedule. In fact, the OSM and the presiding special master will strictly manage these proceedings in an effort to resolve the causation issues in less than the allotted two-year time period.

Second, the OSM recognizes that two years is a relatively long time to ask petitioners to wait for a ruling on the general causation issues. Congress clearly envisioned rulings on Program petitions rendered in a much shorter time frame. However, the short decision-making time periods provided in the Program statute were obviously based upon the assumption that most Program claims would present far different issues than those presented in these autism cases. The assumption clearly was that in most Program cases the question for the special master would simply be whether

petitioner's case fit within one of the "Table Injury" categories set forth at § 300aa-14(a). It was also assumed that even in those relatively few cases where no Table Injury was alleged and a petitioner attempted to prove that the vaccine "actually caused" an injury, the petitioner would file *along with his petition* all of his proof concerning the causation issue, including a report from an expert supporting the claim. In contrast, in these autism claims petitioners have requested a period of 500 days from now—almost a year-and-one-half—before filing expert reports explaining and supporting their theory of causation. These reports will follow a lengthy discovery period of a type clearly never envisioned by Congress. However, it is clear to the OSM that the reality of the difficult medical issues involved and the stringent legal standards applied to causation cases justifies petitioners' request for a reasonable discovery opportunity and the extended time for filing expert reports. Unfortunately, resolution of the general causation inquiry must await longer than Congress envisioned and the OSM would ideally wish; but it is clear to all involved that without the requested extended time frames, petitioners would be unable to prosecute their claims. In this instance, quick justice would mean no justice.

Third, the above pages have referenced the "general causation issues." The OSM recognizes that the Omnibus Autism Proceeding is in its earliest phase. While petitioners' representatives have mentioned multiple potential theories of causation, until discovery is completed and expert reports are filed it will not be known whether one or more causation theories are at issue. As noted above, there have been suggestions that autistic disorders can be caused by (1) MMR vaccinations; (2) the thimerosal component of the DTP, DTaP, Hepatitis B, and HIB vaccinations; and/or (3) a combination of (1) and (2). Accordingly, the presiding special master, working with the parties' representatives, will decide at a later date the most efficient procedure for resolving the causation issues, depending upon the development of the causation theories put forth by Petitioners' Steering Committee.

### E. Opting into, or out of, the Omnibus Autism Proceeding

All persons with pending petitions or potential Program claims involving an autistic or autistic-like disorder should assess their own cases in light of the Omnibus Autism Proceeding. Many petitioners with pending claims have already requested and have been granted stays in their own cases until the conclusion of the Omnibus Proceeding.[1] The presiding special master will conduct no case-specific proceedings in those "stayed" cases until the conclusion of the Omnibus Proceeding, unless otherwise requested by a party. The OSM will keep all petitioners or their counsel updated as to the progress of the Omnibus Proceeding. After the Omnibus Proceeding is concluded by the special master's ruling concerning the general causation issues, the individual cases will then be addressed. If the ruling on the general causation issues appears favorable to an individual petitioner's case, the petitioner will be ordered to demonstrate that his or her case qualifies for compensation under the general ruling, and proceed to a damages determination. If the general

---

[1] Such cases will be officially transferred from the docket of the originally-assigned special master to the docket of Special Master Hastings, the special master presiding over the Omnibus Autism Proceeding.

5

ruling, on the other hand, appears unfavorable to an individual petitioner's case, then the petitioner will be given the opportunity to introduce additional supportive case-specific evidence, including expert reports, or to dismiss the case for want of proof. The court will determine how to process individual cases, following the resolution of the general causation issues, only after ample time and opportunity is granted to each petitioner to review the evidence from the Omnibus Proceeding, to consult with counsel and medical experts, and then to make a reasoned choice.

Any petitioner with a *pending* autism-related claim, who has not yet requested to have proceedings in his own case stayed for the duration of the Omnibus Autism Proceeding, may do so simply by filing a Notice to Stay Proceedings, similar to that contained at Ex. F to this General Order. Once that is done, no case-specific proceedings will be held in that case until further notice, and that case will be treated as described in the previous paragraph.

Persons who have autism-related claims for which they have *not yet filed* Program petitions, and who wish to have their cases stayed during the Omnibus Autism Proceeding, may file their petitions by filing a "Short-Form Autism Petition for Vaccine Compensation" in a form similar to the one set forth as Ex. B to this General Order.[4] No medical records need be filed with such a short-form petition, though each petitioner or his counsel is encouraged to assemble, organize, and keep all relevant medical records so that they will be available for filing if, and when, the petitioner is directed to do so by the special master. Once such a short-form petition is filed, no case-specific proceedings will be held in the case during the course of the Omnibus Autism Proceeding, and the case will be treated as described above.

*One important caveat, however, is drawn to the attention of all petitioners and their counsel.* There may be cases involving autistic-like disorders which manifested following an injury defined in the Vaccine Injury Table. That is, a vaccinee may have suffered an episode involving a severe acute encephalopathy within 72 hours after a pertussis vaccination (DTP or DTaP), or 5 to 15 days after an MMR vaccination. If so, such an acute encephalopathy and any residual effects thereof would be *presumed* to be vaccine-caused pursuant to the Vaccine Injury Table. *See* 42 C.F.R. § 100.3(a) (10-1-97 version of CFR).[5] However, this would apply only to cases falling within the current Vaccine Injury Table's definition of "acute encephalopathy," in which the vaccinee suffered a sudden, dramatic, and severe change in level of consciousness lasting at least 24 hours. 42 C.F.R. § 100.3(b)(2)(i)(A) and (D). The incident must have been "sufficiently severe so as to require hospitalization," though actual hospitalization at the time need not have occurred. 42 C.F.R. § 100.3(b)(2)(i). Autism cases involving Table Injuries have been compensated under the Program. If in a particular case there exist medical records demonstrating that such a qualifying

---

[4] The OSM acknowledges that respondent opposes the use of a short-form petition. The court's reasoning on this topic will be set forth in a separate document.

[5] Note that the Vaccine Injury Table contained in the statute at § 300aa-14(a) is *not* applicable to Program petitions filed since March 10, 1995. For any petition filed on or after March 14, 1997, the applicable Vaccine Injury Table is found at 42 C.F.R. § 100.3 (1997).

7

"acute encephalopathy" occurred within the appropriate time frame, petitioner or counsel should bring that to the assigned special master's attention so that, if appropriate, the case can be processed without delay as a Table Injury.

Finally, petitioners should note that even after electing to have their case stayed pending the conclusion of the Omnibus Autism Proceeding, such election is not irrevocable. That is, if at a future time a petitioner determines that his own case should be separated from the Omnibus Autism Proceeding and processed separately, with the petitioner introducing case-specific proof of causation, such petitioner may request that a special master analyze his case. A special master will be assigned and the case will be processed as expeditiously as possible.

## F. Obtaining Information About the Progress of the Omnibus Autism Proceeding

As noted above, during the course of the Omnibus Autism Proceeding, the individual autism cases will be stayed, with no case-specific proceedings conducted. During that time, however, the OSM will keep the petitioners in such cases well informed as to the progress of the Omnibus Autism Proceeding, by two devices.

First, the OSM from time-to-time will issue additional Autism General Orders detailing the progress of the Omnibus Autism Proceeding. Such general orders will be sent to all counsel, or petitioners appearing *pro se*, in autism cases.

Secondly, a specific page on this court's internet website will be devoted to the Omnibus Autism Proceeding. Relevant filed documents and periodic updates regarding the proceedings will be posted on that site. This page may be accessed by logging onto this court's website at www.uscfc.uscourts.gov, then clicking on the "Special Masters" icon.

## G. Conclusion

The Office of Special Masters is determined to process these autism petitions as swiftly and efficiently as possible, while giving all interested parties a fair opportunity to present their claims and evidence. We appreciate the assistance of all petitioners, petitioners' counsel, and respondent's representatives in this challenging endeavor.

Gary J. Golkiewicz
Chief Special Master
For the Office of Special Masters

8

EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
OFFICE OF SPECIAL MASTERS

| | |
|---|---|
| IN RE: CLAIMS FOR VACCINE INJURIES RESULTING IN AUTISM SPECTRUM DISORDER OR A SIMILAR NEURODEVELOPMENTAL DISORDER | |
| | AUTISM MASTER FILE |
| VARIOUS PETITIONERS, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

MASTER AUTISM PETITION FOR VACCINE COMPENSATION

Pursuant to the Autism General Order #1 issued by the Office of Special Masters of this

the Omnibus Autism Master File created in the Office of the Clerk of this Court. As detailed in that Autism General Order #1, any petitioner desiring that his or her Vaccine Act claim be processed

3.   As a direct result of one or more vaccinations covered under the National Vaccine Injury Compensation Program, the vaccinee in question has developed a neurodevelopmental disorder, consisting of an Autism Spectrum Disorder* or a similar disorder.  This disorder was caused by a measles-mumps-rubella (MMR) vaccination; by the "thimerosal" ingredient in certain Diphtheria-Tetanus-Pertussis (DTP), Diphtheria-Tetanus-acellular Pertussis (DTaP), Hepatitis B, and Hemophilus Influenza Type B (HIB) vaccinations; or by some combination of the two.

4.   The vaccinee received the vaccination or vaccinations in question in the United States, or otherwise in compliance with 42 U.S.C. § 300aa-11(c)(1)(B).

5.   The petition is being filed within three years after the first symptom of the disorder, or within three years after the first symptom of a vaccine-caused significant aggravation of the disorder.  (If the vaccine-related death is alleged, the petition is being filed within two years after the date of death and no later than 48 months after onset of the injury from which death resulted.)

6.   The vaccine-related injury either has persisted for more than six months or resulted in death.

Therefore, by filing a "Short-Form Autism Petition for Vaccine Compensation," a petitioner will be deemed to be seeking an award under the National Vaccine Injury Compensation Program. Such a petitioner will be deemed to have deferred specific compensation demands, pursuant to 42 U.S.C. § 300aa-11(c), until the issue of entitlement to compensation is determined.

---

*An autism spectrum disorder is a brain disorder affecting the petitioner's ability to communicate, form relationships, and/or respond appropriately to the environment. Such disorders sometimes result in death. The "spectrum" of such disorders includes relatively high-functioning persons with speech and language intact, as well as persons who are mentally retarded, mute, or with serious language delays. Symptoms may include, but are not limited to, avoidance of eye contact, seeming "deafness," abrupt loss of language, unawareness of environment, physical abusiveness, inaccessibility, fixation, bizarre behavior, "flapping," repetitive and/or obsessive behavior, insensitivity to pain, social withdrawal, and extreme sensitivity to sounds, textures, tastes, smells, and light. National Institute of Mental Health, Publication 97-4023.

2

EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

OFFICE OF SPECIAL MASTERS

_____,

parent(s) of

_____, a minor,

　　　　　　　Petitioners,

　　　v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

　　　　　　　Respondent.

No. [leave blank        ]
Special Master [leave blank    ]

## SHORT-FORM AUTISM PETITION FOR VACCINE COMPENSATION

The petitioners, on behalf of their minor child, hereby petition for compensation under the National Vaccine Injury Compensation Program, and adopt the MASTER AUTISM PETITION FOR VACCINE COMPENSATION.

_____
Date

Check One:

　　　　　Attorney ☐
　　　　　Pro Se   ☐

Sign:_____
Print Name:_____
Address:_____
City, State, Zip:_____
Phone Number:_____
Fax Number:_____

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the attached Autism Petition for Vaccine Compensation was sent by First Class or Certified Mail on _____, to:

Secretary of Health and Human Services
c/o Director, Bureau of Health Professions
5600 Fishers Lane, Suite 8-05
Rockville, MD 20857

_____
Signature of person mailing Petition

EXHIBIT C

## AUTISM ADVISORY COMMITTEE PARTICIPANTS

### Participants from the Office of Special Masters

Chief Special Master Gary Golkiewicz
Special Master George Hastings
Special Master John Edwards

### Petitioners' Counsel Participants

Clifford Shoemaker
Ghada A. Anis
SHOEMAKER & ASSOCIATES
Vienna, VA

Jeff Thompson
WILLIAMS BAILEY, L.L.P.
Houston, TX

John Kim
GALLAGHER, LEWIS, DOWNEY & KIM
Houston, TX

Ben C. Martin
LAW OFFICES OF BEN C. MARTIN
Dallas, TX

Ronald Homer
Kevin Conway
CONWAY, HOMER & CHIN-CAPLAN, P.C.
Boston, MA

### Participants Representing Respondent

Mark Raby
Vince Matanoski
U.S. Department of Justice

Vito Caserta, M.D., Chief Medical Officer
National Vaccine Injury Compensation Program
Medical Analysis Branch
U.S. Department of Health & Human Services

Deborah Harris
Office of General Counsel, Public Health Division
U.S. Department of Health & Human Services

Vernessa Pollard, Assistant Chief Counsel
Office of the Chief Counsel
Food and Drug Administration

Ex. C, p. 2

EXHIBIT D

## AUTISM PETITIONERS' STEERING COMMITTEE

Clifford Shoemaker
cliff@attorneyaccess.net

Ghada A. Anis
ghada@attorneyaccess.net

SHOEMAKER & ASSOCIATES
Attorneys and Counselors at Law
9711 Meadowlark Road
Vienna, VA 22182
Telephone: (703) 281-6395
Fax: (703) 281-5807

Jeff Thompson
jthompson@williamsbailey.com

WILLIAMS BAILEY, L.L.P.
8441 Gulf Freeway, Suite 600
Houston TX 77017-5001
Telephone: (713) 230-2207
Fax: (713) 643-6226

John Kim
jhkkimlaw@aol.com

GALLAGHER, LEWIS, DOWNEY & KIM
Bank of America Center
700 Louisiana Street, 40th Floor
Houston TX 77002
Telephone: (713) 238-7787
Fax: (713) 222-0066

Ronald Homer
rhomer@ccandh.com

Kevin Conway
kconway@ccandh.com

CONWAY, HOMER & CHIN-CAPLAN, P.C.
16 Shawmut Street
Boston, MA 02116
Telephone: (617) 695-1990
Fax: (617) 695-0880

EXHIBIT E

OMNIBUS AUTISM PROCEEDING

MASTER SCHEDULING ORDER

| | |
|---|---|
| July 1, 2002 | Autism General Order #1 |
| August 2, 2002 | Petitioners file discovery requests, setting forth the discovery sought from any party or entity subject to the control of respondent agency |
| September 3, 2002 | Respondent files response and any objections to petitioners' discovery requests |
| September 17, 2002 | Conference on discovery requests |
| October 8, 2002 | Hearing on discovery requests |
| February 3, 2003 | Petitioners file supplemental discovery requests setting forth any additional and/or third-party discovery sought |
| March 3, 2003 | Respondent and/or third parties file response and any objections to supplemental discovery requests |
| March 17, 2003 | Conference on supplemental discovery requests |
| April 3, 2003 | Hearing on supplemental discovery requests |
| August 22, 2003 | Discovery completed |
| August 22, 2003 | Petitioners designate experts for Omnibus Hearing |
| October 21, 2003 | Respondent designate experts for Omnibus Hearing |
| November 21, 2003 | Petitioners file expert reports with supporting authorities |
| January 21, 2004 | Respondent file expert reports with supporting authorities |
| February 20, 2004 | Any additional motions, objections, statements of interest, etc., must be filed |
| March 22, 2004 | Omnibus evidentiary hearing |
| May 3, 2004 | Post-hearing briefs due |
| July 1, 2004 | Decision on causation issues |

EXHIBIT F

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## OFFICE OF SPECIAL MASTERS

| | |
|---|---|
| — and —, | * |
| parents of | * |
| | * |
| _____ | * |
| Petitioner(s), | * |
| | * |
| v. | * |
| | * |
| SECRETARY OF HEALTH AND | * |
| HUMAN SERVICES, | * |
| | * |
| Respondent. | * |

## NOTICE TO DEFER PROCEEDINGS IN AUTISM CASE

The petitioner(s) in this case believe(s) that the causation question in the case may be related to the general causation issues to be addressed in the Omnibus Autism Proceeding, and request(s) that case-specific proceedings in this case be deferred pending completion of the Omnibus Autism Proceeding.

_____
Counsel for Petitioner(s)

[or Petitioner appearing pro se]

OFFICE OF SPECIAL MASTERS

No. 02-819V

(Filed: December 30, 2002)

```
* * * * * * * * * * * * * * * * * * * * * * * * * *
KIM STEWART, Parent of Heath                    *
Stewart, a Minor,                               *
                                                *
              Petitioner,                       *
                                                *
       v.                                       *          TO BE PUBLISHED
                                                *
SECRETARY OF HEALTH AND                         *
HUMAN SERVICES,                                 *
                                                *
              Respondent.                       *
                                                *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```

Ronald Homer, Boston, Massachusetts, for petitioner.
Vincent Matanoski, Department of Justice, Washington, D.C., for respondent.


ORDER DENYING MOTION TO DISMISS

*HASTINGS, Special Master*

This is an action in which the petitioner seeks an award under the National Vaccine Injury Compensation Program (hereinafter "the Vaccine Program" or "the Program").[1] Respondent has filed a motion seeking dismissal of the petition. For reasons to be stated below, I hereby deny that motion.


I


THE AUTISM CASES AND THE "OMNIBUS AUTISM PROCEEDING"

The respondent's dismissal motion in this case arises in the context of an unusual situation

---

[1]The applicable statutory provisions defining the Program are found at 42 U.S.C.§ 300aa-10 *et seq.* (2000 ed.). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. (2000 ed.). I also note that I will sometimes refer to the statute that enacted the Program as the "Vaccine Act."

involving multiple cases filed under the Vaccine Program that share a common issue of medical causation. Each of these cases involves an individual who suffers from a neurodevelopmental disorder known as "autism spectrum disorder"--"autism" for short--or a similar neurodevelopmental disorder. In each case, it is alleged that such disorder was causally related to one or more vaccinations received by that individual--*i.e.*, it is alleged that the disorder was caused by measles-mumps-rubella ("MMR") vaccinations; by the "thimerosal" ingredient contained in certain diphtheria-tetanus-pertussis ("DTP"), diphtheria-tetanus-acellar pertussis ("DTaP"), hepatitis type B, and hemophilus influenza type B ("HIB") vaccinations; or by some combination of the two. To date, nearly 1,300 such cases have been filed with this court, and many more filings (perhaps several thousand) are anticipated.

To deal with this large group of cases involving a common factual issue--*i.e.*, whether these types of vaccinations can cause autism--the Office of Special Masters (OSM) conducted a number of informal meetings with attorneys who represent many of the autism petitioners and with counsel for the Secretary of Health and Human Services, who is the respondent in each of these cases. At these meetings the petitioners' representatives proposed a special procedure by which the OSM could process the autism claims as a group. They proposed that the OSM utilize a two-step procedure: first, conduct an inquiry into the *general causation issue* involved in these cases-- *i.e.*, whether the vaccinations in question can cause autism and/or similar disorders, and if so in what circumstances--and then, second, apply the outcome of that general inquiry to the individual cases. They proposed that a team of petitioners' lawyers be selected to represent the interests of the autism petitioners during the course of the general causation inquiry. They proposed that the proceeding begin with a lengthy period of discovery concerning the general causation issue, followed by a designation of experts for each side, an evidentiary hearing, and finally a ruling on the general causation issue by a special master. Then, the general causation conclusions, reached as a result of the general proceeding, would be applied to the individual cases.

As a result of the meetings discussed above, the OSM adopted a procedure generally following the format proposed by the petitioners' counsel. On July 3, 2002, the Chief Special Master, acting on behalf of the OSM, issued a document entitled Autism General Order #1.[2] That General Order sets up a proceeding known as the Omnibus Autism Proceeding (hereinafter sometimes "the Proceeding"). In that Proceeding, a group of counsel selected from attorneys representing petitioners in the autism cases are in the process of obtaining and presenting evidence concerning the *general issue* of whether these vaccines can cause autism, and, if so, in what circumstances. The results of that general inquiry will then be applied to the individual cases. (Autism General Order #1 at 3 (2002 WL 31696785 at *3).)

---

[2]The Autism General Order #1 is published at 2002 WL 31696785 (Fed. Cl. Spec. Mstr. July 3, 2002). I also note that the documents filed in the Omnibus Autism Proceeding are contained in a special file kept by the Clerk of this court, known as the "Master Autism File." That file may be viewed at the Clerk's office, or viewed on this court's Internet website at www.uscfc.uscourts.gov/osm/osmautism.htm.

The Autism General Order #1 assigned the responsibility for presiding over the Omnibus Autism Proceeding to the undersigned special master. In addition, I have also been assigned responsibility for all of the individual Program petitions in which it is alleged that an individual suffered autism or an autistic-like disorder as a result of MMR vaccines and/or thimerosal-containing vaccines. The individual petitioners have agreed that, in general, no proceedings with respect to the *individual* petitioners will be conducted until after the conclusion of the Omnibus Autism Proceeding with respect to the *general* causation issue.[1] The OSM will then deal specifically with the individual cases.

II

ISSUE OF THE "SHORT-FORM" AUTISM PETITIONS

As noted in the Autism General Order #1 (p. 4; 2002 WL 31696785 at *2), during the meetings of the informal advisory group, the respondent's representatives did not oppose the petitioners' general plan, as set forth above, that the OSM first conduct a general inquiry into the causation question, then apply the conclusions reached in that inquiry to the individual cases. A difference of opinion did emerge, however, on one important procedural point, a difference which ultimately resulted in the motion at issue here.

The petitioners' representatives proposed that would-be petitioners who wish to elect into the Omnibus Autism Proceeding be permitted to file their Program petitions by filing very simple short-form "opt-in" petitions. Each such short-form petition, it was proposed, would consist basically of a petition form containing the names of the injured vaccinee and that vaccinee's parents or other representatives, and an agreement to opt into the Omnibus Autism Proceeding. By using the short-form petition, each petitioner would automatically be asserting that the vaccinee had suffered autism or a similar disorder as a result of MMR vaccinations and/or thimerosal-containing vaccinations. The short-form petition would not contain a detailed account of the relevant vaccinations and the history of the vaccinee's disorder, nor would it be accompanied by the medical records of the vaccinee's injury. Respondent's representatives indicated that they could not agree to this part of the petitioners' proposal, which would allow the filing of a "short-form" petition unaccompanied by medical records. They pointed to the statutory provisions calling for a Program petition to set forth a detailed account of the injury alleged, and contended that a petition must be filed along with all relevant medical records. *See* § 300aa-11(c).

The OSM noted this concern of respondent in the Autism General Order #1 (p. 7, fn.4), and then analyzed the concern in detail in a document filed on July 8, 2002, entitled "Discussion of Issue of Short-Form Petitions" (hereinafter "Discussion"). Like the Autism General Order #1, this

---

[1] I note that it is up to each individual petitioner to determine whether to defer proceedings concerning his own case pending the completion of the Omnibus Autism Proceeding. If an individual petitioner has proof of causation in his own case that he wishes to put before a special master at any time, that petitioner will be allowed to do so.

3

"Discussion" document was filed by the Chief Special Master on behalf of the OSM. The Chief Special Master acknowledged that the respondent was raising serious and important concerns, but, considering all the circumstances, concluded that it was appropriate to permit use of the short-form petitions. (Discussion at 2-4.)

After publication of the Autism General Order #1, many petitioners began to file short-form petitions as a way of simultaneously filing their Program petitions and indicating their agreement to stay proceedings in their own individual cases pending the completion of the Omnibus Autism Proceeding. As of November 30, 2002, more than 1100 short-form petitions or very similar petitions[4] had been filed. The petitioner in this case, Kim Stewart, filed a short-form petition on July 18, 2002. No medical records were filed with the petition, although petitioner's counsel also filed a "Motion for Issuance of Subpoena," requesting permission to utilize court subpoenas to obtain medical records pertaining to the autistic condition of petitioner's son, Heath Stewart. I issued an Order in this case on August 7, 2002, granting the subpoena request and confirming that, at petitioner's request, I would not conduct any case-specific proceedings in this case (unless requested by a party) until the completion of the Omnibus Autism Proceeding.

On August 15, 2002, the respondent filed a "Motion to Dismiss" (hereinafter "Motion") asserting that this petition should be dismissed because it was not accompanied by medical records or affidavits describing Heath Stewart's condition. Petitioner's counsel requested extensions of time for responding to the motion, so that counsel could consult with other attorneys representing autism petitioners before filing petitioner's response. Petitioner ultimately filed her reply to the motion ("Reply") on December 2, 2002, urging that I deny the motion to dismiss. Respondent filed a response memorandum ("Response") on December 5, 2002.

### III

### THE STATUTE DOES NOT REQUIRE THAT I DISMISS THIS PETITION

I have carefully considered respondent's arguments, but I conclude that, contrary to respondent's contentions, the statute does not require that I dismiss this petition. My reasoning will follow.

Respondent bases his motion chiefly upon those portions of the Vaccine Act which state that certain documents are to be filed with a Program petition. The Vaccine Act states that a petition "shall contain * * * an affidavit, and supporting documentation, demonstrating that" the petitioner qualifies for an award under Program. § 300aa-11(c)(1). The Act further states that certain types of medical records, such as prenatal, vaccination, and physician records, shall accompany the petition.

---

[4]More than 600 petitions have been filed using the "short-form" format as set forth in the Autism General Order #1, Ex. B; no medical records were filed with most of those petitions. In addition, one law firm has filed more than 500 petitions that are only slightly more detailed than the short-form version; those petitions also were filed without medical records.

4

§ 300aa-11(c)(2). Based on these provisions, respondent seems to argue that any petition that is not accompanied at the time of filing by all the records mentioned in § 300aa-11(c)(2) must therefore automatically be dismissed, for failure to comply with the statute. I find this argument to be wholly unpersuasive.

It is true that, as respondent points out, § 300aa-11(c) of the statute contemplates that, ideally, a Program petition will set forth all details of the vaccinee's injury, and be accompanied by all relevant medical records. As respondent notes, the instruction that a petitioner file a detailed petition with all relevant medical records was obviously designed to enable the special master to promptly evaluate and rule upon the claim. Throughout the history of the Program, the special masters have strongly urged that detailed petitions accompanied by all medical records be filed whenever possible. And in situations where such complete petitions have been filed, special masters have done everything possible to speedily evaluate and rule upon such petitions.

However, the history of the Program has also shown that the ideal is not achieved in every Program case. In a great many Program cases (probably a substantial majority) petitions have been filed with some medical records, but not all of those necessary for processing the case.[5] In such cases, the processing of the claim has been delayed for at least some period of time until the additional records could be obtained. Indeed, in a substantial number of cases--usually those in which the final allowable filing date under the statutory limitations period was approaching-- petitions have been filed without *any* records at all; in some such cases the petitions have also contained very little description of the injury claimed, amounting to no more than a statement that a vaccinee was injured by a vaccination. In those situations, the processing of each case was delayed until all relevant records were obtained and the petitioner could specifically describe the alleged injury. This process sometimes has taken many months, and, in a few extreme cases in which it was very difficult to obtain medical records, even years.

Yet, in these situations, it has not been argued, by respondent or anyone else, that petitions that were not complete when filed should be summarily dismissed for that reason. In such situations, the special masters have generally urged that the necessary records be filed as soon as possible, but have afforded such petitioners the time needed to obtain and file records. Thus, for fourteen years-- the entire history of the Program--failure to file all of the relevant medical records with a petition has never been considered reason to dismiss the petition. But now, for the first time, respondent proposes a new and extremely harsh interpretation of the statute. What has generated this startling change of statutory interpretation by respondent? Respondent does not tell us.

Of course, as respondent has pointed out (Response at 4), the fact that respondent has not sought in the past to dismiss petitions that were unaccompanied by medical records does not automatically mean that respondent's current motion is without merit. The proper question, as

---

[5]For example, petitioner's counsel, whose law firm has probably handled more Program cases on petitioners' behalf than any other firm over the past fourteen years, asserts that "in practice, vaccine petitions are almost never filed with complete supporting documentation."

respondent points out, is whether the statute requires dismissal in this case, even if, in answering that question, I were to conclude that all parties (including respondent) have been erroneously interpreting the statute for 14 years [6]  Addressing that question, I conclude that the statute does *not* require dismissal.

Respondent's memorandum's asserts that the issue involved in this motion is whether a special master in a Program case has authority to "amend or alter" the statute, or to "waive requirements" set forth in the statute or this court's rules. (Motion at 5, 7.)  Of course, a special master has no authority to "amend," "alter," or "waive" statutory requirements. The question, rather, is whether any part of the statute *requires* that a petition *automatically be dismissed* if it is filed without the medical records necessary to fully evaluate the petition. Reading the statute as a whole, I conclude that the statute does *not* so require.

The short summary of my analysis is simply that there is nothing in the statute or the rules of this court indicating that when a Program petition is filed without medical records, it must *automatically* be dismissed. While the statute does state, as noted above, that the petition "shall" contain certain medical records, the statute and this court's rules are silent concerning what should happen in the event that a petition is filed without such medical records. The interpretation of the statute that has obviously been utilized by all of the special masters throughout the history of the Program is that, considering the statute as a whole, the presiding special master in each Program case has *discretion* to regulate the procedure in order to further the goals of the Program. That is, the interpretation has been that the special master has *discretion* to entertain petitions filed without all of the required documents, and to allow the petitioner to file at a later time any documents that were not filed with the petition.

The existence of such discretion is supported by the statutory description of the duties of special masters, contained in § 300aa-12(3)(B).  That statutory section provides a special master presiding over a Program case with broad discretion in determining how to take evidence and to resolve the claim. It provides, *inter alia*, that the special master "may require such evidence as may be reasonable and necessary," "may require the submission of such information as may be reasonable and necessary," and "may require * * * the production of any documents as may be reasonable and necessary." § 300aa-12(d)(3)(B)(i), (ii), and (iii).  The fact that this provision in general gives the special master such extremely broad discretion, in determining procedure in Program cases, provides implicit *general* support to the conclusion that Congress must have intended that a special master

---

[6] I note that in a number of *non-autism* Program cases petitions have been filed without medical records even since the date (August 15, 2002) on which respondent filed the dismissal motion in this case. In those cases, not only has respondent not filed any dismissal motions, but respondent's attorneys, to their credit, have often been helpful in such cases in assisting petitioners in obtaining and filing the necessary medical records. It is confusing to me how respondent's counsel can take the position in this case that I have no discretion to do anything but dismiss the petition, but in other cases in which petitions were filed without medical records, respondent *to this day* seems to have no objection to processing the cases.

6

have *discretion* in determining when, if ever, a petition should be dismissed for failure to supply the relevant medical records. Moreover, it is also important that the portions of § 300aa-12(d)(3)(B) quoted above *specifically* give the special master authority to "require * * * evidence," "require the submission of * * * information," and "require the production of * * * documents." These provisions, thus, *specifically* give the special master broad discretion to determine the *timing* of submission of evidence in a Program proceeding, which evidence obviously will nearly always include *medical records*. These provisions would seem to become meaningless if the statute required the immediate, automatic dismissal of any petition not accompanied by all of the records described in § 300aa-11(c).

A review of this court's *rules* also supports my conclusion that a special master has discretion whether or not to dismiss a petition that is unaccompanied by all specified medical records. This court has promulgated the "Vaccine Rules," which currently appear at Appendix B to the Rules of the United States Court of Federal Claims. Vaccine Rule 1 states that "[i]n all matters not specifically provided for by the Vaccine Rules, the special master * * * may regulate the applicable practice * * *." Vaccine Rule 3 provides that "[t]he special master shall determine the nature of the proceedings" in Program cases. Vaccine Rule 8 states that "[t]he special master in each case, based on the specific circumstances thereof, shall determine the format for taking evidence * * *." The Vaccine Rules, then, in giving the special master such extremely broad discretion over Program proceedings--*i.e.*, authority to "regulate the applicable practice," to "determine the nature of the proceedings," and to "determine the format" for taking evidence--also imply that a special master must have discretion whether or not to immediately dismiss a petition when it is filed without medical records.

Further, as petitioner has pointed out, a change in the Vaccine Rules adopted by this court seems to *specifically indicate* that a special master should not automatically dismiss a petition filed without medical records. That is, in the set of Vaccine Rules adopted by this court on January 18, 1990, Vaccine Rule 2 contained section (e)(4), which stated as follows:

"Petitions not accompanied by all the documents required by statute and the Vaccine Rules, or an affidavit explaining why any missing required documents are unavailable, will not be filed by the Clerk."

That section (e)(4) of Rule 2, however, was, in practice, not enforced, to my knowledge. To the contrary, when for the first time a general revision of the Vaccine Rules was undertaken, section (e)(4) of Rule 2, as quoted above, was deleted. And in deleting that provision, the Rules Committee of this court explained the reason for the deletion as follows.

The actual practice has been for the clerk to file any document that purports to be a petition, and then the respondent and/or the special master notifies petitioner if all

7

required records were not submitted. This approach is preferable to having the clerk reject petitions, which might result in missing the limitations period.[7]

Thus, the judges of this court acting collectively, in revising this court's rules, have explicitly rejected an interpretation of the Vaccine Act that would require rejection of a Program petition merely because it was not accompanied by medical records. This action by the judges of this court clearly offers support to the interpretation of the statute that I am adopting here.

I note further that the interpretation of the statute that I am adopting here does not disregard or ignore the provisions of § 300aa-11(c), described above, with regard to the filing of medical records and other supporting documentation. As respondent points out, the instruction contained in § 300aa-11(c), that the petitioner file a detailed petition accompanied by all relevant medical records, was obviously designed to enable the special master to promptly evaluate and rule upon the claim. And it seems likely that Congress expected that in most Program cases, the petitioner would be able to file the relevant records with the petition, and thereafter would be able to promptly present petitioner's theory of entitlement to the special master. However, Congress must have understood that in at least *some* cases the relevant medical records could not be filed along with the petition, and/or the petitioner would not be immediately ready to present the petitioner's proof of entitlement to the special master. Certainly Congress must have intended that in such cases the special master would have discretion to supervise the filing of evidence and the processing of the case in an orderly fashion appropriate to the circumstances. There is nothing in the statute or the legislative history to indicate that Congress intended that the special master would be required to *automatically dismiss* any case in which all relevant documents could not be filed with the petition. Therefore, I do not believe that my interpretation of the statute conflicts with the directives concerning the filing of affidavits and medical records contained in § 300aa-11(c).

Further, I am *not* claiming, as respondent suggests, the authority to "waive" or "amend" the requirement that the petitioner file the materials described in § 300aa-11(c). Of course, I would not purport to *resolve* this case without those materials. I conclude merely that a special master has discretion to *defer* the filing of such materials *to a later time*, in situations in which the overall circumstances of the case make such deferral seem appropriate.

Further, as petitioner has argued, respondent's interpretation of the statute, as requiring automatic dismissal of this petition, seems to be grossly inconsistent with the very purposes of the Program. Congress enacted the Program chiefly for the twin purposes of reducing tort litigation against vaccine manufacturers and administrators, as well as compensating individuals who may have been harmed by vaccinations. (See, *e.g.*, H.R. Rept. No. 99-908, 99th Cong., 2d Sess., pp. 3-7 (reprinted at 1986 U.S. Code Cong. & Admin. News 6344-6348).) Further, the Vaccine Act clearly seems to require that, as respondent himself agrees, all claims of the sort involved in the Omnibus

-----

[7]"Notice of Proposed Changes to Appendix J of the Rules of Procedure (Vaccine Rules)," May 16, 2000, Page 4, Rules Committee Note to Rule 2(e)(4).

Autism Proceeding *must* be filed in the Vaccine Program.[8] *Leroy v. Secretary of HHS*, No. 02-392V, 2002 WL 31730680 (Fed. Cl. Spec. Mstr. Oct. 11, 2002). Given that the Vaccine Act *required* the autism petitioners to bring their claims to this court as Program petitions, how would it further the purposes behind the Program if I interpreted the statute to require that I immediately *dismiss* most of those petitions because they were not filed along with complete medical records? To the contrary, such an interpretation would clearly seem to *frustrate* the clear Congressional intent that these claims be adjudicated under the Program, and that such petitioners be given a chance in Program proceedings to demonstrate the merits of their claims.

In short, for all the reasons stated above, I must reject the respondent's argument that the Vaccine Act requires the automatic dismissal of this petition, or of any petition filed under the Program, merely because such petition was not accompanied by all of the materials listed at § 300aaa-11(c). Rather, I conclude that the statute, viewed as a whole, affords the special master with broad *discretion* to determine *when* a petitioner must file the required documents. I conclude that in an appropriate situation--for example, if the special master has repeatedly instructed a petitioner to supply documents but that petitioner has refused or failed to do so--a special master may dismiss a Program petition for failure to file the records mentioned at § 300aa-11(c). But the respondent's argument that the statute *requires* automatic dismissal *whenever* a petition is filed without those records is, in my view, without merit.[9]

## IV

## EXERCISE OF DISCRETION

As noted above, I conclude that I have *discretion* whether to dismiss this case. Of course, I will exercise that discretion in favor of *denying* respondent's motion to dismiss. The petitioner in this case submitted her petition in reliance on the statement in the Autism General Order #1 (p. 7; 2002 WL 31696785 at *6) authorizing the use of short-form petitions in autism cases. Further, the fact that no records have been filed as yet in this case certainly is not delaying resolution of the case in any way, since the petitioner and her counsel have elected to defer proceedings in this case

---

[8]Under the Vaccine Act, a claimant alleging injury from a thimerosal-containing vaccination or MMR vaccination may not sue a vaccine administrator or manufacturer without first bringing a Program claim. See *Leroy v. Secretary of HHS, supra*; § 300aa-11(a)(2).

[9]Respondent has also stated that the short-form petitions "raise a significant question regarding whether they are legally adequate to stop the running of the Vaccine Act's statute of limitations." (Motion at 5, fn.1.) I do not understand why there would be such a question. By filing the short-form petition, the petitioner is clearly naming a particular vaccinee, alleging that such vaccinee suffered autism or an autism-like disorder as a result of MMR vaccines and/or thimerosal-containing vaccines, and certifying that the petition is being timely filed. (See Autism General Order #1 at Exhibits A and B (2002 WL 31696785 at *7-8).) I do not understand how such a petition might fail to stop the running of the Vaccine Act's statute of limitations.

pending the completion of the Omnibus Autism Proceeding. I see no reason whatsoever to dismiss this petition

## V

## I WILL NOT REQUIRE THE FILING OF RECORDS AT THIS TIME

As set forth above, I see no merit in the idea that I should dismiss the petition in this case. Indeed, the dismissal of this petition would seem to be such a harsh and unwarranted result that it is hard for me to believe that what respondent actually desires is that the petition be dismissed. I note that during the informal discussions that led to the Omnibus Autism Proceeding, discussions in which I participated, respondent's representatives argued that autism petitioners should be required to file detailed petitions accompanied by all medical records relevant to the vaccinee's condition. Perhaps what respondent's counsel actually wish me to do in this case--and in all of the autism cases involving short-form petitions or similar petitions--is not to *dismiss* the petition, but to order the petitioner to *supplement* the petition *at this time* with a detailed statement concerning the vaccinee's condition and copies of all related medical records. If that is actually what respondent seeks, then that request would strike me as a more reasonable request than respondent's stated assertion that I should *dismiss* the petition. Nevertheless, after careful consideration, I conclude that the Chief Special Master was correct when he determined, after consultation with other special masters, that it is appropriate to allow the autism petitions to be filed via short-form petitions, and to permit the filing of medical records in these cases to be deferred pending the completion of the Omnibus Autism Proceeding.

Initially, I acknowledge that the use of the short-form petitions in the autism cases has created a situation which is somewhat different from many situations in which, in the past, Program petitions have been filed without medical records. That is, in many cases over the history of the Program when incomplete petitions were filed, it was expected that the petitioners would move *expeditiously* to fill in the gaps in their petitions by supplying additional details and/or medical records. The procedure now being adopted in these autism cases, thus, is different, because the adopted procedure in the autism cases contemplates that in most of these cases the petitioners will not be required to supplement their petitions for many months, perhaps as much as two years. But this procedure is not wholly unprecedented. In late 1990 and early 1991, the Program was inundated with several thousand petitions filed at the end of the deadline for the so-called "pre-Act" cases involving vaccinations occurring prior to October 1, 1988. The system was unable to promptly and simultaneously process all those cases, and thus the cases were processed in a staggered fashion. At that time, the OSM did instruct many petitioners, whose cases could not be processed immediately, to delay filing their medical records until notified to so do. (*See* unnumbered General Order filed November 1, 1991.) As far as I am aware, neither the respondent nor anyone else argued at the time that that procedure, necessitated by a deluge of case filings in a short time period, was objectionable.

The Program now faces an influx of petitions that seems likely to rival, in numbers, the 1990-91 case filings. And as now constituted (six special masters currently in active service, a maximum

of eight authorized by statute), the OSM could not immediately analyze voluminous medical records in thousands of cases, even if requested to do so by petitioners. Moreover, the crucial factor is that the OSM is *not being requested* by petitioners to individually analyze the factual records in each of these cases at this time. The autism petitioners have requested, rather, that the OSM first conduct an inquiry into the *general causation issues,* and only *then* analyze the individual records if appropriate. In such circumstances--*i.e.,* petitioners do not want the OSM to analyze the individual case records at this time; the OSM does not currently have sufficient personnel to analyze the individual case records; the office of the Clerk of this court would be strained to accept and file the individual case records; and the individual records do not bear on the general causation issues to be decided in the Omnibus Autism Proceeding--I see no practical reason to require petitioners to file voluminous stacks of records in each individual case at this time.[10]

In this regard, respondent has stated that by permitting petitioners to refrain from initially filing medical records with their petitions, the OSM is guilty of "virtually guarantee[ing] that no statutory time goals will be realized in any of these cases." (Motion at 4.) This assertion is certainly misplaced. It is true, of course, that the statute states a time goal of 240 days for resolution of a Program claim (§ 300aa-12(d)(3)(A)(ii)), and that for the currently-filed autism cases that goal obviously will not be met. But, as respondent is well aware, the fact that we will not be able to meet the time goal in these cases clearly has nothing to do with the OSM's decision to allow short-form petitions. Rather, the delay is due to the fact that the *autism petitioners themselves* have requested an extended procedure in which we first engage in extensive discovery procedures, next explore the general causation issue, and only thereafter turn our attention to the individual cases. The goal of speedy resolution of Program petitions was obviously intended to benefit *petitioners,* not respondent. If the autism petitioners wish to utilize a relatively time-consuming procedure in order to give themselves the best chance of proving their cases, I see nothing wrong with that. And it should be quite clear that any delay in final resolution of these autism cases will result from the *petitioners' own choices* concerning how to pursue their cases, not from the OSM's decision to permit short-form petitions.

Respondent has also suggested that a reason for requiring more detailed petitions, and requiring medical records to be promptly filed in each autism case, would be to enable respondent's counsel to analyze each individual case to see whether the petition was *timely filed,* pursuant to § 300aa-16, which provides the deadlines for timely filing petitions. Respondent seems to suggest that in the event that the general causation issue is ultimately resolved in a way that would be favorable to some of the autism cases, then the processing of individual cases at that time might be speedier if the files in each case were already complete, and if the respondent had already been able to review each case to see if it was timely filed.

Again, there is some merit in the respondent's argument, but again, viewing the entire situation with an eye toward practicality, I agree with the decision reached by the Chief Special

---

[10]As petitioner's counsel points out (Reply at 7), in autism cases the medical and developmental records are likely to be quite voluminous.

Master, on behalf of the OSM, that there is no need for a rush to supply medical records in each case for this purpose. I agree with the reasoning of the Chief Special Master (see Discussion at 3-4) that it would make no sense for the OSM to begin a huge expenditure of time and effort toward determining whether individual autism cases were timely filed, prior to the completion of the Omnibus Autism Proceeding. There are several reasons for this conclusion.

First, the issue of whether any individual autism case was timely filed may very well prove to be *completely moot*. That is, if the Omnibus Autism Proceeding does not produce valid proof of causation that would apply to a particular case, and that particular petitioner is otherwise unable to demonstrate a causal link between the particular vaccinee's condition and a vaccination, then, as far as qualifying for compensation for the injury, it would be a moot point whether the petition was timely filed. Of course, the issue of timely filing might prove to be relevant to the issue of whether the petitioner would be entitled to an award for *attorneys' fees*.[11] However, in a particular case a petitioner might *never* seek an award for attorneys' fees. Therefore, any time spent by the parties or the special masters in autism cases concerning timeliness issues, prior to resolution of the general causation issues,[12] may prove to be a complete waste of time.

A second reason, in my view, involves the fact that there are currently pending before Congress proposals to modify § 300aa-16(a), which defines the period for timely filing a Program petition. Respondent's own representatives, I understand, have endorsed one such proposal, which would extend the filing period specified in § 300aa-16(a)(2) from 36 months after the onset of symptoms to 72 months after onset. Other pending proposals would provide an even lengthier time period for filing. Further, as I understand it, it appears not only possible, but *very likely*, that *some* kind of change in the limitations period will be enacted by the incoming Congress. Therefore, in this unusual situation in which a change to the applicable statutory provision is not only possible, but *seems likely*, it would seem to be an unfortunate waste of resources to expend extensive attorney and

---

[11]Under the Program a petitioner who fails to demonstrate entitlement to an award for an injury may nevertheless be granted compensation for attorneys' fees, if the petition was filed in good faith and with a reasonable basis in fact. (§ 300aa-15(e)(1).) However, it has been held that if the petition was not *timely filed*, the petitioner is ineligible even for an attorneys' fee award. See, *e.g.*, *Jessup v. Secretary of HHS*, 26 Cl. Ct. 350 (1992).

[12]To be sure, in many court proceedings, including Program cases, it is common to resolve "timely filing" issues *prior* to addressing the substantive merits of the case. But that procedure makes sense in many proceedings because resolving the timeliness issue in such a case may prevent the need for a lengthy trial concerning the substantive merits of the case. With respect to the autism cases, on the other hand, we will need to explore the *general* causation issues *in any event*, even if many individual cases were to be dismissed on timeliness grounds. Therefore, in terms of conserving the resources of both the parties and the OSM, it seems to make sense to delay spending time on individual timeliness issues, since the resolution of the general causation issue may make the timeliness issues moot.

12

special master time in grappling with timeliness issues in large numbers of autism cases, pursuant to a provision that is likely to be changed.

Third, I note that "timely filing" issues in autism cases have the potential to be far more complicated than timeliness issues in other types of cases, in or out of the Program. For example, autism seems to be a disorder with no dramatic and obvious onset, so that determining what was the "first symptom" of an autistic disorder is a question of fact that might be quite complex in many cases. Further, the causation theory in the autism cases seems to be that the vaccinee *is injured by a combined effect* of a number of different vaccinations. If that is so, then the statute-of-limitations issues become even more complex. For example, if a vaccinee was injured by a combination of vaccination A and vaccination B, then it may turn out that such vaccinee's petition was *not* timely filed with respect to the first symptom of the injury caused by vaccination A, but *was* timely filed with respect to the first symptom of the *additional injury* caused by the later-administered vaccination B. In other words, in the autism cases the issues of *timely filing* may be inextricably intertwined with resolving the *causation* issues. Therefore, this potential complexity of the timeliness issues with respect to the autism cases adds, in my view, another very strong reason for deferral of timeliness issues until the completion of the Omnibus Autism Proceeding.

Fourth, petitioner's counsel are still estimating that several thousand more autism cases are likely to be filed with this court in the coming months. If this occurs, and if I were to require detailed records to be provided with each petition at this time, it seems doubtful that respondent would have sufficient personnel available to analyze each case for potential timeliness issues. Further, even if respondent were able to analyze each case, and raised timeliness issues in a substantial number of cases, it would not be possible or desirable for the special masters to spend time resolving such timeliness issues. Recognizing the constraints of time and resources, I agree with the Chief Special Master that the special masters' efforts would best be dedicated to (1) resolving the general causation issues in the Omnibus Autism Proceeding, and (2) processing the many non-autism cases on each special master's docket. The parties' time and resources are likewise best allocated to those two tasks, rather than to addressing timeliness issues in autism cases that may prove to be moot.

In short, although I have given full consideration to the concerns raised by respondent, in the very unusual circumstances presented by these autism cases, with the likelihood of thousands of case filings in the upcoming months, I find it appropriate to continue to allow the filing of short-form autism petitions, and to allow the autism petitioners, if they wish,[11] to defer the filing of medical records to a later time.

## VI

## CONCLUSION

For the reasons stated above, the respondent's motion to dismiss this petition is hereby

---

[11]An autism petitioner, of course, may file a more detailed petition, and medical records, if the petitioner wishes to do so.

13

denied. As previously noted, at petitioner's request I will continue to refrain from conducting case-specific proceedings in this case, pending the outcome of the Omnibus Autism Proceeding.

George L. Hastings, Jr.
Special Master

14

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JIMMY CARR and SUSAN CARR,          )
                                    )
          Plaintiffs,               )
                                    )
vs.                                 )          CV 02-J-3096-NE
                                    )
AVENTIS PASTEUR, INC., et al.       )
                                    )
          Defendants.               )
                                    )

**ENTERED**

**FEB 2 7 2003**

## ORDER

Pending before the court are defendant Eli Lilly Company's motion to dismiss (doc. 9), defendant Sigma Aldrich Inc.'s motion to dismiss, or in the alternative, motion to stay (doc. 11), and defendants Aventis Pasteur Inc., SmithKline Beecham Corporation d/b/a GlaxoSmithKline, Merck & Co., Inc., and Wyeth's motion to dismiss (doc. 7).

Plaintiffs Jimmy and Susan Carr have brought this action to recover damages for loss of consortium and services on the basis of defendants' negligence, wantonness, fraud, conspiracy and a violation of the Alabama Extended Manufacturers Liability Doctrine (AEMLD), which plaintiffs allege caused injury to their child, Daniel Carr. Daniel Carr allegedly suffers from an autism-like disorder as a result of taking a childhood vaccine containing thimerosal, a chemical compound containing mercury, which is used as a preservative in vaccines thereby enabling the manufacturers to supply vaccines in multi-dose batches rather than in single units.

Defendants asserts that plaintiffs' claims are due to be dismissed pursuant to the

*32*

Vaccine Act. 42 U.S.C. § 300aa. The Vaccine Act provides a compensation system for injuries resulting from the administration of a childhood vaccine. *Id.* The intent behind this act was to limit litigation expenses for vaccine manufacturers thereby encouraging vaccine development. *Schafer v. American Cyanamid Co.*, 20 F.3d 1, 2 (1st Cir. 1994). Where an individual alleges vaccine related injuries he may bring a claim before a special master appointed by the United States Court of Federal Claims. An individual solely must prove that the vaccine caused his injuries in order to obtain a recovery. Subsequently, this individual may reject any recovery that he obtained and file a civil lawsuit against the manufacturers. 42 U.S.C. § 300aa-21.

Defendants assert that plaintiffs' claims are due to be dismissed because they have failed to first file a petition for relief before the special master/vaccine court. When an individual sustains vaccine-related injuries and files a civil lawsuit against a vaccine manufacturer alleging damages in excess of $1,000, he or she must first file a petition with the special master/vaccine court. 42 U.S.C. § 300aa-11(a)(2)(A); *Shalala v. Whitecotton*, 514 U.S. 268, 270, 115 S.Ct. 1477, 1478 (1995). The court is required to dismiss any action by a plaintiff who fails to file a petition before filing a civil lawsuit. 42 U.S.C. § 300aa-11(a)(2)(B). However, only the claims of individuals (or the legal representatives of those individuals) who have sustained vaccine-related injuries are barred by this requirement. 42 U.S.C. § 300aa-11a(9) and 11b(1)(A).

This action is not due to be dismissed on these grounds. Parents bringing a civil

2

action, on their own behalf, for damages to themselves, arising from injuries to their child, need not first file a petition before the vaccine court. *Schafer*, 20 F.3d at 6; *Owens v. American Home Products*, 203 F.Supp.2d 748, 756 (S.D. Tex. 2002). Parents, suing for their own injuries, are not even eligible to file a petition before the vaccine court. *Id.*; 42 U.S.C. § 300aa-11(a)(9).

The court finds that plaintiffs may have viable claims for fraud, conspiracy, loss of services of the child and AEMLD. Therefore, defendants' motions to dismiss those claims are **DENIED**. Plaintiffs' claim for negligence/wantonness merges into the claim for AEMLD as both are premised upon the same underlying allegations and theory. *Spain v. Brown & Williamson Tobacco Corp.*, 230 F.3d 1300, 1310 (11th Cir. 2000). In essence, under the facts here, plaintiffs' claim for negligence/wantonness is the same as that for AEMLD. *Id.* Defendants' motions as to plaintiffs' claim for negligence/wantonness are **GRANTED** and the claim is **DISMISSED WITH PREJUDICE**.

Plaintiffs' claim for loss of consortium is dismissed by this court as no cause of action exists under Alabama law for that type of claim. The Alabama Supreme Court has specifically found that the "loss of the society of a child...cannot form the element of recoverable damages." *Hannon v. Duncan*, 594 So.2d 85, 93 (Ala. 1992). Defendants' motions as to plaintiffs' claim for loss of consortium are **GRANTED** and that claim is **DISMISSED WITH PREJUDICE**.

A parent's claim for loss of services is derivative of the child's claim for personal

injury under Alabama law. *Owens v. Lucas*, 604 So.2d 389 (Ala. 1992).   As this is a

derivative claim, it may not proceed at this juncture because Daniel Carr's injury is

currently being adjudicated in the Vaccine Court.  Upon the disposition of the child's

claim, the parents' claim for loss of services may proceed.

Additionally, plaintiffs may not recover any damages for their child's medical

expenses resulting from the alleged injuries from the vaccine.  Plaintiffs cannot make a

double recovery for damages.  Daniel Carr has already made a claim before the Vaccine

Court for his medical expenses.  Daniel Carr may file a civil action following the

adjudication of his claims in Vaccine Court if he is unsatisfied with any recovery

obtained.  Plaintiffs' attempt to recover medical expenses through this action is nothing

more than an attempt to circumvent the bar put in place by the Vaccine Act requiring a

child to first seek recovery from the Vaccine Court for injuries related to a vaccine.

However, it is this court's opinion, that the plaintiffs' remaining claims before this

court are due to be stayed.  "[T]he power to stay proceedings is incidental to the power

inherent in every court to control the disposition of the causes on its docket with economy

of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*,

299 U.S. 248, 254, 57 S.Ct. 163, 166 (1936).  However, the court's power to stay an

action should not be abused and any stay should be narrowly tailored so as not to unduly

prejudice the parties. *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc.*, 761 F.2d 198,

203 n.6 (5th Cir. 1985).

4

There are several factors which support the imposition of a stay in this action. In order to recover on their claims, plaintiffs must establish that defendants caused the injuries sustained by their son. The general issue of whether thimerosal causes autism-like disorders is currently pending before the vaccine court. Autism General Order #1, United States Court of Federal Claims, Office of Special Masters, July 3, 2002. If it is found to cause autism or autism-like disorders, it will then be determined if this conclusion can be applied to individual cases before the Vaccine Court, including Daniel Carr's. *Id.* at 3. To reach this conclusion, a number of experts will be retained. In essence, the parties will be required "to conduct a parallel inquiry, on a different timetable, to determine plaintiffs' right to recover." *Case v. Merck & Company*, CV-02-1779, 2003 U.S. Dist. Lexis 770 (E.D. La. Jan. 17, 2003). This would be duplicative, wasteful and inefficient.

Finally, this court notes that the evidence does not demonstrate that a stay of limited duration will cause undue prejudice to the plaintiffs in this action. Therefore, a stay in this action is due to be granted in the interest of justice. In analogous situations to that present before this court, other courts have similarly ordered the implementation of stays. *Case v. Merck, et al.*, No. 02-1779, 2003 U.S. Dist. Lexis 770 (E.D. La. Jan. 17, 2003); *Russak v. Aventis Pasteur*, No. A-02-CA-480-SS, at 8 (W.D. Tex. Sept. 9, 2002); *Owens v. American Home Products Corporation*, No. G-02-185, at 1 (S.D. Tex. July 12, 2002).

5

Based upon the foregoing rationale, defendants' motion to stay is **GRANTED**. It is further **ORDERED** that plaintiffs shall file a status report with this court every six months from the date of this order informing the court of the status of Daniel Carr's petition in the vaccine court. This action is **STAYED** pending the outcome of the Vaccine Court proceedings.

**DONE** and **ORDERED** this the ___27___ day of February, 2003.


Inge P. Johnson
U.S. District Judge

6

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| ALAN J. CHESKIEWICZ, ET AL. | : | MAY TERM, 2002<br>NO. 0952 |
| VS. | : | |
| AVENTIS PASTEUR, INC., ET AL. | : | CONTROL NO. 100957 |

## MEMORANDUM OF LAW

BY: HON. VICTOR J. DiNUBILE, JR.

The issue presented in this case is whether plaintiffs' cause of action must be discontinued because of failure to exhaust remedies provided to the plaintiff under the National Childhood Vaccine Injury Act, 42 U.S.C. Secs. 300 aa-1 to 300 aa-34 (1994 & Supp. V 1999) (hereinafter referred to as the "Vaccine Act" or "Act"). This Court agrees with the defendants. Consequently, this case is Dismissed and Discontinued.

The parents of minor plaintiff primarily assert products liability claims against various drug companies for injuries arising from mercury poisoning from certain vaccines administered to him during the first 18 months of his life (May, 1994 – December, 1995). Plaintiffs' Complaint maintains that the substance Thimerosal, used as a preservative in these vaccines, contained mercury which caused an adverse reaction and injury to their son. It is not in dispute that the vaccines used by the minor child in this case come within the purview of the Vaccine Act. The Vaccine Act, enacted by Congress, provides that all such causes of action resulting in harm from the use of certain enumerated vaccines must initially be brought before a specially constituted court of the United States Court of Federal Claims (hereinafter referred to as Vaccine Court).

The Act unequivocally provides that parties must first exhaust their remedies under this Act before commencing suit in either state or federal court. The Act further directs the state or federal courts to dismiss actions not first pursued under the Vaccine Act. The Act, however, provides an exception to the exhaustion requirement where the vaccine(s) in question contained a "contaminant" or "adulterant".

Plaintiffs maintain suit is proper here under the exception because the preservative Thimerosal constitutes a contaminant or adulterant. This Court disagrees. All the case law contradicts the plaintiffs' position. This Court adopts the well-reasoned opinions of the Vaccine Court and federal district courts that the preservative Thimerosal, contained in the vaccines, is not a contaminant or an adulterant. Leroy v. Secretary of Department of Health and Human Services, No. 02-392V, 2002 WL 31730680 (Fed. Cl. Spec. Mstr. October 11, 2002); Blackmon v. American Home Products Corp., No. 6-02-179, slip op. (S.D. Tex. May 8, 2002); Owens v. American Home Products Corp., 203 F.Supp. 2d 748 (S.D. Tex. May 7, 2002); O'Connell v. American Home Products Corp., No. 6-02-184, slip op. (S.D. Tex. May 7, 2002). The purpose of the Act is to provide a uniform federal no-fault system with consistent venue to adjudicate claims of persons seeking redress for injuries stemming from adverse reactions from the use of the enumerated vaccines. The contaminant/adulteration exception would apply if some foreign substance, not ordinarily contained in the vaccine, found its way into the drug causing harm. But where the harm arises from an allergic reaction to non-foreign substances contained in the vaccine itself, the claim should first be heard in Vaccine Court. The above cited federal authorities, after an analysis of the purpose of the Act coupled with a medical/general dictionary review of the words "contaminant" and "adulterant", concluded that the Thimerosal preservative is not

encompassed in the exception since it is a component of the vaccine. This Court agrees with their rationale.

The plaintiffs also contend that in any event, even if the Court should agree with the federal authorities that the exception does not apply, plaintiff still can maintain the suit in state court because they do not "qualify" as litigants under the Act. The Act requires that all actions must be commenced by litigants within 36 months of the time in which adverse symptoms first occur. The symptoms first manifested themselves in the minor plaintiff in December of 1995. Since no action was ever brought in Vaccine Court, plaintiffs argue the Act does not apply to them and therefore can maintain the within suit in state court. This Court respectfully disagrees. One cannot simply wait out the three year limitations provision and then file a civil tort action free from all substantive and procedural limitations under the Vaccine Act. It is clear that plaintiffs' attempts to commence this suit in district court and subsequently this Court are to circumvent the requirements of the Act. If the instant suit were permitted, then every litigant who did not want to first assert claims in Vaccine Court simply could wait out the 36 month requirement if the tort actions were not barred by the statute of limitations and then commence their actions in federal or state courts. Such an approach is counter to the intent of Congress. See McDonald v. Lederle Labs, 775 A.2d 528, 532 (N.J. Super. Ct. App. Div. 2001) (affirming the lower court's dismissal of the suit under circumstances similar to the instant case).

Plaintiffs also maintain that the requirement of first having to commence an action in the Vaccine Court is unconstitutional. No authority is cited in support of this proposition. The Vaccine Act does not preclude the bringing of a suit in federal or state Courts. It merely provides that suit must first be maintained in the special Court. If the litigant exhausts remedies there and

3

is dissatisfied with the results, then the Act does not preclude subsequent tort actions being brought in federal or state Courts[1]. Weighing the purpose of the Act to have claims quickly, expeditiously and consistently resolved on a no-fault basis by first requiring litigants to proceed in Vaccine Court, certainly does not constitute such an onerous burden as to render the Act unconstitutional.

> The preclusive application of the Act, which prevents plaintiff in her representative capacity from pursing a civil action does not represent an "absurd or unjust result," that would permit us from disregarding its plain language. *United States v. Shriver*, 989 F.2d 898, 901 (7th Cir.1993). It is, instead, consistent with the stated purpose of avoiding the public harm that would result from either a loss or decline in the production of necessary vaccines. Simply put, Congress wants victims to first try the Program with the expectation that its results will be accepted. Unless a petitioner is required to fully adjudicate a claim, pursuant to the Program's expedited procedures, Congress's objectives will not be realized. McDonald v. Lederle Labs, supra., 775 A.2d 528, 534-535.

Consequently, this case is dismissed/discontinued pursuant to the provisions of the Vaccine Act.[2]

BY THE COURT:

DATED: December 16, 2002

_____
DiNUBILE, JR., J.

---

[1] The Act provides the tolling of the statute of limitations during the pendency of the action before the Vaccine Court.

[2] Plaintiffs also argue that they as parents do not qualify under the Act since they seek medical expenses on their own behalf. They assert that this action for medical bills is not covered under the Vaccine Act. To the contrary, the Act permits reimbursement for medical bills incurred by or on behalf of a minor.

4

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CIVIL TRIAL DIVISION

ALAN J. CHESKIEWICZ, ET AL.          :          MAY TERM, 2002
                                                NO. 0952

          VS.                        :

AVENTIS PASTEUR, INC., ET AL.        :          CONTROL NO. 100957

## O R D E R

AND NOW, this 16th day of December, 2002, the Defendants' Preliminary Objections are

Sustained. This case is Discontinued pursuant to the dictates of the National Childhood Vaccine

Injury Act.

BY THE COURT:

_____

DiNUBILE, JR., J.

l of 4 DOCUMENTS

**RANDALL BLOCK, Plaintiff, v. WYETH, INC., et al., Defendants.**

Civil Action No. 3:02–CV–1077–N

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

*2003 U.S. Dist. LEXIS 1169; CCH Prod. Liab. Rep. P16,525*

**January 28, 2003, Decided**
**January 28, 2003, Filed; January 28, 2003, Entered**

**DISPOSITION:** [*1] Defendant Wyeth's motion to dismiss for failure to state claim granted. Plaintiff's claims against Wyeth dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff consumer sued defendant manufacturer of a drug, alleging that the manufacturer was liable in tort for the consumer's injuries resulting from ingestion of a generic form of the drug which used the manufacturer's inadequate package labeling and product description. The manufacturer moved to dismiss the complaint for failure to state a claim.

**OVERVIEW:** The consumer contended that the name brand drug manufacturer owed a legal duty to insure that the product labeling and description formulated for its drug was adequate, since the labeling and description could lawfully be used with the generic equivalent ingested by the consumer, and the injury to the consumer from ingestion of the generic drug was a foreseeable consequence of the manufacturer's inadequate warnings. The court held that, under state law, the manufacturer did not have a duty to warn or instruct the consumer about the generic equivalent manufactured by another, and the rule was not limited to strict liability claims but also applied to other tort claims.

**OUTCOME:** The manufacturer's motion to dismiss was granted.

**LexisNexis (TM) HEADNOTES– Core Concepts:**

**COUNSEL:** For RANDALL BLOCK, plaintiff: C Andrew Waters, Melissa Casey Katz, Attorney at Law, Waters & Kraus, Dallas, TX USA.

For RANDALL BLOCK, plaintiff: Ralph D Pittle,

Attorney at Law, Medical Legal Consultants of Washington, Bellevue, WA USA.

For ALPHARMA INC, PUREPAC PHARMACEUTICAL CO, defendants: George Gore, Attorney at Law, Janet Gore, Attorney at Law, Arter & Hadden, Cleveland, OH USA.

For ALPHARMA INC, PUREPAC PHARMACEUTICAL CO, defendants: Aimee Perilloux Fagan, Attorney at Law, Arter & Hadden, Dallas, TX USA.

For **WYETH** INC, defendant: Michael R Klatt, Attorney at Law, Kelly R Kimbrough, Attorney at Law, Clark Thomas & Winters, Austin, TX USA.

**JUDGES:** David C. Godbey, United States District Judge.

**OPINIONBY:** David C. Godbey

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

Before the Court is the motion to dismiss for failure to state a claim of defendant Wyeth, formerly known as American Home Products, individually and as successor in interest to A.H. Robins Company ("Wyeth"). For the reasons stated below, that motion is granted.

Wyeth developed Reglan, [*2] a brand name of the drug metoclompramide, and obtained FDA approval for its sale. In conjunction with that process, Wyeth developed package labeling and a product description for inclusion in the *Physician's Desk Reference*, a reference book commonly used by physicians as a source of information regarding medications. Other vendors subsequently manufactured and sold generic forms of metoclompramide, copying the labeling **Wyeth** formulated for Reglan, pur-

Case 1:03-cv-00222   Document 11   Filed in TXSD on 12/15/2003   Page 186 of 187
Page 2

2003 U.S. Dist. LEXIS 1169, *2; CCH Prod. Liab. Rep. P16,525

suant to *21 U.S.C. § 355(j)(2)(A)(v)*. n1 Plaintiff **Block** alleges that the labeling and PDR description **Wyeth** formulated were inadequate; as a consequence of that inadequacy, **Block** took generic metoclopramide, *not manufactured by Wyeth*, and was injured. **Block** alleges that his injury was a foreseeable consequence of **Wyeth's** inadequate warnings. Although **Block** now concedes he has no strict liability claim against **Wyeth**, he argues that **Wyeth** nonetheless can be held liable for its conduct in creating the labeling and description, if not its product, under theories of negligence, negligent misrepresentation, fraud, conspiracy, and malice.

> n1 A manufacturer of a generic drug may alter a drug's labeling "to add or strengthen a contraindication, warning, precaution or adverse reaction" or "to delete false, misleading or unsupported indications for use or claims for effectiveness" without prior FDA approval. *21 C.F.R. §§ 314.70(c)(2), 314.97.*

**[*3]**

The question before the Court is whether a name brand drug manufacturer owes a legal duty to consumers of a generic equivalent arising out of the content of product labeling and descriptions formulated for the name brand drug. In determining that question, this Court applies Texas law, and absent clear precedent must make an "*Erie* guess" as to how the Texas Supreme Court would decide the issue. *Herrmann Holdings, Ltd. v. Lucent Technologies Inc., 302 F.3d 552, 558 (5th Cir. 2002)*. The existence of a legal duty is a question of law for the Court. *Seagram & Sons, Inc. v. McGuire, 814 S.W.2d 385, 387, 34 Tex. Sup. Ct. J. 564 (Tex. 1991)*.

In the context of strict liability, the Texas Supreme Court has stated: "A manufacturer does not have a duty to warn or instruct about another manufacturer's products, though those products might be used in connection with the manufacturer's own products." *Firestone Steel Products Co v. Barajas, 927 S.W.2d 608, 616, 39 Tex. Sup. Ct. J. 848 (Tex. 1996)*. Block attempts to limit the holding in *Barajas* to strict liability, but the case is not so limited; the plaintiff in *Barajas* also brought negligence and conspiracy claims. In rejecting the **[*4]** negligence claims, the Texas Supreme Court stated: "Firestone conclusively showed it did not design, manufacture or sell the wheel in question. Accordingly, *Firestone owed no duty to the Barajases.*" *Id. at 615* (emphasis added). Likewise, in rejecting the conspiracy claim, the court stated: "Firestone proved it had no duty to the Barajases. Accordingly, Firestone negated the Barajases' civil conspiracy claim as a matter of law." *Id. at 617.*

It thus appears that *Barajas* directly controls Block's negligence, negligent misrepresentation and conspiracy claims. Although the opinion in *Barajas* did not directly address fraud and "malice," the structure of the analysis strongly suggests how the Texas Supreme Court would address those theories. The quoted portions above reflect a brief Texas two-step analysis: (1) because Firestone did not design, manufacture, or sell the product, it owed no legal duty to plaintiff; and (2) because it owed no legal duty, plaintiff's tort claim failed. There is no indication from the discussion of negligence and conspiracy that the two-step analysis would be any different for any other common law tort theory.

This reading **[*5]** of *Barajas* is reinforced by the dissent. Justice Enoch, concurring in part and dissenting in part, argued that Firestone's liability in its capacity as a designer sounding in negligence was different from its liability as a manufacturer sounding in strict liability.

> *Alm* recognized a duty of non-manufacturing designers to exercise ordinary care in the design of a product. This duty is not dependent on whether Firestone placed the injury-causing product into the stream of commerce, but rather derives from Firestone's actions as designer. The duty should be the same whether the designer designed the entire product or a component part alleged to have been the cause of injury. Because Firestone designed *the* feature of the wheel alleged to have caused the tire explosion . . . Firestone owed a duty of ordinary care in its design.

> The fact that Firestone's design has become an industry standard does not militate against a duty. Liability should not be more limited the more widely adopted a design is by an industry. To the contrary, a designer who offers up its design for a product through a royalty-free license in the hopes of gaining widespread adoption of the design **[*6]** in the industry militates in favor of a duty.

*Id. at 619* (emphasis in original, citing *Alm v. Aluminum Co. of America, 717 S.W.2d 588, 29 Tex. Sup. Ct. J. 471 (Tex. 1986)*). The wheel design in *Barajas* serves a role roughly analogous to the content of the warnings in Block's theory here. Justice Enoch was thus advocating essentially the same position that Block urges this Court to adopt, distinguishing the conduct from the product; the Texas Supreme Court rejected that position, 8-1. This Court believes the Texas Supreme Court would likewise reject Block's claims.

2003 U.S. Dist. LEXIS 1169, *6; CCH Prod. Liab. Rep. P16,525

This view in strengthened by what appears to be the only case directly addressing claims like those Block asserts. *Foster v. American Home Products Corp. 29 F.3d 165 (4th Cir. 1994).* Applying Maryland law, the Fourth Circuit held that a manufacturer of a name brand drug does not owe a legal duty to a consumer of a generic drug. There is no indication in the opinion that there was anything unusual or unique about Maryland common law that lead to that result. There is also no indication that the Texas Supreme Court would reach a different result.

Block invites this Court to extend Texas [*7] tort law into new and uncharted territory. This Court believes the Texas Supreme Court would decline such an invitation and must therefore do likewise. Accordingly, **Wyeth's** motion to dismiss for failure to state a claim upon which relief can be granted is GRANTED and **Block's** claims against **Wyeth** are DISMISSED WITH PREJUDICE.

SIGNED this 28 day of January, 2003.

David C. Godbey

United States District Judge